# 21-2098-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



UNITED STATES OF AMERICA,

*Appellee,*

*v.*

JORDAN TAYLOR,

*Defendant,*

*and*

LORENZO MCCOY,

*Defendant-Appellant.*

———————————

*On Appeal from the United States District Court
for the Southern District of New York*

## APPENDIX
## VOLUME II OF II
## Pages A155 to A336

PETER J. TOMAO, ESQ.
*Attorney for Defendant-Appellant*
600 Old Country Road, Suite 328
Garden City, New York 11530
516-877-7015

## **Table of Contents**

**Page**

### **Volume I**

District Court Docket Entries ................................................................. A1

Complaint, sworn to April 11, 2019 ...................................................... A23

Transcript of Conference held before the
     Honorable Paul E. Davison on April 11, 2019 ............................... A28

Transcript of Conference held before the
     Honorable Paul E. Davison on August 28, 2019 ........................... A50

Transcript of Conference held before the
     Honorable Paul E. Davison on October 31, 2019 .......................... A59

Transcript of Conference held before the
     Honorable Vincent L. Briccetti on December 9, 2019 .................. A68

Transcript of Conference held before the
     Honorable Vincent L. Briccetti on January 22, 2020 .................... A76

Transcript of Conference held before the
     Honorable Vincent L. Briccetti on April 24, 2020 ........................ A84

Transcript of Conference held before the
     Honorable Vincent L. Briccetti on September 10, 2020 ............... A102

Transcript of Conference held before the
     Honorable Vincent L. Briccetti on October 23, 2020 ................... A113

Transcript of Conference held before the
     Honorable Vincent L. Briccetti on November 13, 2020 ............... A126

### **Volume II**

Transcript of Conference held before the
     Honorable Vincent L. Briccetti on February 24, 2021 ................. A155

**Table of Contents**
**(Continued)**

**Page**

Order of the Honorable Vincent L. Briccetti,
 dated February 25, 2021 ................................................................. A213

Letter from Nicholas S. Bradley to Bruce Koffsky,
 dated March 23, 2021 ................................................................. A214

Superseding Information, filed March 25, 2021 .................................. A218

Transcript of Plea held before the
 Honorable Vincent L. Briccetti on March 25, 2021 ...................... A223

Transcript of Proceedings held before the
 Honorable Vincent L. Briccetti on August 19, 2021 ..................... A273

Order of Restitution of the Honorable Vincent L. Briccetti,
 dated August 19, 2021 ................................................................. A321

Judgment of the United States District Court, Southern District
 of New York, entered August 20, 2021, Appealed From .............. A324

Notice of Appeal, filed August 26, 2021,
 with Cover Letter and Envelope ................................................... A331

Order of the Honorable Vincent L. Briccetti,
 dated October 5, 2021 ................................................................. A335

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   UNITED STATES of AMERICA,

 4          -against-                    19cr549
                                         Conference
 5
     LORENZO McCOY,
 6
                         Defendant.
 7
     ------------------------------------x
 8

 9                                  United States Courthouse
                                     White Plains, New York
10
                                    February 24, 2021
11

12

13   B e f o r e:

14             THE HONORABLE VINCENT BRICCETTI,
                              District Court Judge
15

16

17

18   A P P E A R A N C E S:

19

     Audrey Strauss
20        United States Attorney for
          the Southern District of New York
21   BY:  NICHOLAS S. BRADLEY
          Assistant United States Attorney
22

23   KOFFSKY & FELSON LLC
          Attorneys for Defendant
24   BY:  BRUCE D. KOFFSKY

25
                         PAMELA GRIMALDI, CRR, CLR
                              914.390.4053
```

 1          THE DEPUTY CLERK:  United States of America against

 2   Lorenzo McCoy.  Would counsel please note their appearance for

 3   the record.

 4          MR. BRADLEY:  Good afternoon, your Honor.  Nicholas

 5   Bradley for the government.

 6          MR. KOFFSKY:  Good afternoon, your Honor.  Attorney

 7   Bruce Koffsky, appointed counsel for Mr. Lorenzo McCoy.

 8   Mr. McCoy stands to my right in the plaid shirt.  Your Honor's

 9   left -- no.  I guess straight ahead.

10          THE COURT:  Got it.

11          Welcome, everybody.  Have a seat.

12          I'll also note that Mr. Barrios is here from Pretrial

13   Services, and it looks like Mr. McCoy's parents are here as

14   well.  Welcome.  Thank you for coming.

15          All right.  I received a letter on February 15, I

16   think -- yep, February 15 -- from Mr. Koffsky talking about a

17   number of things.  But the most important thing in that letter

18   was that he was seeking a hearing with respect to the

19   defendant's competency.

20          Of course, I'll note that we have a trial date in

21   this case scheduled for April 12, which is about six weeks from

22   now, so that's in the pretty near future.  It's in the near

23   future.  Let me correct myself.

24          The government then wrote me a letter, Ms. Keenan --

25          I guess she's on this case as well, Mr. Bradley?

1        MR. BRADLEY:  That's correct, your Honor.

2        THE COURT:  I got a letter from Ms. Keenan -- well,

3   signed by her, but it's from her and Mr. Bradley the next day,

4   and you asked for a conference to discuss the matters raised in

5   Mr. Koffsky's letter, which I granted.  You also asked that the

6   Court require defense counsel to turn over copies of the two --

7   the two psychological assessments that were referred to in

8   Mr. Koffsky's letter.

9        So I issued an order scheduling today's conference.

10  I said that it would be in person.  I think this is important

11  for this one to be in person, even though we're not disposing

12  of the case today.  At least I don't think so.  And I directed

13  the lawyers for both sides to confer and attempt to agree upon

14  a qualified psychologist or psychiatrist to conduct the

15  examination that I might order -- I'm not saying I'm ordering

16  it yet, but that I might order -- in connection with the

17  competency hearing.  And I also said that the two evaluations

18  referred to in Mr. Koffsky's letter would -- should be turned

19  over to the government, or I gave Mr. Koffsky the opportunity

20  to explain to me why he should not have to do so.

21       I don't think I got a letter from you, but I think I

22  got an email or a communication with my deputy, Mr. Koffsky,

23  saying that you had turned over both evaluations to the

24  government; is that right?

25       MR. KOFFSKY:  That's correct, your Honor.  I

PAMELA GRIMALDI, CRR, CLR
914.390.4053

1    apologize if I didn't send a cover letter in.  But I did

2    immediately respond to chambers via email and made both copies

3    available to the government.

4                    THE COURT:  All right.  Fair enough.  So you have

5    both of these evaluations, Mr. Bradley?

6                    MR. BRADLEY:  Yes, your Honor.

7                    THE COURT:  So we're all dealing with the same set of

8    materials at this point?

9                    MR. BRADLEY:  Correct, your Honor.

10                    THE COURT:  I want to hear what both of you have to

11   say about this and what, if anything, you've done between

12   February 15 and today.  But let me just sort of quickly review

13   what I understand the law that applies here and, you know, what

14   the issues are that we need to address.

15                    First of all, and this is pretty basic, due process

16   requires that in order to stand trial, the defendant has to be

17   competent.  And then, of course, there's a lot of law about

18   what that means.  And if I can just summarize quickly, a

19   defendant is not competent when his mental condition is such

20   that he lacks the capacity to understand the nature and object

21   of the proceedings against him.  So lacks the capacity to

22   understand the nature and object of the proceedings, i.e., that

23   this is a criminal case in which the prosecution is attempting

24   to convict him of a crime and ultimately, perhaps, send him to

25   jail.  That's the nature and object of the proceedings.

1        Secondly, to consult with counsel.  In other words,

2    the question is, does the defendant have the capacity to

3    consult with counsel?  And third, to assist counsel in

4    preparing his defense.  And I'll just cite to one 2nd Circuit

5    case on this which is U.S. against Kerr, K-E-R-R, 752 F.3d 206,

6    which is a 2nd Circuit case from 2013.  But this is settled

7    law.  None of this is up in the air.  What's up in the air is

8    facts, not the law.

9        Now, under § 4241(a) of Title 18, the Court must

10   order a hearing on the defendant's motion or on the Court's own

11   motion.  I don't even need a motion from the defendant, but I

12   can do it on my own motion, to determine the competency of the

13   defendant, quote, If there is reasonable cause -- that's the

14   key phrase -- is reasonable cause to believe that the defendant

15   may presently be suffering from a mental disease or -- disease

16   or defect rendering him mentally incompetent.  So is there

17   reasonable cause to believe that the defendant may be suffering

18   from a mental disease or defect rendering him mentally

19   incompetent under that standard that I just recited a moment

20   ago.

21       To aid in the assessment of whether the defendant is

22   mentally competent, I have the authority to order a psychiatric

23   or psychological examination.  That's under § 4241(b), as in

24   boy.  I'm not required to order such an examination, but I have

25   the authority to do that if I believe there's reasonable cause

**A160**

1    to do so.  And if I do order such an examination, I'm required

2    to also order that the report of the examination be filed with

3    the Court prior to the date of the competency hearing.

4            If we had a competency hearing, it would be conducted

5    in accordance with 18 United States Code § 4247(d), as in

6    David.  And if at the hearing I were to find that the defendant

7    was mentally incompetent, I would be required to commit him

8    into the custody of the Attorney General to be hospitalized for

9    treatment in a suitable facility for up to four months to

10   determine whether there is a substantial probability that in

11   the foreseeable future he will obtain the capacity to permit

12   the case to go forward, in other words, if he improves well

13   enough to no longer be mentally incompetent.  And if so -- in

14   other words, if I put him in for four moments to determine

15   whether there's a substantial probability that in the

16   foreseeable future he will attain the capacity to permit the

17   case to go forward -- and if that's the case, I could continue

18   that in-custody status for a reasonable period of time until

19   his mental condition is so improved that the trial may proceed.

20           So there's several steps here, right?  So the first

21   step is do I think there's reasonable cause to believe that the

22   defendant may presently be suffering from a mental disease or

23   defect, et cetera.  The second step is the ordering of an

24   evaluation, and that could be done in custody or out of

25   custody; it's not required to be in or out but it could be done

1   either way.  The third step is that once I get that report,

2   we'd have a hearing, and there's certain procedural aspects of

3   that hearing which are set forth in the statute.  And then the

4   next thing would be to decide whether or not the defendant was

5   mentally incompetent.  If he was mentally competent, then

6   obviously the case would go forward.  But if he was found to be

7   mentally incompetent, then I would be required -- and this is

8   not -- my reading of the statute doesn't give me any discretion

9   in this regard.

10          If I found him to be mentally incompetent, I would be

11  required to order him to the custody of the Attorney General to

12  be hospitalized for treatment for a period of time to see

13  whether there was a substantial probability that he would

14  get -- he would improve, his mental status would improve enough

15  so that he would become competent.  And after that period of

16  time, no more than four months, I could also order him to

17  remain in custody for a reasonable period of time until his

18  mental condition is so improved so that the trial may proceed.

19          So there's a whole series of steps here.  We're

20  obviously at the very beginning of it because Mr. Koffsky made

21  this motion and I have it and the government has it.  So I just

22  wanted to put that sort of on the record to make sure we're

23  all -- we all understand what the rules are.

24          I have referred -- excuse me.  I have reviewed both

25  of the evaluations that were referred to in Mr. Koffsky's

1    letter, one was dated -- one is dated August 3, 2020, and it

2    was an evaluation conducted by Dr. Michelle Casarella, which

3    was conducted at the request of Mr. Koffsky.  He asked me for

4    authority under the Criminal Justice Act to retain

5    Dr. Casarella to do that evaluation, and I approved that back

6    in -- well, last summer sometime, maybe even earlier than that.

7    I don't remember when it was, but it was quite a while ago.  It

8    wasn't recent.  And I approved that, and she issued that

9    detailed report which is dated August 3, 2020.  And then

10   there's a separate evaluation, which is less detailed, but it's

11   a November 18, 2020 evaluation by a nurse practitioner named

12   Jacques Lucien, L-U-C-I-E-N, of the Westchester Jewish

13   Community Services where the defendant has been in treatment

14   since June of 2019.

15          And I'll note for the record that neither of these

16   evaluations concludes that Mr. McCoy is incompetent to stand

17   trial.  Of course, neither of them were asked to do that.

18   These are not forensic evaluations.  They were -- as such, they

19   were really just mental status evaluations and just trying to,

20   in the first instance, give Mr. Koffsky a sense of what, if

21   any, psychological issues his client suffers from.  But I don't

22   think Dr. Casarella was asked to opine as to whether Mr. McCoy

23   was competent to stand trial or not.  In any event, she doesn't

24   say that he's not competent, but she doesn't say that he is

25   competent either.  I think it's silent on that one way or the

```
 1   other.

 2          And then the other -- well, let me just say that the

 3   Casarella report says that he has -- Mr. McCoy, that is -- has

 4   limited intellectual functioning, which is his biggest problem,

 5   also that he suffers from complex posttraumatic stress disorder

 6   and a number of related symptoms.  One of the comments that

 7   jumped out to me from Dr. Casarella's report was her finding

 8   that Mr. McCoy functions at a much younger level than his

 9   chronological age, which I believe is 22.

10          Is that his current age, Mr. Koffsky?

11          MR. KOFFSKY:  That's correct, your Honor.

12          THE COURT:  Functions at a much younger level than

13   his chronological age --

14               (Woman in gallery spoke out.)

15          THE COURT:  Find out what his age was Mr. Koffsky,

16   will you please.

17          MR. KOFFSKY:  He was born June 4, 1999.  I guess

18   which means that on June 4, 2021 he'll be 22.

19          THE COURT:  All right.  So he's 21.  Fair enough.

20          MR. KOFFSKY:  He's 21 now.

21          THE COURT:  That's not the most important point now.

22   The important point is whether he's 21 or 22 -- turns out he's

23   21 -- he -- according to Dr. Casarella, anyway -- I'm not

24   adopting this necessarily; I'm just sort of summarizing what

25   she says.  She says that he functions at a much younger level
```

1   than his chronological age with abilities consistent with a

2   child during adolescence or younger.  And that report also

3   indicates that Mr. McCoy has had at least two psychiatric

4   hospitalizations.  The WJCS evaluation is, as I said, a little

5   bit less detailed, but it does say that Mr. McCoy has a

6   diagnosis of schizoaffective disorder, among other things, and

7   that he suffers from auditory verbal hallucinations, as well as

8   delusions -- I'm not sure if it's auditory and verbal -- but in

9   any event, auditory hallucinations as well as delusions of

10   paranoia and psychosis.  That report says that Mr. McCoy has

11   actually had four prior psychiatric evaluations.

12         So what should we do here?  That's the question.

13         Mr. Koffsky, I'm going to ask you first because

14   you've made this application.

15         MR. KOFFSKY:  Thank your Honor.

16         If I may, I will start out with just a brief

17   historical recitation of my involvement in the case, and the

18   problems I face in attempting to reach a resolution of this

19   matter.

20         I was appointed as successor counsel to another CJA

21   lawyer who appeared to have difficulty in communicating with

22   the defendant, made more difficult by communications with his

23   mother, with the defendant's mother.  When I was appointed by

24   the Court, I met with that other CJA lawyer, and he gave me

25   some early documents that he had received from the defendant's

1    school and some medical providers and indicated to me that

2    there was a psychological -- that the defendant suffered from

3    some psychological defects which made it difficult to

4    communicate with the defendant.  I was appointed by the Court,

5    and along with the attorney for the co-defendant, we attempted

6    on a number of occasions to have the prosecution of both

7    defendants resolved in a manner that didn't require them to

8    plead guilty.

9             In so doing, I collected records going back to when

10   my client was 10 years old.  I thought it might be too

11   theatrical to bring in the Bankers Box of medical documents and

12   school documents I've collected but your Honor should know that

13   I have several thousand pages of medical documents from

14   probably close to a dozen medical facilities which treated the

15   defendant over the years.

16            The request to have the defendant's case resolved in

17   a way that did not include a federal conviction, either through

18   sending it back to the state or resolving it with a deferred

19   prosecution agreement, took a long time.  I reviewed all the

20   records.  I digested all the records.  And with the help of

21   your Honor, I received a psychological evaluation from

22   Dr. Casarella.  And as the Court points out, it wasn't for the

23   purposes of determining competence; it was for advising me on

24   how to communicate with the defendant, whether I could

25   communicate with him as to pleading guilty or not guilty, but

1   most importantly in getting the information to share with the

2   government in an effort to resolve the case in a manner that

3   did not include the federal conviction.

4           Both are active -- and as the Court knows, the

5   co-defendant was represented by Jason Ser, a member of the

6   Federal Defenders office.  Both Mr. Ser and I made

7   presentations to the U.S. Attorney's Office here.  It was

8   reviewed by a supervisor.  Much to our chagrin, it wasn't

9   accepted, and the matter -- the case, instead, needed to be

10  resolved with either a trial or a plea.

11          The Court should note that I was appointed in I

12  believe late 2019.  The Court first allowed a -- allowed me to

13  get a psychiatrist, but as a result of some problems with the

14  psychiatrist that the Court allowed me to retain and his desire

15  not to go into a facility because of the pandemic, we -- the

16  Court accepted a second application from me to retain the

17  services of Dr. Casarella who indicated that she could conduct

18  a televisit with the defendant and the defendant's family and

19  would review the voluminous documents that I had in my file.

20          Just so the Court should know, it's my best

21  recollection, and I don't have a copy here, that I prepared a

22  CV of several hundred pages of medical reports, medical

23  records, and educational records that I received and shared

24  them with the government together with a cover letter that

25  outlined the defendant's psychological defects and impairments.

1          Dr. Casarella ultimately got a report to us in August

2     of last year.  And, again, at that point the government wasn't

3     interested in resolving the case without a plea or a trial for

4     federal charges.  The co-defendant decided to resolve his case

5     with a plea and was ultimately sentenced.  It was left to me,

6     your Honor, to communicate with the defendant about the fact

7     that the case was not going to be resolved in a way other than

8     trial or plea, and I attempted to do that.

9          Because of the defendant's functioning, my office and

10    I prepared a PowerPoint presentation of the evidence in the

11    case, arranged for several video communications with the

12    defendant and his mother.  I should say that the defendant,

13    although not always engaged, certainly wasn't resistant to my

14    efforts to educate him on the facts of the case, a trial of the

15    case, the risks attended with a federal prosecution.  My

16    problem was that I couldn't get through the phalanx of his

17    parents in order to communicate with him.  The attempts at

18    communicating, of course, were not done in my office; they were

19    done over a video screen.  They were done mostly through my

20    client's cell phone, I imagine, because it appeared that he

21    only used a cell phone to communicate with me and its video

22    capabilities.  But I have had a number of aborted attempts to

23    communicate with the defendant.

24          If the Court recalls, the last time I wrote to the

25    Court, I indicated that the defendant's parents, particularly

1    his mother, was adamant that the client was never interviewed

2    by Dr. Casarella, and that the report that I had received from

3    her was a figment of my imagination, or a phantasm.  And it

4    didn't matter what I said or read to her.

5              THE COURT:  Mr. McCoy -- I'm sorry, Mr. Koffsky.

6    Okay.  Fine.  You had trouble communicating with your client

7    because of your client's parents.  But let's not focus on the

8    parents so much.  Let's focus on your client.

9              MR. KOFFSKY:  Certainly, your Honor.  I apologize.

10             THE COURT:  You made a motion.  I'm trying to deal

11   with that.

12             MR. KOFFSKY:  Okay.  After receiving Dr. Casarella's

13   report, the parents indicated to me that my client was going to

14   undergo his own evaluation.  At that point, I had nothing in my

15   hands to indicate, other than Dr. Casarella's report and my

16   observation of the defendant, which at least indicated to me

17   that he wasn't incompetent to stand trial.  I indicated that as

18   soon as I received the copy of that new evaluation, I would

19   review it and do what I could with it.

20             Again, in the interim, your Honor, I attempted to get

21   ready for trial.  It's a relatively easy trial to prepare for.

22   It's an isolated incident in time and evidence.  But when I got

23   finally the second evaluation from the family, I decided to

24   share it with the Court because, your Honor, I have no

25   psychological background.  I didn't take any classes in

1    psychology.  I didn't major in sociology [verbatim].  I don't

2    have a medical background.  And I wasn't in the best position

3    to decide whether there was, in fact, reasonable cause to

4    believe of my client's inability to assist in his own defense

5    or appreciation of the wrongfulness of his conduct.

6              And so I apologize for putting it in the Court's lap.

7    But based upon those two evaluations, I filed an application to

8    have the defendant evaluated for competency.

9              THE COURT:  Don't apologize for anything.  This is my

10   job.  They pay me to do this, so you don't have to apologize.

11   I just want to figure out what to do, what the right thing to

12   do is.  By the way, the fact that you -- and this applies to me

13   as well -- do not have training in psychology or psychiatry, I

14   do know that having practiced law for many years, I kind of

15   functioned as a psychiatrist for many clients over the years,

16   or at least a therapist.  I'm not trained in it either.  But

17   the question is can the defendant -- does he understand what's

18   happening?  Does he understand that he's charged with a crime?

19   Does he understand that he could go to jail?  Can he

20   communicate with his lawyer?  Can he help his lawyer?  You

21   know, actually, you're in the best possible position to answer

22   those questions.

23             Of course, the law permits me to, you know, order a

24   formal forensic evaluation here.  But the fact that you don't

25   have training in that area, that doesn't prevent you from

1    telling me what you think about your client's competence,

2    because you're the one who is dealing with him, or not dealing

3    with him, as the case may be, depending on the parents'

4    interference.

5           MR. KOFFSKY:  Judge --

6           THE COURT:  I also -- don't get me wrong.  I'm not

7    saying you're wrong about that.  It's very troubling to me.

8    It's incredibly stupid, to be blunt about it, because I can say

9    this -- and I'm glad you're here, Mr. and Mrs. McCoy.  I don't

10   know what's going to happen to your son.  I know you love your

11   son and want the best for him.  That part I know.  But I don't

12   know what's going to happen to him.

13          What I do know is this:  That if you don't cooperate,

14   if you don't allow your son to communicate with your son's

15   lawyer, who is a highly competent, highly experienced lawyer

16   with a great reputation in this court and with me personally,

17   if you don't do that, you are guaranteeing a bad outcome for

18   your client -- for your son.  So that would be a good reason

19   not to do that, right?  Because if you interfere, if you don't

20   let him speak to his lawyer -- this is a criminal case.

21   There's only so much control you have over this.  If you don't

22   allow your son to cooperate with your son's lawyer, you are

23   virtually guaranteeing a bad outcome.

24          Now, let's say you do cooperate.  Let's say you do

25   cooperate.  Let's say you do cooperate, which is the smart

PAMELA GRIMALDI, CRR, CLR
914.390.4053

1 thing to do.  That doesn't guarantee that there's going to be a

2 great outcome.  But at least there's a chance that there's

3 going to be a better or favorable outcome as opposed to a zero

4 chance of a favorable outcome.  So please hear me when I say

5 that you're not a party to the case.  Your son is.  I can't

6 really order you to do anything, but I certainly can urge you

7 to do things and recommend you -- recommend that you do certain

8 things.  That I can definitely do.

9    And so I can't tell you -- I can't understate the

10 importance -- sorry.  I can't overstate the importance of not

11 interfering with your son's representation by your son's

12 attorney, Mr. Koffsky.  You're not attorneys.  You don't know.

13 You don't have the training and experience that he does.  You

14 are his parents, so you have a great deal of relevant

15 information, don't get me wrong, and you should be speaking to

16 Mr. Koffsky and you should give him information.  One thing I

17 heard is that for some reason you didn't --

18    MRS. McCOY:  (Inaudible)

19    THE COURT:  Would you please be quiet, ma'am.

20    THE COURT REPORTER:  I can't hear her anyways.

21    THE COURT:  Good.  Because she's not saying anything

22 of use.

23    What you need to do is cooperate with your son's

24 lawyer.  That's it, period.

25    Mr. Koffsky, I'm sorry I interrupted you.

A172

1      MR. KOFFSKY:  That's all right, your Honor.

2           Just to address one thing that the Court said.  In

3  fact, the last trial I had in front of your Honor was a

4  gentleman who had some psychological defects, Mr. Christopher

5  Von Stein, and so I'm well aware of individuals with defects.

6  But I'll just cite the case of *U.S. v. Lorenzo Nichols*, 560

7  F.3d at 403, which talks about the difficulty -- that it was

8  the Court that had to make the decision whether the Defendant's

9  unwillingness to cooperate was volitional rather than due to

10  mental illness and that he was competent to stand trial.

11           So an appellate court or a habeas attorney might

12  decide that I failed in bringing this to the attention of the

13  Court even though we're six, eight weeks before trial, when

14  faced with the information that I have now.

15      THE COURT:  I'm glad you brought it up, Mr. Koffsky.

16  Believe me.  I feel like you're being a little defensive and I

17  don't want you to be.  I don't.  I really don't.  I'm not

18  kidding.  I just want to do what's right; that's all I want to

19  do.

20           So are you saying that I -- I think you are saying,

21  but let me just put a period on the sentence.  Are you saying

22  that the combination of your interactions with your client as

23  well as the two reports that you provided are sufficient to

24  give the Court reasonable cause to believe that the defendant

25  may -- not is, but may -- presently be suffering from a mental

**A173**

19

1    disease or defect rendering him mentally incompetent?  Is that

2    what it boils down to?

3          MR. KOFFSKY:  That's my application, your Honor.

4          THE COURT:  Right.  Which is different from saying he

5    is mentally incompetent.  You're not saying that.  You're just

6    saying that there's reasonable cause to believe that he may be.

7    And the wise thing to do, because it's in your client's

8    interests and because it makes for a better record, frankly, is

9    to get him formally evaluated by someone who would be

10   specifically asked to render an opinion on that ultimate

11   question, which is is he competent to stand trial.  So it has

12   to be a forensic evaluator who understands the legal aspect of

13   this, not just the psychiatric aspect of it.

14         MR. KOFFSKY:  That's right, your Honor.

15         THE COURT:  Mr. Bradley, what do you have to say

16   about all of this?

17         MR. BRADLEY:  Thank you, your Honor.

18         First, I would just like to share that like the

19   Court, like Mr. Koffsky, without any specialized training, you

20   know, the government is simply trying to make sure that

21   everyone here is doing the right thing when a situation like

22   this is raised in court.  And based on the circumstances, your

23   Honor, based on the government's review of the evaluations, the

24   history of this case and its review of the case law, I don't

25   believe that there is reasonable cause for the Court to order

PAMELA GRIMALDI, CRR, CLR
914.390.4053

1   an evaluation under § 4241, and it does not appear to reach the

2   standard under § 4241 for a competency evaluation.

3        I would just note starting, your Honor, as the Court

4   observed, this case began in April 2019.  It was assigned to

5   your Honor in October 2019 with a superseding indictment.  I

6   believe Mr. Koffsky was appointed on Halloween of 2019.  So

7   this case has been around for quite some time, and with a trial

8   on April 12, it does seem rather late in the game for this

9   application.

10       THE COURT:  That's not a good enough reason,

11  Mr. Bradley.  But is -- yes, is it late in the game?  Yes, it

12  is.  But that's just -- okay, fine.  The question is whether

13  the standard is met or not.  That's all -- that's the only --

14  and I'm not going to base that on the fact that it's late in

15  the game, or the fact that -- I mean, I guess your point is why

16  wasn't this application made earlier.

17       Mr. Koffsky got the WJCS -- WJ -- CS, right?  WJCS --

18  evaluation two weeks ago.  That's when he got that.  He got the

19  Casarella evaluation a long time ago, but he got the other one

20  just two weeks ago.  It has been very difficult for him to

21  communicate with his client because of his parents'

22  interference, because his client's parents' interference, which

23  was unwise and it was not in their son's best interests, no

24  question about it, but okay.  What can I do?  I mean, what am I

25  going to do, lock them up?  I can't do that.  Neither can you.

1        So we're just dealing with the set of facts that we

2   have, so let's not worry about the timing of it.  Let's focus

3   on whether I should or should not go down this competency

4   route, which is not -- to be clear, no one has said, certainly

5   not me, no one has said that Mr. McCoy is not competent.  No

6   one's said that.  The question is whether we should get a full

7   evaluation of that to make that decision.  And it may well be

8   that when that's done, that everyone will agree that there's no

9   way for me to conclude that he is not competent to stand trial.

10  I'm not making that ruling yet one way or the other.  And the

11  fact that he hasn't made this application earlier under the

12  circumstances of this case really is of no moment to me.  It

13  really isn't.  So don't even talk about that anymore.

14        But go ahead, tell me anything else that you might

15  have.

16        MR. BRADLEY:  Understood, your Honor.

17        And first let me just say my apologies for attempting

18  to talk over the Court.  That was not my intent.

19        I would -- and the next thing I was going to mention,

20  your Honor, is, of course, *United States v. Kerr*, the Court has

21  a continuing obligation and a continuing responsibility to

22  observe any changes in the defendant's demeanor or condition

23  that may lead to a competency question.  So I certainly agree

24  with the Court that simply the age of the case or why wasn't

25  something raised earlier, that's certainly not grounds for the

1    Court to -- or the motion before the Court to rise or fall.  I

2    very much agree with that, your Honor.

3            I would note, however, that the reasonable cause

4    standard, and I believe the *Kerr* case puts this out well, is

5    that it is a standard that is highly particularized, it's an

6    assessment that varies in every case.  The *Kerr* panel noted

7    that there is no fixed or immutable sign which invariably would

8    indicate whether the Court would need to grant an evaluation

9    one way or another.  But there are factors that the Court may

10   consider.  And I believe that several of those -- well, at

11   least two of those are before the Court at this time.  The

12   first is the defendant's or defense counsel's request, which

13   is, of course, but one factor.  The Court may also consider the

14   evaluations that have been provided by defense counsel in this

15   case, and it may rely on its own observations of the defendant

16   and the defendant's own demeanor, either in person or by

17   telephone, that have occurred over the lifetime of this case.

18           As I looked at the docket before coming in, your

19   Honor, I noted that it appeared that there were -- and, again,

20   in a COVID era, several of these appear to have been telephone

21   conferences, but it appears that we have had, with the

22   defendant's presence, either telephonic or in person, six

23   pretrial conferences in this case over the life of the matter

24   specifically before your Honor.  That doesn't -- not including

25   anything that would have happened before any magistrate judges.

1    And it certainly appears by what Mr. Koffsky said in his letter

2    and before the Court just now that he has had repeated

3    difficulties in communicating with his client.  But as I heard

4    Mr. Koffsky say, he said that he did -- the defendant,

5    Mr. McCoy, was not resistant to any attempts to be educated

6    about the matter or the strength of the government's case or

7    any potential disposition or what might happen at trial in this

8    matter, but rather, the issues that Mr. Koffsky brought to the

9    Court's attention in his ability at least to communicate with

10   his client based on his own observations appear to be grounded

11   primarily in his -- in what he described as the sabotage of the

12   defendant's parents.  And I do believe that is important for

13   the Court to consider.  Certainly that's one factor, and it's

14   not a dispositive factor.  And it's -- another factor would the

15   psychological evaluations before the Court.

16          I would note by contrast, for example, your Honor, in

17   2015 -- and admittedly, this is a summary opinion -- in *United

18   States v. Houston*, 603 Federal Appendix 7 from 2015, the 2nd

19   Circuit --

20          THE COURT:  Give me that cite again, please.

21          MR. BRADLEY:  Yes, your Honor.  That would be 603

22   Federal Appendix 7 is the pin cite.  It's a 2015 summary

23   opinion -- summary order by the 2nd Circuit.

24          THE COURT:  So 603 Federal Appendix what?

25          MR. BRADLEY:  Seven.

1        THE COURT:  Seven.  And what's the name of the case

2   again?

3        MR. BRADLEY:  *United States v. Houston.*

4        It's just an illustrative example, your Honor, of a

5   situation in which the defendant's second appointed counsel in

6   that case asked the District Court to order a competency

7   hearing expressing concerns the defendant would not be able to

8   aid in his own defense, specifically recounting a meeting in

9   which the defendant had engaged and what counsel described as a

10  30- to 35-minute rant which the defense counsel described as

11  almost babbling.

12       I don't believe we've really seen any of those sort

13  of situations or concerns elevated by Mr. Koffsky here, and I

14  think it is important for the Court to note.  It obviously is

15  troubling that Mr. Koffsky has had difficulty communicating

16  with this client through actions of the defendant's parents,

17  but it is not in the government's view a reason to question the

18  defendant's competency.

19       With regard to the reports, your Honor, the Casarella

20  report certainly describes intellectual limitations and a

21  variety of other issues with regard to the defendant's

22  upbringing that certainly appear to be highly relevant factors

23  perhaps under § 3553(a) with regard to the history and

24  characteristics of the defendant.  But I would note, your

25  Honor, that with regard to -- again, I certainly acknowledge

1     that Dr. Casarella was not asked to evaluate the forensic

2     question of competency, but it does appear that in the report

3     the evaluator, Dr. Casarella, noted that the defendant should

4     receive a psychiatric evaluation and would benefit from

5     treatments such as dialectical behavioral therapy and social

6     skills groups, which, again, would suggest more of a

7     therapeutic non -- obviously pharmaceutical would be one aspect

8     of any sort of treatment that Dr. Casarella recommended, but

9     also appears to suggest that the defendant would benefit from

10    certain forms of talk therapy and social skills groups, which

11    does not, at least in the government's view, appear to be

12    indicative of a lack of competency.

13         THE COURT:  Mr. Bradley, let me ask you about this.

14    Honestly, this is the -- and I recognize that I'm

15    cherry-picking.  I accept that, okay.  Because, you know, she

16    wrote a report -- and of course it's not numbered.  I wish

17    people would number whatever -- I don't know how many pages it

18    is.  Let's say it's 10 single-spaced pages.  So I recognize

19    that I'm picking and choosing things out of it, and you just

20    picked something out of it yourself.  But here's the thing

21    that -- this jumps out at me the most.  I said it earlier.

22    This is on -- I don't know what page it is.  It's on the

23    third-to-last page.

24         I've told lawyers, by the way, who submit briefs

25    without page numbers -- I just send it back and say you've got

PAMELA GRIMALDI, CRR, CLR
914.390.4053

1    to do it again, because I'm not reading it.  I shouldn't read

2    this too.  She's not a lawyer, so we'll give her a break.

3         It says, In addition to the pervasive lifelong

4    traumatic experiences of an interpersonal nature.  Stop right

5    there.  That's pretty bad.  And I agree, that sounds

6    3553(a)-ish.  But then it goes on to say, Mr. McCoy is further

7    debilitated by both biological and genetic components.

8         "Biological and genetic components."

9         Of greatest concern is his limited intellectual

10   functioning, which is reflective -- reflective -- I think she

11   meant to say which is reflected in the intellectual disability

12   diagnosis.  Having such impairments in intellectual functions

13   means he will inevitably have extremely limited coping skills.

14   Skipping.  He simply does not have the coping skill capacity to

15   manage life demands.

16        And one of those life demands is, for example, I

17   don't know, a criminal case in which you're indicted and you're

18   sitting at the defense table.

19        It says he does not have -- "does not have" -- the

20   coping skill capacity to manage life demands, and it impairs

21   his ability to function in various domains of life including

22   socially, academically, et cetera.

23        And then here's a sentence that really jumped out at

24   me.  He is functioning at a much younger level than his

25   chronological age.  He's 21.  So much younger than that, it

1  gets you into really young.

2       In many ways he exhibits abilities consistent with a

3  child during adolescence or younger.

4       Now, let's just say hypothetically Mr. Koffsky was

5  representing a 14-year-old in this courtroom.  I don't think

6  you'd be saying, Judge, let's go to trial, or let's try him as

7  an adult, let's go forward.  He did a really bad thing.  We

8  need to lock him up and punish him for what he did.  I don't

9  think you would do that because you'd say, He's 14, or 13,

10  whatever the case may be.  But here what Dr. Casarella's

11  saying -- and it's not competency.  I get that.  But it's --

12  you know, we're talking about reasonable cause.  And what she

13  says is, He is functioning at a much younger level than his

14  chronological age.  In many ways he exhibits abilities

15  consistent with a child during adolescence or younger.

16       To me that does start -- it doesn't use the word

17  "competency to stand trial," okay.  I haven't made that

18  decision.  And look, I've been around long enough to know, as

19  do you and Mr. Koffsky, we all know, that the standard for

20  competency is actually a pretty low standard.  It doesn't

21  really require a lot.  It just requires that the defendant know

22  what's happening.  What am I doing here?  Is this -- am I in a

23  restaurant?  No, no.  I'm in a courtroom.  I was charged with a

24  crime.  I know what the crime -- the alleged crime is.  They

25  are charging me with carjacking, basically, you know,

1   physically harming another person and stealing his car.  I know

2   that if I -- if things don't go well for me, that's going to be

3   bad.  I might have to go to jail.  I can tell my lawyer what I

4   remember about the incident, whether there are any witnesses

5   that might be helpful.

6           It doesn't require a lot.  It doesn't require that

7   the person be a high school graduate or an intelligent person.

8   Quite to the contrary, it -- competency -- a person who is of

9   limited intellectual functioning could well be competent.  And

10  I'm not finding that Mr. McCoy is not competent.  But when I

11  have a psychologist who knows, who, unlike us, is skilled in

12  this area and does have training in this area, who says, after

13  a very lengthy report, however many pages it is, that Mr. McCoy

14  is functioning at a much younger level than his chronological

15  age, in fact, consistent with a child during adolescence, I

16  think to myself, well, that sounds like maybe he's not really

17  competent to understand what's happening here today and maybe

18  we should have someone really look at this more carefully so

19  that I am satisfied that he's competent.  This is the...

20          And then, you know, you throw in this other report

21  which is different, but it, you know, talks about delusions and

22  hallucinations and -- I don't know.  Again, I'm not a

23  psychologist, so I don't know what that's all about.  But when

24  I look at a report that says, This person is functioning as a

25  young child, I'm thinking, gee whiz, maybe we should look at

1  this more carefully.

2         So I hear what you're saying.  What you're saying is

3  not unreasonable.  It's not -- for example, there's nothing in

4  here that says anything like, I don't really think he's

5  competent to go forward in this trial, Mr. Koffsky.  We're not

6  talking about Dr. Casarella.  Because Dr. Casarella did her

7  report, met with Mr. McCoy, did her evaluation, reviewed the

8  documents, at Mr. Koffsky's request.  It wasn't just a random

9  thing, come on in, I'd like to chat.  She knew that Mr. Koffsky

10  was representing him in a criminal case and she did this

11  report.  She never says in there, you know, Look, I think a

12  further evaluation should be made as to his competency, or, I

13  don't think he's competent.  She doesn't say that.  But she

14  does say he's akin to a child during adolescence or younger.

15  That's pretty young.  What's ad -- what's the definition of

16  adolescence?  12, 13, 14 years old?  Or younger?  That's the

17  thing that I'm troubled about the most.  I'm just being honest

18  with you.  That really jumped out at me when I read that

19  sentence.

20         So I kind of cut you off, but I'm telling you this is

21  the problem.  And I acknowledge -- I said it before, I'll do it

22  again.  I acknowledge I'm not reading everything in context.

23  I'm not doing that.  Quite the opposite.  I'm picking out one

24  sentence or one paragraph.  But it's still a pretty important

25  sentence in a pretty important paragraph.  That's the struggle

1    that I'm having right now.  But if you -- certainly if you have

2    anything else you want to say, you're welcome.  I don't mean to

3    cut you off at mid sentence.  That's not really my -- it's not

4    my intention.

5           MR. BRADLEY:  No, not at all, your Honor.  And I

6    certainly didn't read it as such or interpret it as such.  And

7    I certainly understand the Court's position and views with

8    regard to that portion of the Casarella report.  I'm not going

9    to joust with the Court by picking other sentences in the

10   report about that.  I think the report read as a whole does

11   paint a picture of a defendant that has very troubling history

12   and characteristics, some of which the Court, you know, may

13   well eventually need to consider at the sentencing stage in the

14   3553(a).

15          THE COURT:  You're absolutely correct.  I may have to

16   do that.  You're right.

17          MR. BRADLEY:  What I would just note to the Court --

18   I don't want to belabor the point, but as the Court mentioned,

19   the competency standard is, even against a backdrop of

20   intellectual difficulties or psychological difficulties or a

21   history of that, it is a standard as the Court described as

22   relatively low, it is is the defendant, in essence, alert and

23   oriented as to person, place, and time.  Where am I?  What is

24   happening?  Am I able to talk to my attorney?  Am I able to

25   describe what happened and assist in some extent in the

1   defense?

2          I don't believe I'm giving short shrift at all to

3   that characterization of the standard even though it's not

4   actually lifted directly from the case law, I think it's

5   roughly consistent with what the *Kerr* Court said and what the

6   2nd Circuit has said on multiple occasions.  And I don't

7   believe, your Honor, that based on the confluence of the

8   circumstances, particularly based on what Mr. Koffsky has

9   reported to the Court and based on the two evaluations, that

10  this necessarily would put the Court in a position where it

11  would feel compelled to order a competency evaluation.

12         But we certainly do, from the government's

13  perspective, understand the Court's concerns.  And to the

14  extent the Court is inclined to order a competency evaluation,

15  we have, consistent with the Court's order, conferenced that

16  matter with Mr. Koffsky.  We have agreed upon an evaluator.

17  He's the former chair of the psychology department at Fordham

18  University.  Our understanding is that he would be available to

19  do an evaluation, although we certainly need to just confirm to

20  the extent the Court is going to order one and under what

21  timetable that he would be able to proceed under.

22         THE COURT:  You know, it's interesting, because I

23  think that if I denied Mr. Koffsky's motion and the case went

24  forward and Mr. McCoy was convicted, and whatever the sentence

25  is -- I mean, who knows?  But assume he's convicted and he

1    appealed, and point one on appeal is, The judge should have

2    granted the competency examination and a competency hearing.  I

3    think I would be upheld.  I don't think it's even -- I don't

4    think there's any doubt about it in my mind, in part, because

5    Mr. Koffsky, who I said before that he has a great reputation

6    around here, one of the reasons why he has a great reputation

7    is that he comes across as an honest broker.  He doesn't say,

8    like, crazy things.  He says what he believes.  He represents

9    his clients, but he's also not going to lie to the Court.  So

10   when Mr. Koffsky said a few minutes ago, By my observation,

11   he's not incompetent, or to put it another way, he is

12   competent, he's just being honest with the Court.

13          But at the same time, he also said -- and it comes

14   across in his letter -- that he feels that he would be

15   committing a Sixth Amendment violation, i.e., failing to

16   provide effective assistance of counsel, if he didn't make this

17   application even if the application was denied.  But if he

18   didn't make the application at all, then you've got, in his

19   view, a Sixth Amendment violation.

20          Am I stating that right, Mr. Koffsky?

21          MR. KOFFSKY:  Yes, that's correct, your Honor.

22          THE COURT:  Which is not the same as saying, Judge,

23   I'm pounding on the table, you have to do that.  That's not the

24   same.  He's not saying that.  To the contrary, he said, You

25   know, I've had difficulties communicating with my client, but I

1   can't tell you, Judge, that in my view he's incompetent.  I

2   can't tell you that.  What I can tell you is what is set forth

3   in these evaluations that I submitted.

4           By the way, I saw a case -- I was doing a little

5   research on this and I came up with a very recent case, it's a

6   summary order also -- because like I said, these are -- these

7   issues -- there's nothing really legally complicated here.  The

8   standards are well-established, both in terms of competency and

9   also the procedural aspects of this.  The case is *U.S. against*

10  *Green*.  It's a summary order from --

11          MR. BRADLEY:  2020, your Honor.

12          THE COURT:  November of 2020.  So pretty recent.  You

13  know, a few months ago.  And basically what happened in that

14  case is the district judge did not order a competency

15  evaluation, and the case went up on appeal, and the circuit

16  affirmed and said the Court did not abuse its discretion in

17  failing to order a competency evaluation.  And then it becomes

18  very fact intensive.

19          The point is, there's a lot of discretion here.  And

20  I think that if I were to say, We don't need to do this,

21  there's just not enough here, there's not enough for me to

22  conclude there's reasonable cause, I think I would be upheld on

23  appeal.  I really do.  But that's not my only -- that's not the

24  only thing that drives me, right?  I am troubled about this

25  case.  I am troubled about -- nothing about what the government

1    has done.  I'm troubled that this adolescent, let's call him

2    that, or at least he appears to act like an adolescent, his --

3    unfortunately some people get lucky when they are born and some

4    don't.  And unfortunately Mr. McCoy got pretty unlucky, and

5    he's got limited intellectual functioning.  I'm not trying to

6    be mean about it.  That's just what it says.  It says it here.

7    It says it in the other report.  And I'm worried that I would

8    be -- I would not be doing the right thing if I didn't get a

9    more definitive examination and report about his competency.

10            Honestly, if we did go forward -- and I'm perfectly

11   fine to appoint the person you mentioned.  I don't know if you

12   mentioned his or her name, but whoever it is that you agree

13   upon.  If that person is qualified and that person does

14   whatever that person does and writes a report and says, Listen,

15   he's got limited intellectual functioning, but he's competent

16   under the standard that I understand to be the law, because I'm

17   a forensic evaluator, and I understand that.  Or I'm a forensic

18   psychologist and I understand the standard.  Well, it seems to

19   me that that's the end of it.  We don't need much of a hearing

20   at that point.  We're not going to call witnesses.  Because as

21   it is, I'm really on the line here.

22            It's not like Mr. Koffsky is saying to me, Judge,

23   trust me, this guy is incompetent.  He's not saying that.

24   Because he's being honest with me.  If he said to me, Trust me,

25   Judge, my client is incompetent, I've been doing this long

1    enough to know, and I'm telling you this fellow is, this young

2    man is, that would be very influential with me.  And, of

3    course, the flip side is it's -- when he says that he's -- as

4    far as he's concerned, he's not incompetent, that's why this is

5    such a close call.

6            In terms of my observations -- and this is for the

7    benefit of the record, as well.  I have had observations of

8    Mr. McCoy.  But honestly, there haven't been many, because most

9    of the conferences that I had -- and probably the most

10   substantial one was a bail hearing that we did almost a year

11   ago.  And by the way, that's why I wanted Mr. Barrios here,

12   because he's been working directly -- he's had a lot more

13   dealings with Mr. McCoy than I have.  But even that, which was

14   a lengthy bail hearing, was remote.  It was in April.  We

15   weren't doing in-person proceedings then.  So I'm a little bit

16   hamstrung in that regard.  I really have not had much in the

17   way of an opportunity to really observe Mr. McCoy.

18           What I will say is that back in the fall, at one

19   point I was told that the parties thought there was a plea

20   deal, and there must have been discussions at some point, maybe

21   it was a similar plea that was offered to the co-defendant, and

22   we scheduled it for a plea, and on the day of the plea, when

23   Mr. McCoy was going to come in in person, he feigned, he faked,

24   illness, you know, fake coughing, pretend fever, pretend

25   headache, whatever it was, on the steps of the courthouse.

**A196**

36

1    Why?  So that -- he knew that -- he or his parents knew that if

2    he did that, there was no way the court security officers, in

3    the middle of the pandemic, were going to let him come in the

4    building.  And it worked.  It really worked very well.  Didn't

5    come in.  We all wasted our time.  Mr. Koffsky was here.

6    Prosecutor was here.  We accomplished nothing.  Because of what

7    Mr. McCoy did, and what his parents did.

8           So then we put the matter over for a month or so, and

9    I forget the exact dates, but I want to say now it's November.

10   What was it?  Do you have the date there when we had the

11   in-person conference in November?

12           MR. BRADLEY:  November 13.

13           THE COURT:  There we go.

14           Wouldn't you know it?  The same thing happened.  I'm

15   sick.  Got a headache.  Got a fever.  Spoke to Mr. Barrios --

16   who works for me, by the way.  He doesn't work for you.  He

17   doesn't work for the parents.  He doesn't work for Mr. Koffsky.

18   He works for the Court, so me.  And I said, Listen, Leo, could

19   you do me a favor, find out what's going on?  And he did.  And

20   lo and behold, Mr. McCoy came in.  And I suspect that

21   Mr. Barrios said something to him along the lines of, I know

22   you're faking, and I'm going to tell the judge you're faking.

23   The judge might say, Listen, if you're a faker and you're

24   trying to pretend that you're sick so that you don't have to

25   come to Court, he might just decide to lock you up, because

**A191**

1    then he can be sure that you would come to court.  Put you in

2    jail.  Sit in jail.  And then when it's time to come to court,

3    the marshals would bring you here, and then there'd be no

4    coughing and sneezing, there would be just coming to court.

5    And lo and behold, Mr. McCoy and his parents decided, You know,

6    maybe we should go upstairs after all.  And then, of course, we

7    didn't accomplish anything that day because we weren't ready to

8    do anything.  Which is fine.  He doesn't have to plead guilty.

9    But that's when we -- I believe that was the day that we set

10   the trial in April.

11              MR. BRADLEY:  That's correct, your Honor.

12              THE COURT:  Right.  So, again, the details are a

13   little bit fuzzy, but that's my recollection.  Because at that

14   point, what else is there to do other than set a trial date?

15   Ugh, I'm telling you.

16              The good news is I checked with Mr. Barrios earlier

17   about how Mr. McCoy is doing on bail.  He did not do very well

18   early on, which is why we had a bail hearing.  He clearly

19   tampered with his electronic bracelet.  He or somebody did.  I

20   don't know if it was him or his parents.  I don't know.

21   Somebody did.  They left when they were not allowed to do so

22   and it was a bit of a mess.  All of that was bad.  But the good

23   news is that eh -- there was no evidence that he was out

24   committing crimes or, you know, engaging in risky behavior.  It

25   was just, you know, again, dumb stuff.  Facilitated by his

**A192**

1   parents, by the way, which tells you a lot about his parents.

2           I spoke to Mr. Barrios today, and he told me that

3   since then, now it's almost a year --

4           Right Leo, April last year?

5           MR. BARRIOS:  That's correct, your Honor.

6           THE COURT:  -- that he's not had any problems with

7   Mr. McCoy.  Mr. McCoy's life must be pretty boring because he's

8   sitting in his room or in his house, and I'm sure that's not a

9   lot of fun, but at least he's not violating the terms and

10  conditions of his release.  And that gives me a lot of

11  confidence that he will continue not to violate the terms and

12  conditions of his release, because if he does, I'll lock him

13  up.  It's as simple -- it's not that complicated at this point.

14  The jails are capable of handling people like Mr. McCoy.  They

15  have a lot of people in jail who have limited intellectual

16  functioning, a lot of people in jail who have mental health

17  issues, unfortunately, but that's true.  And they are capable

18  of handling that.  They are trained and equipped to do that.

19  It's not a lot of fun for the defendant or his family.  In

20  fact, it's the opposite of that.

21          I'm going to order the competency hearing.  I am.

22  This is not a black-and-white thing.  I totally -- I think

23  you're taking a very reasonable position, Mr. Bradley.  But I

24  think on balance I'm going to do it, because I'm not confident

25  at this point that I have enough information to conclude that,

1    in fact, Mr. McCoy is competent to stand trial.  If the report

2    comes back that he is, and certainly not inconsistent, really,

3    with anything else, then Mr. Koffsky and Mr. McCoy would be

4    hard pressed to convince me that he was not competent.  But

5    right now I think there's enough of a question mark about it, I

6    think I'm going to grant it.  I am going to grant it.  Let's

7    just put it that way.  So the motion is granted.

8              What's the name of this psychiatrist or psychologist

9    that you agreed on?

10             MR. BRADLEY:  Dr. Barry Rosenfeld, your Honor.

11             THE COURT:  Dr. Barry Rosenfeld.

12             And what do you know about him?  Was this someone

13   that you came up with or Mr. Koffsky?  Who came up with the

14   name?

15             MR. BRADLEY:  We have -- your Honor, we proposed

16   Dr. Rosenfeld to Mr. Koffsky.  He has been offered by our

17   office, or suggested by our office on several occasions.  He

18   has, for the record, found that people -- defendants he has

19   evaluated to be competent and also incompetent in the past.

20   He's the former chair of the psychology department at Fordham

21   University.

22             THE COURT:  You know I went to Fordham Law School.

23   That's why you chose that one, right?

24             MR. BRADLEY:  It had a non-zero factor in our

25   decision, your Honor.

**A194**

1          THE COURT:  Yeah, okay.

2          MR. BRADLEY:  In all seriousness, he's been a

3     professor since 2006, your Honor.

4          THE COURT:  So he's a psychiatrist or a psychologist?

5     I'm sorry.

6          MR. BRADLEY:  A psychologist, your Honor.

7          THE COURT:  A psychologist.  Okay.

8          MR. BRADLEY:  He has a doctorate in clinical

9     psychology from UVA, your Honor.

10          THE COURT:  And he specifically is competent -- or,

11     not competent, but he is a -- he's a forensic psychologist, and

12     this is the kind of work -- he may do other things, as well,

13     but this is the kind of thing he's capable of doing, assessing

14     as a legal matter whether someone is competent as that term is

15     defined?

16          MR. BRADLEY:  Correct, your Honor.  And as of 2000,

17     he had received a diploma in forensic psychology from the

18     American Board of Forensic Psychology.

19          THE COURT:  Got it.

20          MR. BRADLEY:  So our understanding is that he is

21     available, but we will certainly confirm that.  If for some

22     reason there appears to be some sort of scheduling conflict, we

23     will, of course, notify the Court, and I will also conference

24     that with Mr. Koffsky.

25          THE COURT:  Mr. Koffsky, you're agreeable to this?

1          MR. KOFFSKY:  I am, your Honor.  The government

2     forwarded me his name, his CV, and some supporting

3     documentation.  I looked him up on the internet.  I think he's

4     an appropriate person under the circumstances to conduct a

5     forensic psychological evaluation of Mr. McCoy.

6          THE COURT:  All right.  Well, there's still open

7     questions, of course.  I mean, there's open questions, of

8     course, about how long it's going to take.  Does anybody have

9     any idea about that?  Maybe the thing to do is that you need to

10    do some additional checking with Mr. -- I'm sorry -- with

11    Dr. Rosenfeld and figure out between the two of you what it's

12    going to take, and then maybe propose some sort of a scheduling

13    order that would include both the appointment of

14    Dr. Rosenfeld --

15          Who pays for this, by the way?  Do I pay for it?  I

16    mean, I assume it's paid for by somebody, either by the Court

17    or by the government, but I'm not sure.

18          MR. BRADLEY:  I believe it may be paid by the Court,

19    your Honor, but we will confirm and let chambers know.

20          THE COURT:  These are details, but I think we

21    probably need to know that so that it could -- you know, he

22    needs to be -- he's not doing it pro bono.  He's being asked to

23    perform an important professional, you know, service.  He, of

24    course, deserves to be paid for it.

25          But I think maybe you should get together and come up

**A196**

1  with some sort of proposed order that kind of incorporates both

2  timing and appointment and when we can reasonably expect -- or

3  even could say that, The report shall be completed -- the

4  evaluation shall be completed, a report prepared and provided

5  to the Court and counsel by no later than X.  But I don't want

6  to just give you a date arbitrarily.  I'd like you to discuss

7  it with him and with Mr. Koffsky and figure out what the -- you

8  know, what makes the most sense.  Can you do that?

9          MR. BRADLEY:  Yes, your Honor, we can do that.

10          THE COURT:  I want to talk about another subject, but

11  before I get to that subject, let me just say one other thing.

12  And this is really, I think, largely for the benefit of

13  Mr. McCoy's parents.  I'm going to order this psych exam, and

14  it's going to go forward.  But I'm also ordering the following:

15  That when Dr. Rosenfeld meets with Mr. McCoy, it shall be

16  Dr. Rosenfeld and Mr. McCoy.  Nobody else.  Most importantly,

17  not his parents.

18          If the doctor -- I'm not sure exactly how I want to

19  incorporate this into an order.  You can think about this when

20  you're preparing something with the -- working with

21  Mr. Koffsky.  If the doctor feels the need to communicate with

22  the parents at some point, which my guess is he will, that's

23  fine.  I have no problem with that.  But these people are not

24  going to interfere with this process.  And I can't order them

25  to do something, but I can order the doctor and Mr. McCoy and

1    the lawyers to do something, and that -- what I'm going to

2    order is that any meetings or consultations between Mr. McCoy

3    and the doctor be solely between Mr. McCoy and the doctor.

4          Now, before I actually leave this subject, is that

5    something you're okay with, Mr. Koffsky, or do you feel that

6    you should there be for these --

7          MR. KOFFSKY:  Oh, no, I don't think I should be

8    there.  I think it's a completely appropriate order under the

9    circumstances.

10         THE COURT:  Okay.  I mean, I might consider to allow

11   you if you thought it was necessary.  But the thing I'm

12   trying -- not trying.  The thing that I am accomplishing here

13   is that Mr. McCoy's parents shall not participate in those

14   meetings, whether they are by video or in person, whether it's

15   one meeting, whether it's more than one meeting.  It doesn't

16   mean the doctor can't consult with them separately.  Of course

17   he can.  Absolutely he can.  I would assume he would want to,

18   but I'll leave that up to him.  But not during his meetings

19   with Mr. McCoy.  That's forbidden.

20         And, you know, there's an enforcement mechanism here,

21   which is the following:  That if there is interference, that

22   notwithstanding the order that I issue, there's interference

23   from Mr. McCoy's parents, well, there's a simple solution, okay

24   the solution is that I will -- because I have the authority to

25   do this -- place Mr. McCoy in the custody of the Attorney

1   General, the Bureau of Prisons, so as to ensure that the

2   examination is conducted without interference.  The statute

3   certainly permits me to do that.  I'm not going to do that here

4   because -- at least not now because he's been out on bail, the

5   parties have agreed on someone who can do this with Mr. McCoy

6   still out on bail.  I don't want to do something that is

7   thought of as revoking his bail.  I'm not doing that.  I would

8   only do what I'm saying, in other words, putting him in

9   custody, if -- and only for so long as is absolutely necessary

10  to conduct this exam, if there's interference from the parents,

11  because then I'm going to put him in custody, period.  And the

12  statute certainly allows me to do that.  There's no question

13  about it.

14          So is that clear, Mr. and Mrs. McCoy?  You interfere

15  with this, then I'm putting Mr. -- I'm putting your son in

16  custody, in the custody of the Attorney General, so that the

17  evaluation will proceed and be completed without your

18  interference.  So I hope you understand that means you shall

19  not interfere.  Do you understand, both of you?

20          MRS. McCOY:  Yes, I do.

21          THE COURT:  Mr. McCoy?

22          Mrs. McCoy?

23          MR. McCOY:  Yes.

24          THE COURT:  Great.  Thank you.

25          And to give credit where credit is due, that idea,

1    the concept of requiring any meetings between the defendant and

2    the doctor be held only between the defendant and the doctor so

3    as to exclude the parents, that was Mr. Barrios's idea, and

4    he's right.  It's the right way to do this.

5              All right.  So we'll do that.

6              Let me move on to something else.  I mean, again, one

7    last thing.  Does it even make sense to hold this April 12

8    trial date under the circumstances?  What do you think about

9    that, Mr. Bradley?  I mean realistically that's six weeks from

10   now.  I mean, I can hold it.  I don't have to cancel it.  In

11   fact, maybe I shouldn't cancel it.  Let's just see what

12   happens.  You know, we can always cancel it down the road.

13             Hold on a second.  Let me just talk to Donna.

14             Go ahead, Mr. Bradley.

15             MR. BRADLEY:  I was going to just agree with what the

16   Court -- the conclusion the Court came to, which is I don't

17   believe it makes sense for the Court to take the trial off the

18   calendar at this time.  I know, or at least my understanding is

19   that rescheduling jury trials would be an enormous undertaking

20   by the Court, and it has to be done in conjunction or

21   collaboration with the other district judges, and I think at

22   least at this stage my hope is that we would be able to have an

23   evaluation and perhaps a report completed expeditiously.  So my

24   inclination and recommendation to the Court is that we would

25   keep the trial date.  And, of course, if we believe there's a

**A200**

1   reason why we -- why it would be completely unrealistic, either

2   due to the evaluator's schedule or whatever may come up, we can

3   notify chambers so that the Court is not holding a date that we

4   know that we can't make.

5          THE COURT:  Mr. Koffsky, can you comment on this one

6   way or the other?

7          MR. KOFFSKY:  The only thing I would...

8          THE COURT:  I'd like to keep the pressure on, to be

9   brutally honest.

10          MR. KOFFSKY:  I understand that.  The other thing I

11   would -- the only other thing I would say to that is if we get

12   a -- I mean, I have carved out time to try this case.  I am

13   available.  As I indicated to the Court, it's not a lengthy

14   trial.  But I would probably be no more -- well, I wouldn't

15   want to receive an evaluation the last week of March knowing

16   that I was putting on a federal trial the first week of April.

17   That's the only thing I --

18          THE COURT:  Well, it's the second week of April.

19   It's April 12.

20          Look, here's what we're going to do.  This is subject

21   to change, okay?  But here's what we're going to do.  We

22   already have a final pretrial conference in this case scheduled

23   for April 5.  That stays.  We're not changing that.  I've

24   already issued an order back in November, November 13, setting

25   forth dates for 404(b) evidence, if any, motions in limine, et

1    cetera, you have -- it's already in the docket.  You have that.

2    All of that remains in effect.  But I'm hoping that within one

3    week from today, so that would be, what, March 3, that you're

4    going to jointly submit a proposed order with respect to

5    Dr. Rosenfeld and 4241.  And if between now and then -- let's

6    say Dr. Rosenfeld says, Listen, you can't -- I can't do it on

7    this time frame, I just can't.  A, I'm busy.  B, I'm not going

8    to do a half-baked job here.  I'm going to do a real job here

9    and figure out what the answer is.  I don't know what he's

10   going to say.  But I want you to submit a proposed order to me

11   and a cover letter, jointly, within a week.  And if it looks

12   like we have to go to a Plan B, well, then, we'll go to Plan B.

13   But for now, let's stick with the trial date, let's stick with

14   the dates in the pretrial order.

15          It would be different, actually, Mr. Koffsky, if this

16   was an especially complicated or difficult trial.  If that were

17   the case, then I -- you know, I'd be less likely to do what I'm

18   doing.  But it was a one-time event.  I mean, I know more about

19   this from Mr. Taylor's, the co-defendant's, guilty plea and the

20   presentence report in that case.  But it's the same case.  And

21   as I recall it, the victim in the case was a friend of

22   Taylor's, and Taylor was going to pick him up at the train

23   station, give him a ride somewhere, and he stood him up.  And

24   so then Taylor, allegedly -- although, he's admitted to it --

25   but allegedly recruited McCoy and they waylaid the victim and

1  they beat him up and they took his car keys, because that way

2  the victim would not stand up, you know, the -- Taylor the next

3  time Taylor needed a ride.  It's a pretty ridiculous behavior

4  by some -- a couple of young guys.  Both of whom were in their

5  teens at the time, I believe.

6         What was the date of this incident?  When did it

7  actually happen?

8         MR. BRADLEY:  April 2019, your Honor.

9         THE COURT:  So at that time Mr. McCoy was 19, and I

10  think the other fellow, Taylor, was even younger, maybe 18, 17.

11  18 probably.  I mean, it makes you shake your head.

12         I'm sticking with the trial date right now.  And I

13  just got the tentative master trial calendar for the second

14  quarter of 2021, starting April 1.  It is a master calendar

15  because we only have these two courtrooms in which we can do

16  trials right now.  They are going to do some work in Judge

17  Román's courtroom on the second floor to make it available to

18  do civil trials.  But the only courtrooms in which we can do

19  criminal trials are 520, this one, and 521 next door.

20         I know that there were 24 trials requested from the

21  White Plains judges for that three-month period.  24.  Two

22  courtrooms, 24 trials.  Obviously, that's not... But my case,

23  this case, has priority because it's a criminal case that has

24  priority over all civil cases, and because it's an old criminal

25  case.  Mr. McCoy was arrested in April, I guess, of 2019.

1        Is that right?  Is this when he was arrested?

2        MR. BRADLEY:  Correct, your Honor.

3        THE COURT:  So it's a two-year-old case.  So what I'm

4   trying to say is that on April 12, I'm first on the list.  I'm

5   not the backup.  When I say "I'm," I mean this case is not a

6   backup.  It is the case scheduled for April 12 in this

7   courtroom.  But that could change.  If, you know, the timing is

8   such from the conversations you have amongst yourselves, if it

9   makes sense to change that date, we'll change it.

10        Mr. Bradley is right, it is hard to change things,

11  because it requires -- every change affects everybody else.  I

12  don't have control over my own docket when it comes to trials.

13  So if I were to say, for example, Listen, we can't do it April

14  12, but we could do it May 12, let's just say hypothetically,

15  well, maybe, but maybe there's some other case scheduled.

16  Maybe Judge Román has a case with detained defendant, which, by

17  the way, trumps a case with a nondetained defendant.  So

18  criminal trumps civil.  But within criminal, detained trumps

19  not detained.  So if both are scheduled for the same day, the

20  detained case would go first.  So Mr. McCoy's case is not

21  literally the top of the file, but it's pretty close because

22  it's an old criminal case.

23        Is it doable?  Is it possible that we could adjourn

24  it a month or so if that was -- if that made sense?  Yes, it's

25  possible.  But I can't give you that date right now.  The only

1    date I can give you right now is April 12.  All right?  So we

2    just have to work with that and do the best we can.

3              Okay?

4              MR. KOFFSKY:  Thank, your Honor.

5              THE COURT:  But you'll let me know if there's a

6    change in circumstances.  Please try to get back to me within a

7    week.  I do want to move this along.  And thank you very much

8    for heeding my request that you have the conversation ahead of

9    time.  I thought that made sense to just sort of get you both

10   talking to each other in the event that I granted the

11   application.  So I'm glad you do that.  Thank you for doing

12   that.

13             MR. BRADLEY:  Absolutely.

14             THE COURT:  Here's the only other thing.  You both

15   know that Rule 11 prohibits me from becoming involved in plea

16   discussions, right?  I'm not allowed to do it.  It's against

17   the law.  Funnily enough, it's exactly the opposite way in

18   which things are done in state court, and so 100 yards from

19   here judges every single day participate in plea discussions

20   and make offers and promises -- I should say promises as to

21   what the sentence is going to be if the defendant agrees to a

22   particular plea.  And yet we can't -- we're forbidden by law

23   from doing that.  I think it's a bad law, but anyway, that is

24   the law and I'm bound by it.

25             What I can do is encourage, or urge.  And I really

1   encourage the both of you, who are both highly competent

2   attorneys who are intimately familiar with all the facts of

3   this case and all the facts relating to Mr. McCoy's personal

4   situation, let's call it the 3553(a) factors, as Mr. Bradley

5   did a few minutes ago.  You're both extremely familiar with all

6   that.  You know what the case is about.  You know that the

7   co-defendant pleaded guilty.  You know what the evidence is.

8   And you know Mr. McCoy's personal circumstances.  Is there no

9   way to creatively come up with a solution to this case short of

10  trial?

11          And I really -- it's hard for me to say much more

12  than that because I don't think I'm really permitted to.  But I

13  cannot -- again, this is something I can't overstate.  I just

14  feel like this is a case that ought to be resolved.  Mr. McCoy

15  is not insane.  The question of competency is an open question

16  right now.  But he -- I think he knows enough about what's

17  going on here to participate in, for example, plea discussions.

18  There were -- you told me some time ago, months ago, that you

19  had a tentative plea deal in place.  I think you told me that.

20          Am I making that up, Mr. Koffsky?

21          MR. KOFFSKY:  No, your Honor, you're not.

22          THE COURT:  So that did happen in this case.

23          You stated -- you said before, Send it back to the

24  state.  What did you mean by that exactly?  Was it originally a

25  local arrest which then the feds -- they turned over to the

1    feds?  Is that what happened?

2             MR. KOFFSKY:  It's my -- yes, your Honor, it was a

3    local arrest.  Because it came over as a carjacking, the FBI

4    took it up.  Because of my client's age, his infirmity, the

5    co-defendant's age, we thought -- and I think -- and I won't

6    put words into Matt --

7             THE COURT:  Andrews .

8             MR. KOFFSKY:  -- Matt Andrew's mouth, but I think

9    there was sort of a sense that this could just as easily have

10   been prosecuted by the state, and if it was, that at that point

11   the defendant would be -- that certain programs, most

12   particularly, youthful offender treatment, would be available

13   to him.  And so I think our very first application to

14   Mr. Andrews and the head of the office here in White Plains was

15   just that.

16            THE COURT:  Let the state deal with it.

17            MR. KOFFSKY:  Yeah.

18            THE COURT:  Right.  And if you're 19 or younger, if

19   it's a felony charge, it's discretionary, I believe, with the

20   Court.  But somebody who doesn't have a prior record, or not a

21   prior serious record, anyway, would typically get youthful

22   offender adjudication in state court.  Which is still a

23   conviction.  It's a conviction replaced with a youthful

24   offender adjudication.  But the benefit, of course, to the

25   defendant in that situation is that it's not a criminal record,

1    which is relevant, because later on if he gets convicted of

2    something else, he wouldn't be a predicate offender, or

3    predicate violent, or predicate felony, that kind of thing.

4             But look, you know, I'm not the prosecutor, and I

5    know that, again, from my experience that if you made an

6    application for some sort of deferred prosecution or for

7    returning it to the state, I'm sure that it was considered very

8    thoughtfully and very carefully by the U.S. Attorney.  They

9    weren't cavalier about it.  And they declined to do it.

10            MR. KOFFSKY:  Absolutely.  You know, we were given

11   ample opportunity to supply them with information.  We engaged

12   in discussions.  And it was considered at the highest level of

13   this office.

14            THE COURT:  Well, did the -- you didn't have the

15   Casarella report, did you, until just now, Mr. Bradley?  When I

16   say "you," I mean the U.S. Attorney's --

17            Well, you would know, Mr. -- did you --

18            MR. KOFFSKY:  The Casarella report came -- I can pull

19   out the deferred prosecution letter that I sent.  I don't

20   remember.  But I do remember providing the government with a CD

21   of --

22            THE COURT:  Right.  But did you provide them with the

23   Casarella report?

24            MR. KOFFSKY:  No, I did not, your Honor.

25            THE COURT:  Right.  So you might say that the

1    circumstances have changed.  You might.  Because now you have

2    provided them with the Casarella report.  He has it,

3    Mr. Bradley has it.  It says what it says.  He's going to get a

4    report -- if this matter is not otherwise resolved, he's going

5    to get a report from Dr. Rosenfeld.  But even before that, he's

6    got Dr. Casarella's report.  He's got the other report from the

7    Westchester Jewish Children's Services -- I'm sorry, I always

8    get that --

9            MR. KOFFSKY:  Community Services, your Honor.

10           THE COURT:  Community Services.  Westchester Jewish

11   Community Services.  Right.  Thank you.

12           You know, maybe those are circumstances -- maybe

13   those two reports, now in the possession of the government,

14   would give rise to further discussions about how to resolve

15   this case.  So all I'm doing is urging you to have discussions

16   about resolving the case.  That's all I'm doing.  If you don't

17   resolve it and if he's competent, we'll try it.  But I really

18   would like the parties to reinvest time in trying to resolve it

19   short of trial.  That's what I would like.  Especially since

20   you now have new information.  Or at least the government has,

21   which they didn't previously have.

22           I think that's as far as I can go.  I don't know that

23   I can do anything more than that in light of Rule 11.

24           But Mr. Bradley, you hear me loud and clear.  And can

25   you speak to your superior, and speak to be Mr. Koffsky?  And

1    if it doesn't go anywhere, okay, fine.  I'm not going to be mad

2    at anybody.  But I really want you to try.

3          MR. BRADLEY:  Yes, your Honor.

4          THE COURT:  And that applies to you, as well,

5    Mr. Koffsky.  Try.  And it also applies to Mr. McCoy.  And I

6    realize that it's hard for you to explain complicated things to

7    him.  I get it.  I think you're going to have to do the best

8    you can.

9          MR. KOFFSKY:  I will continue to.

10         THE COURT:  All right.  Thank you for coming in.

11    Thank you for working together on this.  Again, I think the

12    government's position is definitely not unreasonable.  Frankly,

13    if I upheld the government here, I'm sure that it would not be

14    reversible error.  But I think it's a close call.  And I think

15    on balance I'm more comfortable with ordering at least this

16    forensic evaluation, and then we'll see.  And if it turns out

17    that he's competent, well, you know, then that's the end of

18    that.  But who knows?  I don't know what's going to happen.

19    And I'm definitely not making up my mind ahead of time.  We'll

20    wait and see, see what we have.

21         Right now we have a conference scheduled at April 5

22    at whatever time it was.

23         What time did we say it was, Donna?

24         THE DEPUTY CLERK:  Oh, I just signed off.  I

25    apologize.

1       THE COURT:  And time has been excluded under the

2  Speedy Trial Act until then.

3       April 12 at 9:30.  I'm not sure what -- no.  I'm

4  sorry.  I apologize.  April 5 at 2:30.  April 5 at 2:30.

5       What we've been trying to do, certainly what I've

6  been trying to do, in scheduling things in the second quarter

7  of 2021, in part because I now have no courtroom, my courtroom

8  on the sixth floor is completely demolished and it's being

9  renovated.  Judge Seibel's has been completed.  If you want to

10 stick your nose into Judge Seibel's courtroom, it's beautiful.

11 But it's not set up for a COVID trial with, you know, all these

12 extra things we have, the extra jury box in the back and so

13 forth.  So we're not doing jury trials in her courtroom.  We're

14 not doing anything in my courtroom.  It's empty.  It's bare

15 walls and a concrete floor.  So it would be hard to do a trial

16 in there.  I guess we could.  We could set up folding chairs.

17 It might work fine.  But anyway, we're not doing that.

18      So without that, and with the need to squeeze all the

19 trials into these two courtrooms, it's really problematic for

20 the next few months.  And not impossible.  Long ago as a court

21 we decided that we were going to try, and if we tried and

22 failed to move things forward, that's okay, but we were not

23 going to fail to try.  A lot of other courts have failed to

24 try, and that makes it easy to not move stuff forward.  You

25 just don't even try.  But we're trying and we've put a lot of

1    money and effort into all of this.

2             In any event, what I was about to say is that because

3    this courtroom is used for trials, what I've been doing is

4    trying to schedule things for 2:30 in the afternoon or later,

5    because the typical trial day will be 9:30 to 2:30.  So that's

6    why it's scheduled for 2:30.

7             Okay.  I don't need to exclude time.  It's already

8    been excluded.

9             Anything else, Mr. Bradley?

10            MR. BRADLEY:  No, your Honor, not from the

11   government.

12            THE COURT:  Mr. Koffsky?

13            MR. KOFFSKY:  No.  Thank you, your Honor.

14            THE COURT:  Mr. McCoy, Mr. Defendant McCoy, can you

15   hear me okay?

16            THE DEFENDANT:  Uh-huh.

17            THE COURT:  You need to listen to your attorney.  He

18   wants to hear what you have to say.  He's not going to tell you

19   what to do.  But he's a very capable professional, and you need

20   to listen to him and give him an opportunity to explain to you

21   what he thinks the best way forward is.

22            Do you understand that?

23            THE DEFENDANT:  (Nodding his head).

24            THE COURT:  You're nodding your head.  Do you

25   understand that, yes?

**A212**

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  Please do that as best you

3     possibly can.

4          All right.  Thank you all.  The defendant's bail is

5     continued as previously set.  I'm see you on April 5 if not

6     sooner.  And please try and get me an order, a proposed order,

7     I should say, by a week from today, March 3.

8          THE DEPUTY CLERK:  All rise.  The Court will be in

9     recess.

10

11    CERTIFICATE:  I hereby certify that the foregoing is a true and
      accurate transcript, to the best of my skill and ability, from
12    my stenographic notes of this proceeding.

13

14        Pamela L. Grimaldi, RPR, CRR, CLR
          Official Court Reporter, USDC, SDNY

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA                    :

v.                                          :        **ORDER**
                                            :
LORENZO MCCOY,                              :        19 CR 549-2 (VB)
                        Defendant.           :
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/25/21

  For the reasons set forth on the record during a conference held on February 24, 2021,

attended by defendant and all counsel, the Court granted defendant's motion for a hearing to

determine the mental competency of the defendant, and further ordered that a psychiatric or

psychological examination of the defendant be conducted and that a psychiatric or psychological

report be filed with the Court.  See 18 U.S.C. § 4241(a), (b).

  The competency hearing is scheduled for **April 5, 2021, at 2:30 p.m.**

  By March 3, 2021, the parties shall jointly submit a proposed scheduling order with

respect to the examination, report, and hearing.

  All other scheduled dates and deadlines set forth in the Order dated November 13, 2020

(Doc. #70) remain in effect.

Dated: February 25, 2021
  White Plains, NY

     SO ORDERED:

     _____
     Vincent L. Briccetti
     United States District Judge

A214



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

March 23, 2021

**BY EMAIL**

Bruce Koffsky, Esq.
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, Connecticut 06905
bkoffsky@snet.net

    Re:    *United States v. Lorenzo McCoy*, S2 19 Cr. 549 (VB)

Dear Mr. Koffsky:

    This document is not a plea agreement. Rather, pursuant to the suggestion of the Court in *United States v. Pimentel*, 932 F.2d 1029, 1034 (2d Cir. 1991), this letter sets forth the current position of the United States Attorney's Office for the Southern District of New York (the "Office") regarding the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to defendant Lorenzo McCoy (the "defendant") in this case.

    Count One of the Superseding Information charges the defendant with carjacking, in violation of 18 U.S.C. §§ 2119 and 2, and carries a maximum term of imprisonment of 15 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

    Count Two of the Superseding Information charges the defendant with conspiracy to commit carjacking, in violation of 18 U.S.C. § 371, and carries a maximum term of imprisonment of 5 years, a maximum term of supervised release of three years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.

    The total maximum term of imprisonment of Counts One and Two is 20 years.

    The Government currently believes that the Guidelines apply to the crime charged in the Superseding Information as follows:

2019.10.22

### A. Offense Level

1.    The applicable Guidelines manual is the November 1, 2018 edition.

2.    Pursuant to U.S.S.G. § 3D1.2(a), Counts One and Two are grouped together in a single Group. The applicable Guideline is U.S.S.G. § 2B3.1.

3.    Pursuant to U.S.S.G. § 2B3.1(a), the base offense level is 20.

4.    Pursuant to U.S.S.G. § 2B3.1(b)(2)(E), the offense level increases by 3 because a dangerous weapon was brandished or possessed.

5.    Pursuant to U.S.S.G. § 2B3.1(b)(3)(A), the offense level increases by 2 because bodily injury occurred.

6.    Pursuant to U.S.S.G. § 2B3.1(b)(5), the offense level increases by 2 because the offense involved a carjacking.

7.    Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the foregoing calculations, the applicable offense level is 24.

### B. Criminal History Category

Based upon the information now available to this Office, the defendant has 1 criminal history point, calculated as follows:

1.    On or about October 27, 2016, the defendant was sentenced to two years of probation following his conviction in Peekskill, New York of Menacing in the Second Degree, in violation of New York Penal Law § 120.14. The defendant was adjudicated a youthful offender in connection with this conviction. Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(d)(B), this conviction results in one criminal history point.

In accordance with the foregoing, the defendant's Criminal History Category is I.

04.09.2018

**C. Sentencing Range**

Based upon the calculations set forth above, the defendant's sentencing range is 51 to 63 months' imprisonment.  In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2.  At offense level 24, the applicable fine range is $20,000 to $200,000.

The foregoing Guidelines calculation is based on facts and information currently known to the Office.  Nothing in this letter limits the right of this Office (1) to change its position at any time as to the appropriate Guidelines calculation in this case, even if that change is based, in whole or in part, on information that was in the Government's possession as of the date of this letter; and/or (2) to present to the Court or the United States Probation Office, either orally or in writing, any and all facts and arguments relevant to sentencing that are available to the Office at the time of sentencing.  Nor does anything in this letter limit the right of this Office to seek a departure under or variance from the Guidelines, or to take a position on any departure or variance that may be suggested by the Court, the United States Probation Office, or the defendant.

This letter does not and cannot bind either the Court or the United States Probation Office, either as to questions of fact or as to determinations of the correct application of the Guidelines in this case.  Instead, the sentence to be imposed upon the defendant will be determined solely by the Court.  This Office cannot and does not make any promise or representation as to what sentence the defendant will receive.

[Continued on next page.]

04.09.2018

The defendant is hereby notified that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his removal from the United States is presumptively mandatory and that, at a minimum, he is at risk of being removed or suffering other adverse immigration consequences. The defendant is further notified that, if he is a <u>naturalized</u> citizen of the United States, his guilty plea may have consequences with respect to his immigration status. For example, under federal law, an individual may be subject to denaturalization and removal if his naturalization was procured by concealment of a material fact or by willful misrepresentation, or otherwise illegally procured. The defendant is further notified that denaturalization and other immigration consequences are typically the subject of a separate proceeding, and that no one, including the defendant's attorney or the District Court, can predict with certainty the effect of the defendant's conviction on the defendant's immigration or naturalization status. The defendant is entitled to and should seek advice from his attorney on this issue.

                    Very truly yours,

                    AUDREY STRAUSS
                    United States Attorney


                    By: _____
                    Nicholas S. Bradley / Lindsey Keenan
                    Assistant United States Attorneys
                    (914) 993-1962 / (212) 637-1565

04.09.2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - X
                   :

UNITED STATES OF AMERICA   :

      - v. -         :      <u>SUPERSEDING INFORMATION</u>

                  :

LORENZO McCOY,        :      S2 19 Cr. 549 (VB)

                  :

         Defendant.   :

- - - - - - - - - - - - - - X

**COUNT ONE**
**(Carjacking)**

The United States Attorney charges:

1.    On or about April 10, 2019, in the Southern District of New York and elsewhere, LORENZO McCOY, the defendant, with the intent to cause death and serious bodily harm, knowingly took a motor vehicle that had been transported, shipped, and received in interstate and foreign commerce from the person and presence of another by force and violence and by intimidation, and attempted to do so, and did aid and abet the same, to wit, in Peekskill, New York, McCOY and a co-conspirator knowingly took a vehicle that was manufactured in Mexico from another person after luring him into a residential basement, threatening him with a knife, and beating him to the point that hospitalization was required.

(Title 18, United States Code, Sections 2119 and 2.)

## COUNT TWO
### (Conspiracy to Commit Carjacking)

The United States Attorney further charges:

2.    On or about April 10, 2019, in the Southern District of New York and elsewhere, LORENZO McCOY, the defendant, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit carjacking, in violation of Title 18, United States Code, Section 2119.

3.    It was a part and object of the conspiracy that LORENZO McCOY, the defendant, and others known and unknown, willfully, knowingly, and with the intent to cause death and serious bodily harm, took a motor vehicle that had been transported, shipped, and received in interstate and foreign commerce from the person and presence of another by force and violence and by intimidation, and attempted to do so, to wit, in Peekskill, New York, McCOY and a co-conspirator knowingly took a vehicle that was manufactured in Mexico from another person after luring him into a residential basement, threatening him with a knife, and beating him to the point that hospitalization was required.

(Title 18, United States Code, Section 371.)

### FORFEITURE ALLEGATION

4.    As a result of committing the carjacking and conspiracy offenses charged in Counts One and Two of this Information, LORENZO

2

McCOY, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

<u>Substitute Asset Provision</u>

5.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

3

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property

of the defendant up to the value of the above forfeitable

property.

                    (Title 18, United States Code, Section 981;
                Title 21, United States Code, Section 853; and
                Title 28, United States Code, Section 2461.)


                              AUDREY STRAUSS
                              United States Attorney

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

LORENZO McCOY,

Defendant.

### SUPERSEDING INFORMATION

S2 19 Cr. 549 (VB)

(18 U.S.C. §§ 2119, 371, and 2.)

AUDREY STRAUSS
United States Attorney

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   UNITED STATES of AMERICA,

 4            -against-                    19 Cr. 549(VB)
                                          Plea
 5   LORENZO McCOY,

 6
                      Defendant.
 7   ------------------------------------x

 8
                                   United States Courthouse
 9                                 White Plains, New York

10                                 March 25, 2021

11

12

13            THE HONORABLE VINCENT BRICCETTI,
                   District Court Judge
14

15
     AUDREY STRAUSS
16        United States Attorney for
          the Southern District of New York
17   BY:  NICHOLAS S. BRADLEY
          LINDSEY KEENAN
18        Assistant United States Attorneys

19

20   KOFFSKY & FELSEN LLC
              Attorneys for Lorenzo McCoy
21   BY:  BRUCE D. KOFFSKY

22

23

24

25
```

1              THE DEPUTY CLERK:  United States of America against

2    Lorenzo McCoy.  Will counsel please note their appearance for

3    the record.

4              MR. BRADLEY:  Good morning, your Honor.

5              Nicholas Bradley for the government.

6              MS. KEENAN:  Lindsey Keenan for the government.

7              THE COURT:  Good morning.

8              MR. KOFFSKY:  Bruce Koffsky for Mr. Lorenzo McCoy.

9    Mr. McCoy stands with me at counsel table.  He's to my right.

10             THE COURT:  Welcome.

11             I see Mr. McCoy's parents are here, as well.

12             MR. KOFFSKY:  That's correct.

13             THE COURT:  All right, have a seat everybody.

14             I was advised, I'm not sure when exactly, maybe a

15   week ago or so, that the defendant intends to plead guilty to

16   the indictment or intended to plead guilty to the indictment.

17   Since then I was provided with a superseding information.  So

18   obviously, if he's going to plead guilty, he needs to waive

19   indictment before that happens.

20             But the last time we met we discussed Mr. Koffsky's

21   request for a competency exam, and I granted that request and

22   issued an order that was submitted by the government.

23   Actually, it was submitted jointly, I guess.  My order is dated

24   February 26th, and it directed that a psychological, among

25   other things it directed that a psychological evaluation be

1   performed by Dr. Barry Rosenfeld to assist the Court in

2   determining whether McCoy presently is suffering from a mental

3   illness that renders him unable to comprehend the nature and

4   consequences of the proceeding against him or reasonably assist

5   in his defense.

6           That evaluation was conducted on -- I'm not sure when

7   exactly, but I did receive a report.  It was conducted on

8   March 4, according to the report, and I received a report dated

9   March 8, 2021, which was also provided -- well, let me just

10  confirm.

11          Did you receive that as well, Mr. Bradley?

12          MR. BRADLEY:  Yes, your Honor.

13          THE COURT:  And Mr. Koffsky.

14          MR. KOFFSKY:  Yes, your Honor.

15          THE COURT:  Mr. Koffsky, have you discussed that with

16  your client?

17          MR. KOFFSKY:  Your Honor, on March 9 I had a video

18  conference with my client and his parents, and I read to them

19  the entire report and we had since discussed the finding of

20  competency and so we have nothing else to offer to the Court at

21  this point.

22          THE COURT:  That was the next thing I was going to

23  say.  The report does say, although unfortunately Mr. McCoy

24  does suffer from a number of mental issues, and I read the

25  report carefully, the conclusion in the report is that despite

1    the possibility that Mr. McCoy does suffer from a major mental

2    disorder that is currently in remission, he demonstrated a

3    relatively simple but accurate understanding of the proceedings

4    against him and appears capable of participating meaningfully

5    in his own defense.  Mr. McCoy appears capable of making

6    decisions regarding his case, provided these decisions are

7    explained at a level commensurate with his borderline

8    intellectual functioning.  That is, simple explanations with

9    attention to explaining any aspects that he may not already

10   understand.  He appears capable of provide -- it says provide,

11   I assume it means providing.  He appears capable of providing

12   relevant testimony, if necessary, and able to conform his

13   behavior to the demands of the courtroom.  In sum, there is no

14   evidence Mr. McCoy currently suffers from mental disorder that

15   impairs his ability to understand the proceedings against him

16   or to consult with his attorney with a reasonable degree of

17   rational -- with a reasonable degree of rational degree of

18   understanding.

19          The bottom line is that, in accordance with the

20   standard that applies for competency evaluation, Dr. Rosenfeld

21   finds the defendant competent.

22          Do you agree with that, Mr. Bradley?

23          By the way, I keep asking Mr. Bradley.  I don't mean

24   to ignore Ms. Keenan.  Which of you is going to be responsible?

25          MR. BRADLEY:  I will be holding the baton for today's

 1  hearing.

 2          THE COURT:  Fair enough.

 3          Do you agree this report from Dr. Rosenfeld concludes

 4  that the defendant is mentally competent to proceed in this

 5  case?

 6          MR. BRADLEY:  Yes, your Honor.  The government has

 7  reviewed it.  I have discussed it with Ms. Keenan.  The

 8  government has no concerns about the defendant's competency in

 9  light of Dr. Rosenfeld's evaluation.

10          THE COURT:  Really the same question to you,

11  Mr. Koffsky.  Where do you stand on this issue?

12          MR. KOFFSKY:  If your Honor will recall -- well, we

13  accept Dr. Rosenfeld's finding, we ask the Court to find that

14  the defendant is competent to assist in his own defense and

15  understand and appreciate what's going on here, and most

16  importantly, that he is capable of entering a guilty plea.

17          As the Court knows, I never took the position that he

18  was incompetent.  I took the position that I was unable to pass

19  judgment on his competency, and that's when I asked the Court

20  to order this evaluation.  But I ask the Court, at this point

21  in time, that the client is competent and ready to proceed.

22          THE COURT:  All right.

23          And I want to say for the record that I appreciate

24  the way Mr. Koffsky handled this case.  He wasn't dishonest.

25  He wasn't taking a position which he didn't believe to be true.

1    What he was doing was saying, look, my client does have, to use

2    a lay term, issues, mental health issues.  There's no question

3    about that.  I don't think anybody disagrees with that.  And

4    because of the importance of this matter and the importance of

5    this case to Mr. McCoy, also to the government for that matter,

6    but certainly to Mr. McCoy in the first instance, that it made

7    sense, in Mr. Koffsky's view, to proceed under a Section 4241

8    and the other relevant sections of Title 18 to evaluate his

9    competency and to make a determination of his competency under

10   those statutes.  And I'm glad we did, because that makes for a

11   much better record, and it gives me confidence based on the

12   evaluation of someone who knows what he's talking about.  I'm

13   not a psychologist.  Sometimes I think I should have been a

14   psychologist.  I've had to pretend to be a psychologist a lot

15   of times in my career but I'm not.

16              So I appreciate what you did, Mr. Koffsky.  I really

17   do.

18              So at this time, given what the report -- strike

19   that.

20              Given what Dr. Rosenfeld says, given what the

21   government says, given what Mr. Koffsky says, I do find that

22   the defendant is competent to stand trial.

23              I've already read the conclusion into the record.

24   There's no dispute about the conclusion.  So the Court accepts

25   those findings as the findings of the Court.

1          What I read into the record, which is the summary

2     paragraph of the March 8 report, I adopt as the findings of the

3     Court and conclude that that he is, that the defendant is

4     competent.  All right.  That resolves that issue.

5          And again, let me just be crystal clear for the

6     record.  The defendant is proposing to plead guilty today,

7     which means that at some point I'm going to be sentencing him.

8     A lot of what's in Dr. Rosenfeld's report and the other reports

9     that I've seen will become highly relevant to the sentencing

10    determination.  The only decision I'm making now is that he's

11    competent.  I'm not concluding that he has no mental health

12    issues or that he doesn't have limited intellectual

13    functioning.  I'm not doing that at all.  Everything that's in

14    the report from Dr. Rosenfeld plus the other reports that I've

15    read will be relevant at sentencing.  But in terms of

16    competency to proceed in this case, my determination is that he

17    is competent.  Okay.

18          Mr. Koffsky, does your client have an application?

19          MR. KOFFSKY:  Yes, your Honor.  At this time, my

20    client would ask the Court to allow him to withdraw his

21    previously entered pleas of not guilty to Count One and

22    Count Two and accept his pleas of guilty to those counts, which

23    are the only counts that are currently pending against him,

24    either in the indictment or because he's ready to waive

25    indictment and consent to the filing of an information that the

 1    Court would accept his guilty plea to the two counts that would

 2    then be pending against him.

 3              THE COURT:  Okay.  And there's no plea agreement in

 4    this case; is that correct, Mr. Koffsky?

 5              MR. KOFFSKY:  That's correct, your Honor.  Just for

 6    the Court's information, I have reviewed with my client the

 7    government's Pimentel letter that I received both some months

 8    ago from AUSA Mathew -- wait, Mathew --

 9              THE COURT:  Andrews.

10              MR. KOFFSKY:  Andrews, excuse me, and current

11    counsel.  I've reviewed with my client both the plea and the

12    sentencing transcript in the co-defendant's case.  I have

13    reviewed with him the indictment and the new information and

14    the waiver of an indictment, and he is ready to proceed, your

15    Honor.

16              THE COURT:  Okay.

17              All right.  Mr. McCoy, I'm going to be asking you a

18    number of questions today, so I want you to listen carefully to

19    my questions.  I also want you to pull that microphone directly

20    in front of you so that I can make sure I hear your answers.

21    Okay?

22              Now, Mr. Koffsky, have you tested out the

23    communication devices with your client in case you need to use

24    that during --

25              MR. KOFFSKY:  I have, your Honor.

                Angela O'Donnell - Official Court Reporter
                              914-390-4025

```
 1                 THE COURT:  All right.

 2                 Okay, Mr. McCoy, I've been informed that you wish to

 3      waive indictment and to plead guilty to Counts One and Two of a

 4      superseding information which has the docket number on it of

 5      S2 19CR549; is that correct?

 6                 THE DEFENDANT:  Yes, your Honor.

 7                 THE COURT:  You don't have -- just sit normally.  The

 8      microphone should be about a foot away from your mouth.  It

 9      needs to be on a direct line with me.  That's the important

10      part.  Okay?

11                 So your answer was yes to that question?

12                 THE DEFENDANT:  Yes, your Honor.

13                 THE COURT:  Now, before I can accept your guilty

14      plea, I need to ask you certain questions.  And as I say, it's

15      very important that you answer these questions honestly and

16      completely.  I'm doing this so I can make sure that you

17      understand your rights and that you're pleading guilty

18      voluntarily and of your own free will.

19                 I also want to make sure that you're pleading guilty

20      because you are guilty and not for some other reason and that

21      you fully understand the consequences of your plea.

22                 So if at any point during these proceedings today you

23      do not understand my questions -- and that could happen.

24      There's nothing wrong with that -- if that happens, if you

25      don't understand what I'm asking and you want to speak to your
```

1    lawyer or you want me to further explain the question, I will

2    do that, and I'll allow you to speak to your lawyer.  But you

3    need to tell me that you don't understand the question, because

4    I can't know that without you telling me that.

5              It's very important that you understand every

6    question before you answer it.  So will you let me know if

7    there's any question that you don't understand?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  At this time, I'm going to place you

10   under oath.

11             Ms. Hilbert, would you swear the defendant?

12             (Lorenzo McCoy sworn)

13             THE COURT:  Mr. McCoy, you're now under oath.  That

14   means if you answer any of my questions falsely, you could

15   later be prosecuted for perjury or for making a false

16   statement.  Do you understand that?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  What is your full name?

19             THE DEFENDANT:  Lorenzo D. McCoy.

20             THE COURT:  What's the middle initial?

21             THE DEFENDANT:  D.

22             THE COURT:  D?  Okay.

23             How old are you, sir?

24             THE DEFENDANT:  Twenty-one.

25             THE COURT:  How far did you go in school?

                 Angela O'Donnell - Official Court Reporter
                              914-390-4025

1              THE DEFENDANT:  I graduated.

2              THE COURT:  From high school?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  You know what, you don't have to lean

5     into the microphone.  Just sit comfortably, and just speak

6     clearly, and we'll hear you just fine.  You don't have to go in

7     and out.  Okay?

8              So you graduated from high school.

9              THE DEFENDANT:  Yes.

10             THE COURT:  Which high school?

11             THE DEFENDANT:  Peekskill High School.

12             THE COURT:  Now, are you currently, in other words,

13    right now, under the care of a doctor for any reason?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  Tell me about that.

16             THE DEFENDANT:  I'm sorry?

17             THE COURT:  Tell me what you're being treated for.

18             THE DEFENDANT:  Schizophrenic and other stuff.

19             THE COURT:  Okay, and are you seeing a psychiatrist

20    or a psychologist?

21             What kind of treatment are you getting?

22             THE DEFENDANT:  They prescribe medication, and I have

23    an appointment tomorrow.

24             THE COURT:  Mr. Koffsky, do me a favor.  Just pull

25    the microphone a little closer.  I want McCoy to be as

```
 1    comfortable as possible.  Okay?
 2              You said that you have an appointment tomorrow.
 3              THE DEFENDANT:  Yes, your Honor.
 4              THE COURT:  With a psychiatrist or psychologist?
 5              Do you know who you having this appointment with?
 6              THE DEFENDANT:  Yes, Dr. Lucien.
 7              THE COURT:  Mr. Koffsky, do you know if that's a
 8    doctor or a psychologist?
 9              MR. KOFFSKY:  It's a doctor, both a
10    psychopharmacologist and his doctor at the Westchester Jewish
11    Medical Center. Westchester Jewish Center, your Honor.
12              THE COURT:  Are you able to understand what's
13    happening here today?
14              THE DEFENDANT:  Yes, your Honor.
15              THE COURT:  Have you been receiving treatment from
16    any other doctor, not necessarily for mental health issue, or
17    any kind of physical issue or anything like that?
18              THE DEFENDANT:  Not recent.  No.
19              THE COURT:  Now, I know that you've been treated for
20    mental health problems in the past because I've read all of
21    these reports that I've seen.  When was the last time that you
22    were hospitalized for any mental health issue approximately?
23              THE DEFENDANT:  I'm sorry?
24              THE COURT:  When approximately?  In other words, last
25    week, last year, two years ago; do you remember?
```

```
 1                    THE DEFENDANT:  Around 2017.  That was my last being
 2    hospitalized.
 3                    THE COURT:  Okay.  So recently you haven't been
 4    hospitalized.  That's going back a few years.
 5                    THE DEFENDANT:  Yes.
 6                    THE COURT:  All right.  Have you ever been treated
 7    for any drug or alcohol abuse or addiction?
 8                    THE DEFENDANT:  Yes.
 9                    THE COURT:  What were you treated for?
10                    THE DEFENDANT:  Marijuana.
11                    THE COURT:  And when was that?
12                    THE DEFENDANT:  2018.
13                    THE COURT:  Okay.  In the last 24 hours, in the last
14    24 hours, have you taken any illegal drugs, including
15    marijuana?
16                    THE DEFENDANT:  No, your Honor.
17                    THE COURT:  I know that the New York State
18    Legislature is close to legalizing marijuana but it hasn't
19    happened yet.
20                    Have you taken any -- have you consumed any alcohol
21    in the last 24 hours?
22                    THE DEFENDANT:  No, your Honor.
23                    THE COURT:  Have you taken any medicine or any other
24    kind of pills?  In other words, prescribed medication in the
25    last 24 hours.
```

Case 21-2098, Document 56, 03/23/2022, 3275066, Page85 of 185

 1              THE DEFENDANT:  Yes, your Honor.

 2              THE COURT:  What have you taken?

 3              THE DEFENDANT:  Depakote.

 4              THE COURT:  Depakote?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  And what is that for?

 7              THE DEFENDANT:  For the schizophrenic.

 8              THE COURT:  And does that help?

 9              THE DEFENDANT:  Yes.

10              THE COURT:  Okay.  Is your mind clear today?

11              THE DEFENDANT:  Yes, your Honor.

12              THE COURT:  Do you understand what's happening here

13    today?

14              THE DEFENDANT:  Yes, your Honor.

15              THE COURT:  Have you had enough time and opportunity

16    to discuss your case with your attorney?

17              THE DEFENDANT:  Yes, your Honor.

18              THE COURT:  And have you discussed with him the

19    charges against you including any possible defenses that you

20    might have?

21              THE DEFENDANT:  Yes, your Honor.

22              THE COURT:  Have you discussed with him the

23    consequences of entering a plea of guilty?

24              THE DEFENDANT:  Yes, your Honor.

25              THE COURT:  And are you satisfied with your

```
 1   attorney's representation of you?

 2           THE DEFENDANT:  Yes, your Honor.

 3           THE COURT:  Does either counsel have any doubt as to

 4   the defendant's competence to waive indictment and to plead

 5   guilty at this time?

 6           Mr. Bradley.

 7           MR. BRADLEY:  No doubts, your Honor.

 8           THE COURT:  And Mr. Koffsky.

 9           MR. KOFFSKY:  No, your Honor.

10           THE COURT:  Okay, based on the defendant's responses

11   to my questions and my observations of his demeanor, as well

12   as, frankly, the report I received from Dr. Rosenfeld, I find

13   that he is fully competent to waive indictment and enter an

14   informed guilty plea at this time.

15           Now, Mr. McCoy, the document that contains the

16   charges to which you've said you wish to plead guilty is called

17   an information, and it's been issued by the US Attorney.

18           Have you received a copy of the superseding

19   information, the S2 19CR549 information?

20           THE DEFENDANT:  Yes, your Honor.  Yes, your Honor.

21           THE COURT:  Thank you.

22           And have you read it?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  And did you discuss it with your

25   attorney?
```

```
 1                    THE DEFENDANT:  Yes, your Honor.

 2                    THE COURT:  Now, the crimes charged in this

 3      information are felonies, and because of that, you have a

 4      constitutional right to require the government to present

 5      evidence to a Grand Jury to see whether the Grand Jury would

 6      vote to charge you with those crimes.  Do you understand that?

 7                    THE DEFENDANT:  Yes, your Honor.

 8                    THE COURT:  And a Grand Jury is a group of at least

 9      16 but not more than 23 citizens.  Before you could be

10      indicted, at least 12 of them would have to agree that there

11      was probable cause to believe that a crime was committed and

12      that you committed it.  Do you understand that?

13                    THE DEFENDANT:  Yes, your Honor.

14                    THE COURT:  If the Grand Jury voted to charge you,

15      the document they would issue would be called an indictment.

16      Do you understand that?

17                    THE DEFENDANT:  Yes, your Honor.

18                    THE COURT:  Do you wish to give up your right to have

19      your case presented to the Grand Jury?

20                    THE DEFENDANT:  Yes, your Honor.

21                    THE COURT:  And did you discuss that decision with

22      your attorney?

23                    THE DEFENDANT:  Yes, your Honor.

24                    THE COURT:  All right, I've been provided with a

25      waiver of indictment form which appears to include both
```

1   Mr. McCoy and Mr. Koffsky's signature, and what it says is that

2   the above-named defendant, which is Mr. McCoy, is accused of

3   violating certain statutes in the criminal code, being advised

4   of the nature of the charge and of his rights, hereby waives in

5   open court prosecution by indictment and consents that the

6   proceeding may be by information instead of by indictment.

7           So first of all, is this your signature on the form

8   which is dated today, march 25, 2021?

9           THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And did you discuss -- strike that.

11          Did you sign the form voluntarily?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  And before you signed the form, did you

14  discuss the form with your attorney?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Okay, I'm going to mark the waiver of

17  indictment form as Court Exhibit 1.

18          When you signed this form, did you understand that

19  you were giving up your right to be indicted by a Grand Jury?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Did anyone threaten you, or force you, or

22  coerce you to give up that right?

23          THE DEFENDANT:  No, your Honor.

24          THE COURT:  Okay, I find that the defendant has

25  knowingly and voluntarily waived his right to be indicted by a

```
 1   Grand Jury.  The information will be accepted for filing.

 2           Now, Mr. McCoy, you have a right to have me read out

 3   loud in open court the entire information, which I'm willing to

 4   do.  The law gives you that right.  But you don't have to do

 5   that.  You can waive that right.

 6           So would you like me to read it to you or would you

 7   like to waive a public reading?

 8           THE DEFENDANT:  Waive it, your Honor.

 9           THE COURT:  All right.  Thank you.

10           Okay, I'm now going to explain certain rights that

11   you have under the Constitution and laws of the United States.

12   These are rights that you will be giving up if you enter a

13   guilty plea.  So again, please tell me if there's anything you

14   don't understand and either I or your attorney will explain the

15   matter more fully.

16           First of all, you have the right to plead not guilty

17   to the charges contained in this information or persist in your

18   previously entered plea of not guilty.  Do you understand that?

19           THE DEFENDANT:  Yes, your Honor.

20           THE COURT:  If you plead not guilty, you have the

21   right to a speedy and public trial by a jury on the charges

22   contained in the information.  Do you understand that?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  At that trial, you would be presumed to

25   be innocent, and the government would be required to prove you
```

1    guilty by competent evidence beyond a reasonable doubt before

2    you could be found guilty.  So that means that you would not

3    have to prove -- you would not have to prove that you were

4    innocent.  Do you understand that?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Now if there were a jury trial, you could

7    not be convicted unless a jury of 12 people unanimously agreed

8    that you were guilty beyond a reasonable doubt.  Do you

9    understand that?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  At that trial, and at every other stage

12   of the case, you would have the right to be represented by an

13   attorney, and if you could not afford an attorney, the Court

14   would appoint one to represent you.  Do you understand that?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  During a trial, the witnesses for the

17   government would have to come to court and testify in your

18   presence and your lawyer could confront and cross examine those

19   witnesses and also object to evidence offered by the

20   government.  Do you understand that?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  At a trial, your lawyer could also offer

23   evidence on your behalf and you would have the right to use

24   subpoenas to compel witnesses to testify and to obtain evidence

25   to be offered in your defense.  Do you understand that?

 1          THE DEFENDANT:  Yes, your Honor.

 2          THE COURT:  At a trial you would have the right to

 3    testify, if you chose to do so, but you would also have the

 4    right not to testify.  And if you chose not to testify, that

 5    could not be used against you in any way.  So no inference or

 6    suggestion of guilt could be drawn from the fact that you did

 7    not testify.  Do you understand that?

 8          THE DEFENDANT:  Yes, your Honor.

 9          THE COURT:  If you were convicted at a trial, you

10    would have the right to appeal that verdict to a higher court.

11    Do you understand that?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  And do you also understand that even now

14    you have the right to change your mind, you could persist in

15    your not guilty plea, and you can go to trial?

16          Do you understand that?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  But if you do plead guilty, and if I

19    accept your guilty plea, you will be giving up your right to a

20    trial and all the other rights that go with it that I just

21    described other than the right to an attorney.  You keep that

22    right.

23          If you plead guilty, there will be no trial and I

24    will enter a judgment of guilty and sentence you on the basis

25    of your guilty plea after I consider a presentence report

1    prepared by the Probation Department and also consider any

2    submissions that I get from you, your attorney, and the

3    government's attorney.  Do you understand all of that?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  Finally, if you do plead guilty, you will

6    also be giving up your right not to incriminate yourself, and I

7    will ask you questions about what you did in order to satisfy

8    myself that you are, in fact, guilty as charged.  Do you

9    understand that?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  Now I asked you this before.  Let me ask

12   you again.  Have you received the information, the superseding

13   information?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  Have you read it?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  Have you discussed it with your attorney?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Do you understand that you're charged in

20   two counts in this information?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  And I just want to summarize what you're

23   charged with.  This is just a summary.

24             Count One charges you with carjacking, and Count Two

25   charges you with conspiracy to commit carjacking.  In other

1    words, agreeing with at least one other person to commit

2    carjacking.  Do you understand that those are the charges in

3    the information?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  Okay, Mr. Bradley, could you please tell

6    me the essential elements of the offense charged in Count One

7    and Count Two starting with Count One.

8              MR. BRADLEY:  Yes, your Honor.

9              In order to prove the defendant guilty of the charges

10   in Count One, specifically the carjacking statute, the

11   government would have to prove each of the following elements

12   beyond a reasonable doubt:

13             First, that the defendant took a motor vehicle from

14   another person;

15             Second, that the defendant did so by means of force,

16   violence, or intimidation;

17             Third, that the defendant intended to cause death or

18   serious bodily harm; and

19             Fourth, that the vehicle had been transported,

20   shipped, or received in interstate or foreign commerce.

21             With regards to the charges in Count Two.

22             THE COURT:  Hold on one second.

23             MR. BRADLEY:  Yes.

24             THE COURT:  Okay, go forward.  Go ahead.

25             MR. BRADLEY:  Thank you.

**A245**

1          With regard to conspiracy to commit carjacking count

2     charged in Count Two, your Honor, the government would have to

3     prove each of the following elements beyond a reasonable doubt:

4          First, that two or more people agreed to commit a

5     crime, in this instance, carjacking;

6          Second, that the defendant knowingly and intentional

7     joined the conspiracy; and

8          Third, that the defendant committed an overt act in

9     furtherance of that conspiracy.

10          Your Honor, additionally, the government would be

11     required to demonstrate by a preponderance of the evidence that

12     venue is appropriate in the Southern District of New York, and

13     in this case the offense occurred in the vicinity of Peekskill,

14     New York, which is in the Southern District of New York.

15          THE COURT:  Okay, thank you, Mr. Bradley.

16          Mr. McCoy, do you understand that if you did not

17     plead guilty to Count One, which is the carjacking count, the

18     government would have to prove each and every element of that

19     charge beyond a reasonable doubt at trial.

20          So let me say it again.  The government would have to

21     prove each and every element of the carjacking charge, that's

22     Count One, beyond a reasonable doubt at trial, except they

23     don't have to do that if you plead guilty to Count One.  Do you

24     understand that?

25          THE DEFENDANT:  Yes, your Honor.

 1             THE COURT:  Same thing with Count Two.  The

 2    government has to prove each and every element of that charge,

 3    which is the conspiracy to commit carjacking charge, beyond a

 4    reasonable doubt at trial; however, if you plead guilty, they

 5    don't have to do that.  Do you understand that?

 6             THE DEFENDANT:  Yes, your Honor.

 7             THE COURT:  So if you plead not guilty, they have to

 8    prove it, all the elements, and if you plead -- well, that's

 9    the question.

10             Do you understand that if you plead not guilty, the

11    government has to prove each and every element of those two

12    charges at trial?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  Now, I need to tell you about the

15    possible maximum penalties for each of these offenses.  These

16    are the maximum penalties, doesn't mean that's the penalty I'm

17    going to impose, but these are the possible maximum penalties.

18             Again, starting with Count One, which is the

19    carjacking charge.  If you're convicted of that charge, I could

20    sentence you up to a maximum of 15 years in prison, followed by

21    a maximum of three years of supervised release.  I could also

22    sentence up to a maximum of $250,000 fine or twice the gross

23    pecuniary, meaning monetary, gain derived from the offense, or

24    twice the gross pecuniary loss to persons other than you

25    resulting from the offense.  And I could also assess a $100

1    mandatory special assessment.

2              And hold on just one second.

3              Also, if you're convicted of this offense, I can

4    order you to forfeit all property constituting or derived from

5    the proceeds traceable to the commission of the offense.  Do

6    you understand those are the maximum possible penalties for

7    Count One?

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  Now, as to Count Two, it's a little bit

10   different, so let me explain it to you there.

11             Count Two is the conspiracy charge and the maximum

12   possible sentence for that charge is five years in prison

13   followed by a maximum period of supervised release of three

14   years, a maximum fine of $250,000 or twice the gross pecuniary

15   gain derived from the offense or twice the gross pecuniary loss

16   to persons other than you resulting from the offense, and also

17   a $100 mandatory special assessment.

18             Just like for Count One, if you're convicted of

19   Count Two, I could order you to forfeit all property

20   constituting or derived from the proceeds traceable to the

21   commission of the offense.  Do you understand that these are

22   the maximum possible penalties for Count Two?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  Now also, Mr. McCoy, as part of your

25   sentence, I can order you to pay restitution to any person or

1     entity injured as a direct result of your criminal conduct.

2     Meaning, if you took money from somebody or you took something

3     of value, I could order you to pay it back.  That's what

4     restitution means.  Do you understand that?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  And Mr. Bradley, are you aware of a basis

7     for restitution in this case?

8              MR. BRADLEY:  Yes, your Honor.  There is restitution

9     that the government would attempt to seek with regards to the

10    victim's lost property and medical expenses in this case.  That

11    amount is $2,300.  It would be joint and several with a

12    co-defendant in this case, and the Court previously entered an

13    order of restitution as to that defendant that also reflected

14    that it would intend to be joint and several with Mr. McCoy.

15             THE COURT:  Okay, what this means, Mr. McCoy, is I

16    could order you, as a result of your conviction in this case,

17    assuming I accept your guilty plea, I could order you to pay

18    $2,300, $2,300 to the victim in this case.  Do you understand

19    that?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  But it's also important for you to know

22    that I've already ordered Mr. Taylor, your co-defendant in the

23    case, to make that amount of restitution.  The victim can't get

24    it twice.  The victim can only get it once.  So a total of

25    $2,300 is the restitution.  Some or all of that could come from

1  you, some or all of that could come from your co-defendant.  Do

2  you understand that?

3        THE DEFENDANT:  Yes, your Honor.

4        THE COURT:  Now I mentioned supervised release a

5  moment ago.  What that means is that if I sentence you to

6  prison to be followed by a term of supervised release, you will

7  be subject to supervision by the Probation Department after you

8  get released from prison.  And that supervision would be

9  pursuant to a number of conditions that you'd have to comply

10  with.  If you don't comply with any of the conditions of

11  supervised release, then the term of supervised release could

12  be revoked and you could be returned to prison without a jury

13  trial to serve additional time even beyond your original

14  sentence.  If that happened, you would not be given credit for

15  the time you served in prison on your original sentence or any

16  time you spent on supervised release.  Do you understand that?

17        THE DEFENDANT:  Yes, your Honor.

18        THE COURT:  And you should also understand that

19  parole, something called parole has been abolished in the

20  federal system.  So if you're sentenced to prison, you will not

21  be released early on parole.  Do you understand that?

22        THE DEFENDANT:  Yes, your Honor.

23        THE COURT:  Are you a United States citizen?

24        THE DEFENDANT:  Yes, your Honor.

25        THE COURT:  Now, you're proposing to plead guilty to

```
 1   two counts in this information.  Do you understand that I will
 2   impose a separate sentence on each of those two counts?
 3              THE DEFENDANT:  Yes, your Honor.
 4              THE COURT:  And do you further understand that I may
 5   order you to serve the sentences either concurrently, meaning
 6   at the same time, or consecutively, meaning that you'd have to
 7   serve one sentence on one count first to be followed by a
 8   sentence on the second count later?
 9              Do you understand that?
10              THE DEFENDANT:  Yes, your Honor.
11              THE COURT:  In other words, I could do either
12   consecutive or concurrent.  Do you understand that?
13              THE DEFENDANT:  Yes, your Honor.
14              THE COURT:  And do you understand that if I impose
15   consecutive sentences, your sentence could be a maximum total
16   of 20 years in prison, that's because it's 15 on Count One and
17   five on Count Two.
18              Again, I'm not saying that that is the sentence, but
19   it could be the sentence.  Do you understand that?
20              THE DEFENDANT:  Yes, your Honor.
21              THE COURT:  Do you further understand if I accept
22   your guilty plea and adjudge you guilty, that adjudication may
23   deprive you of valuable civil rights such as the right to vote,
24   the right to hold public office, the right to serve on a jury,
25   the right to possess any kind of firearm, and the right to hold
```

 1    certain professional licenses.  Do you understand that?

 2              THE DEFENDANT:  Yes, your Honor.

 3              THE COURT:  Now, Mr. McCoy, have you talked to your

 4    attorney about the federal sentencing guidelines and how they

 5    apply to your case?

 6              THE DEFENDANT:  Yes, your Honor.

 7              THE COURT:  In determining a sentence, I'm required

 8    to consider the guidelines, which are a set of rules and

 9    recommendations for determining an appropriate sentence.  I

10    have to calculate the applicable guideline range, I have to

11    consider that range, and I have to determine whether there

12    should be an upward or downward departure from that range.  In

13    addition to all that, I'm required to consider the sentencing

14    factors set forth in section 3553(a) of Title 18 of the United

15    States Code.  That's a statute, federal statute, and I have to

16    impose a sentence I believe best satisfies the purposes of the

17    criminal law, even if that sentence is higher or lower than

18    what the guidelines recommend.  Do you understand all of that?

19              THE DEFENDANT:  Yes, your Honor.

20              THE COURT:  Do you understand that I will not be able

21    to determine how the guidelines apply to your case until after

22    the presentence report has been prepared by the Probation

23    Office and both you and the government, you and the government

24    have had a chance to review, comment on, and object to anything

25    in the report.  Do you understand that?

```
1                    THE DEFENDANT:  Yes, your Honor.

2                    THE COURT:  Do you also understand that if your

3     attorney or anyone else has attempted to predict what your

4     sentence will be, that prediction could be wrong?

5                    THE DEFENDANT:  Yes, your Honor.

6                    THE COURT:  So, in other words, if someone said to

7     you, look, here's what I think is going to happen, that's fine,

8     somebody can predict, if they want to, but that prediction

9     could be wrong.  Do you understand that?

10                   THE DEFENDANT:  Yes, your Honor.

11                   THE COURT:  And I'm telling you this because you need

12    to understand that no one, not even your attorney or even the

13    government's attorney, can be sure now what your sentence will

14    be, and that's because it's my job to decide what your sentence

15    will be, not the government's job, not your attorney's job, and

16    I'm not going to do that now.  Instead, I'm going to wait until

17    after the presentence report is completed and I've ruled on any

18    challenges to the report, I've calculated the range, determined

19    whether there are grounds to depart, and also considered the

20    section 3553(a) factors.  So at this point nobody can predict

21    what the sentence will be in your case.  Do you understand all

22    of that?

23                   THE DEFENDANT:  Yes, your Honor.

24                   THE COURT:  Now, in this case, the government has

25    written a letter to your lawyer dated March 23, 2021, in which
```

1    the government's attorney explains how he thinks the sentencing

2    guidelines will apply to your case and a copy of it has been

3    provided to me.  Have you discussed this letter, this March 23.

4    2021, letter with your attorney, Mr. Koffsky?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  It's often referred to as a Pimentel

7    letter.  That's a name that lawyers give it based on a case

8    that was decided many years ago.  Thirty years ago, to be

9    exact.

10             So do you understand that if between now and

11   sentencing the government realizes it made a mistake in that

12   Pimentel letter, or it gets new information, it could take a

13   different position at sentencing regarding the guidelines

14   range.  Do you understand that?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  In other words, this is what the

17   government thinks the guidelines are, what the applicable

18   guidelines are.  But that's only what they think.  It's not

19   what I think necessarily.  It's just what they think.  And it

20   could change.  Do you understand that?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  So this letter is not a promise or a

23   guarantee by the government.  Do you understand that?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  And do you also understand that there's

 1   nothing in this letter that's binding on me?

 2           I didn't write the letter.  I'm not a party to this

 3   letter.  So nothing in here is binding on me.  Do you

 4   understand that?

 5           THE DEFENDANT:  Yes, your Honor.

 6           THE COURT:  By the same token, nothing in here is

 7   binding on you either.  You didn't write the letter.  Your

 8   lawyer didn't write the letter.  It's not an agreement.  It's

 9   just the government's position.  Do you understand that?

10           THE DEFENDANT:  Yes, your Honor.

11           THE COURT:  Do you understand that I will be making

12   my own decision as to how the guidelines affect your case and

13   what your ultimate sentence will be?

14           Do you understand that?

15           THE DEFENDANT:  Yes, your Honor.

16           THE COURT:  Now do you also understand that even if

17   your sentence is different from what your attorney or anyone

18   else told you it might be, or different from what you expect it

19   to be, or from what's contained in the Pimentel letter that

20   government has given you, once you pleaded guilty, you will not

21   be allowed to withdraw your plea.  Do you understand that?

22           THE DEFENDANT:  Yes, your Honor.

23           THE COURT:  Has anyone threatened you or coerced you

24   in any way or tried you to force you to plead guilty?

25           THE DEFENDANT:  No, your Honor.

```
 1                   THE COURT:  Has anyone promised you anything or

 2      offered you anything in order to get you to plead guilty?

 3                   THE DEFENDANT:  No, your Honor.

 4                   THE COURT:  Now there's no guilty -- I'm sorry,

 5      there's no plea agreement here, which often contains an

 6      agreement to the forfeiture provision.

 7                   Is the government going to be seeking forfeiture in

 8      this case or is it just going to seek restitution?

 9                   MR. BRADLEY:  It would just be restitution at this

10      time, your Honor.

11                   THE COURT:  So there's a forfeiture allegation, but

12      you're not seeking to forfeit anything from this defendant.

13                   MR. BRADLEY:  Not at this time, your Honor.

14                   THE COURT:  All right.

15                   Mr. McCoy, have you clearly understood everything

16      that's happened so far today?

17                   THE DEFENDANT:  Yes, your Honor.

18                   THE COURT:  Now that you've been advised of the

19      charges against you, the possible penalties that you face, and

20      also the rights that you're giving up, is it still your

21      intention to plead guilty to Counts One and Two of the

22      information?

23                   THE DEFENDANT:  Yes, your Honor.

24                   THE COURT:  With respect to Count One of the

25      information, how do you now plead, guilty or not guilty.
```

1                    THE DEFENDANT:  Guilty.

2                    THE COURT:  With respect to Count Two of the

3     information, how do you now plead, guilty or not guilty?

4                    THE DEFENDANT:  Guilty.

5                    THE COURT:  Are you, in fact, guilty of Count One,

6     the carjacking charge?

7                    THE DEFENDANT:  Yes, your Honor.

8                    THE COURT:  Are you, in fact, guilty of Count Two,

9     the conspiracy charge?

10                   THE DEFENDANT:  Yes, your Honor.

11                   THE COURT:  And are you pleading guilty voluntarily

12    and of your own free will for Count One, which is the

13    carjacking charge?

14                   THE DEFENDANT:  Yes, your Honor.

15                   THE COURT:  And are you pleading guilty voluntarily

16    and of your own free will for Count Two, which is the

17    conspiracy charge?

18                   THE DEFENDANT:  Yes, your Honor.

19                   THE COURT:  Mr. Bradley, would you please summarize

20    what the government would expect to prove if this case went to

21    trial.

22                   And Mr. McCoy, I want you to listen carefully to what

23    the government says.  Okay?

24                   Go ahead, Mr. Bradley.

25                   MR. BRADLEY:  Yes, your Honor.

1          If the case proceeded to trial, the government would

2     introduce, among other things, the following evidence:

3          First, testimony from the victim stating, among other

4     things, that the co-conspirator and another individual later

5     identified as the defendant, lured him into a basement of a

6     house in Peekskill, New York, threatened him with a knife, beat

7     him in the body and head until he was nearly unconscious,

8     robbed him, and stole his vehicle;

9          Second, law enforcement testimony regarding the

10    observed injuries on the victim, including that the victim was

11    bleeding from the head when speaking with law enforcement;

12         Third, medical records showing that the victim

13    sustained multiple lacerations to the head requiring multiple

14    staples to close the wound;

15         Fourth, vehicle records showing that the victim's car

16    was manufactured out of state, specifically, in Mexico;

17         Fifth, cellphone records from the defendant's phone,

18    including text message communications between the defendant and

19    the co-defendant regarding the commission and planning of the

20    offense; and

21         Then finally, your Honor, surveillance footage and

22    photographs, all of which would prove beyond a reasonable doubt

23    that on or about April 10th of 2019, in the vicinity of

24    Peekskill, New York, the defendant agreed with a co-conspirator

25    to knowingly take a motor vehicle from the victim after luring

```
 1    that person into a residential basement, threatening him with a

 2    knife, beating him to the point that the victim required

 3    hospitalization.

 4              The evidence would also show and further demonstrate

 5    the stolen car was manufactured in Mexico.

 6              THE COURT:  All right.  Just one clarification.

 7              When you mentioned text messages, I think what I

 8    heard, maybe I misheard it, that you said there were text

 9    message's from the victim's phone that showed discussions

10    between the two defendants about conducting this offense,

11    carrying out this offense?

12              MR. BRADLEY:  I beg your pardon, it was from the

13    defendant's phone.

14              THE COURT:  This defendant, Mr. McCoy?

15              MR. BRADLEY:  Yes.  And just to make the record

16    clear, those records would be from the defendant's cellphone

17    that included text message communications between the defendant

18    and the co-defendant, Mr. Taylor, regarding the planning and

19    commission of the offense.

20              THE COURT:  Thank you, Mr. Bradley.

21              Mr. McCoy, did you hear what the prosecutor just

22    said?

23              THE DEFENDANT:  Yes, your Honor.

24              THE COURT:  Is what he said substantially correct?

25              THE DEFENDANT:  Yes, your Honor.
```

```
 1              THE COURT:  All right, what I need you to do now is
 2    tell me in your own words what you did to make you believe that
 3    you're guilty of this offense.  If you want to read something
 4    that's okay or can just --
 5              THE DEFENDANT:  I would like to first apologize to
 6    you and the courts and my family and to the victim for my
 7    actions and the role of this situation that I'm being charged
 8    with.  I, Lorenzo McCoy, on April --
 9              THE COURT:  Hold on.  Mr. McCoy, when a person reads,
10    they always speak more quickly than when they speak normally,
11    so you really have to force yourself to slow down.
12              THE DEFENDANT:  Okay.
13              THE COURT:  You can read it, just read it slowly.
14    Okay?
15              THE DEFENDANT:  I, Lorenzo McCoy, on April 10th,
16    2019, in Peekskill, New York, while aiding and abetting another
17    individual, took a car from its owner.  I knowingly used force
18    and violence to take the car from its owner, and I knowingly
19    caused serious bodily injuries to the victim.
20              When I took the car, the car that was taken from the
21    victim has been shipped in interstate commerce because it was
22    manufactured outside of the United States.
23              THE COURT:  Okay, now, it's perfectly okay to do
24    this, but was that written statement prepared with the help of
25    your attorney or did you do it yourself or something you did in
```

1    conjunction with your attorney?  What you just read.

2              THE DEFENDANT:  Yeah, we did it together.

3              THE COURT:  That's fine.  I just want the record to

4    be clear about that.

5              Now, before you did this offense that you just told

6    me about, did you and the other fellow, Mr. Taylor, did you

7    plan it ahead of time?

8              MR. KOFFSKY:  Your Honor, there's a second part of

9    the statement that he hasn't yet finished.

10             THE COURT:  Oh, I apologize.

11             MR. KOFFSKY:  If the Court would allow him to

12   complete, satisfy both Count One and Count Two.

13             THE COURT:  Go right ahead.  Sorry about that.  I

14   thought you were done.  You can continue.

15             THE DEFENDANT:  I, Lorenzo McCoy, on April 10 of

16   2019, in Peekskill, New York, freely and voluntarily joined an

17   agreement with another individual to commit the crime of

18   carjacking which I described above.  I committed both the

19   crimes of carjacking and conspiracy to commit carjacking

20   knowingly and voluntarily and of my own free will, even though

21   I knew that all those acts were illegal.  I accept full

22   responsibility for my actions.

23             THE COURT:  Okay, thank you.

24             Mr. Koffsky, your client did mention this.  Do you

25   concede the government would be able to prove the interstate

1    commerce element?

2           MR. KOFFSKY:  Yes, your Honor.  We concede that the

3    vehicle that was taken was manufactured in Mexico and therefore

4    it must have traveled in interstate commerce.

5           THE COURT:  Unless it was transported *à la Star Trek*,

6    we're pretty sure it moved down the road one way or another

7    from Mexico to New York.

8           MR. KOFFSKY:  That's correct, your Honor.

9           THE COURT:  We all agree on that?

10          MR. KOFFSKY:  Yes.

11          THE COURT:  All right.

12          All right, Mr. McCoy, at the time you did these

13   things that you just told me about, did you know that what you

14   were doing was wrong and against the law?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Did anyone force you to do these things

17   or coerce you to do these things or threaten you to do these

18   things?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  Mr. Bradley, do you believe there's a

21   sufficient factual predicate for the guilty plea?

22          MR. BRADLEY:  I do, your Honor.

23          THE COURT:  Mr. Koffsky, do you agree with that?

24          MR. KOFFSKY:  Yes, your Honor.

25          THE COURT:  And are there any additional questions

```
 1   either one of you would like me to ask the defendant?

 2           First, Mr. Bradley.

 3           MR. BRADLEY:  No, your Honor.  The government is

 4   satisfied.

 5           THE COURT:  And Mr. Koffsky.

 6           MR. KOFFSKY:  No, your Honor.  Thank you.

 7           THE COURT:  And finally, Mr. Koffsky, do you know of

 8   any valid defense that would prevail at trial or any reason why

 9   your client should not be permitted to plead guilty?

10           MR. KOFFSKY:  No, your Honor.

11           THE COURT:  And are you also satisfied based on your

12   conversations and interactions with Mr. McCoy and also with his

13   parents and his family, are you satisfied that he knows what

14   he's doing, that he's competent to do this and that he's

15   proceeding entirely voluntarily and knowingly in entering this

16   guilty plea?

17           MR. KOFFSKY:  Yes, your Honor.  Being cognizant of

18   whatever issues he might have, I have taken great pains to make

19   sure both he and his family understand what we're doing today,

20   what rights he has, what rights he's giving up, and that he's

21   entering these pleas knowingly and voluntarily, but most

22   importantly, being competent to do so.

23           THE COURT:  All right.  Thank you, Mr. Koffsky.

24           Based on the defendant's responses to my questions

25   and my observations of his demeanor, I find that he understands
```

 1   his rights and is waiving them knowingly and voluntarily with

 2   an understanding of the consequences of his guilty plea,

 3   including the potential sentences that may be imposed.

 4           I further find that the guilty plea is voluntary and

 5   did not result from force, threats, or promises.  That the

 6   defendant has admitted he is guilty as charged in Counts One

 7   and Two of the information, and the plea is supported by an

 8   independent and factual basis for each and every element of the

 9   crimes charged.

10           Accordingly, I accept the guilty plea and adjudge the

11   defendant guilty on the charge in Counts One and Two.

12           Now, Mr. McCoy, I'm going to direct the Probation

13   Department to conduct a presentence investigation and prepare a

14   presentence report.  As part of that process, you've going to

15   be interviewed by a probation officer.  When that happens, your

16   attorney will be with you.  Okay?

17           THE DEFENDANT:  Okay.

18           THE COURT:  It's very important whatever you say to

19   the probation officer is truthful and accurate.  Because if it

20   isn't, that's going to get reported to me and that's not in

21   your -- that's against your best interest if that were to

22   happen.  Do you understand that?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  Also, the presentence report that's going

25   to get prepared is very important because I read it carefully,

```
 1   I rely on it at the time of sentencing in deciding what

 2   sentence to impose.  So since it's important to me, it's also

 3   important to you.  Right?

 4              Do you understand me?

 5              THE DEFENDANT:  Yes, your Honor.

 6              THE COURT:  And you're going to get to see it ahead

 7   of time, before I even see it.  They'll send it to you and to

 8   your attorney.  So it's very important that you review it

 9   carefully, discuss it with your attorney, and if there is

10   anything at all in that presentence report that you disagree

11   with or you think is wrong, tell me Mr. Koffsky about it.  He

12   knows how to bring that to my attention, and he will bring it

13   to my attention.  But you can't wait until after sentencing to

14   do that.

15              Every once in a while somebody will tell me after

16   they've been sentenced, oh, you know what, I just found

17   something that was wrong in the report.  It's too late.  You've

18   got to do it before sentencing.  Do you understand me?

19              THE DEFENDANT:  Yes, your Honor.

20              THE COURT:  And as I said both you -- well, both you

21   and your lawyer will have an opportunity to review the report.

22   And before I actually impose sentencing, both you and your

23   attorney will have an opportunity to speak.  Do you understand

24   that?

25              THE DEFENDANT:  Yes, your Honor.
```

1          THE COURT:  Do we have a date for sentencing?

2          THE DEPUTY CLERK:  Yes.  Friday, July 16, 2021, 2:30

3   in the afternoon.

4          THE COURT:  July 16, 2:30.  Maybe back in my

5   courtroom, which is under renovation.  Anyway it will be in

6   person.  All right.  July 16, 2:30.

7          Mr. Bradley, how's that work?

8          MR. BRADLEY:  That works for the government, your

9   Honor.

10          THE COURT:  Mr. Koffsky?

11          MR. KOFFSKY:  Yes, your Honor.  Thank you.

12          THE COURT:  All right.  And the trial date, which is

13   still currently scheduled for I believe April 12th, is now

14   officially canceled since I've accepted the guilty plea.

15          All right, I know the defendant has been out on bail,

16   there were some issues with respect to that early on, but by

17   all accounts he's been doing very well on bail more recently.

18   Actually, for quite a while now.

19          Does the government have a position with respect to

20   whether I should continue the defendant on bail pending

21   sentencing?

22          MR. BRADLEY:  Your Honor, I certainly would

23   acknowledge that the defendant has been in compliance to the

24   best of the government's knowledge with his release conditions

25   as of late.  As the Court noted, there were some issues at the

```
 1   beginning.  Those seem to have been corrected.

 2            I would just note from the government's perspective

 3   that this would be considered a conviction for a crime of

 4   violence, and under section 3143, this would be considered a

 5   mandatory remand.  And under the circumstances, I don't believe

 6   that the government's been able to identify any exceptional

 7   reasons why the defendant's bail should be continued.

 8            THE COURT:  Okay, well, I'll let Mr. Koffsky talk

 9   about this.

10            Mr. Koffsky, the government is correct, I believe,

11   that under 3143(a), I think that's it, yes, it's (a), someone

12   who's been found guilty of certain offenses, including crimes

13   of violence, and I think certainly at least Count One is a

14   crime of violence, that such a person has to have his bail

15   revoked pending sentencing.  But there is a provision in the

16   Bail Reform Act, section 3145(c), which says that if there's

17   clear and convincing evidence that the defendant is not likely

18   to flee or pose a threat to the safety -- pose a danger to the

19   safety of the community or to another person, and if it is

20   clearly shown that there are exceptional reasons why detention

21   would not be appropriate, well then, under those circumstances,

22   I could continue the defendant on bail notwithstanding 3143(a).

23            What's your position on this?

24            MR. KOFFSKY:  Your Honor, I believe the Court can

25   find there are exceptional circumstances to continue the
```

1  release of Mr. McCoy.

2          I suggest to the Court that just as a result of the

3  pandemic the Court can find that there are exceptional

4  circumstances.  Mr. McCoy is 21 years of age, he is nowhere

5  near getting vaccinated.  To put him into a custodial facility

6  at this point would raise significant dangers to him, and I

7  would suggest that that in itself is an exceptional

8  circumstance.

9          In addition, your Honor, as the Court knows,

10  Mr. McCoy has mental health issues.  He is continuing to be

11  medicated, he's continuing to see long-term psychiatric and

12  therapeutic care outside the prison facility.  If the Court was

13  to detain him, he might see a psychiatrist in the facility, but

14  that psychiatrist would have absolutely no history with the

15  defendant, and I would suggest to the Court that his mental

16  health would suffer significantly.

17          With regard to his behavior while he's been out, yes,

18  there were a couple of slip-ups.  Those are more than a year in

19  the past, your Honor.  Since that time he has maintained

20  complete compliance with the terms of release.

21          In fact, your Honor ordered him to attend a

22  competency evaluation at a doctor's office in Manhattan.  My

23  client took it upon himself to make sure he made it there on

24  time.  He has been not only compliant but fully compliant with

25  all the terms and conditions of release.

```
 1              I suggest to the Court -- I can't telegraph what the
 2     Court's sentence will be, I'm mindful of what the Court
 3     sentenced the defendant to, but one of the exceptional
 4     circumstances might be, might be that the defendant might
 5     receive a nonincarceratory sentence.  Might be.  And I would
 6     suggest that all those reasons taken together would give the
 7     Court the appropriate of foundation for the Court to find
 8     exceptional circumstances and continue the defendant's release
 9     conditions.
10              THE COURT:  I'm going to continue him on bail.  I do
11     find that there's clear and convincing evidence that Mr. McCoy
12     is not likely to flee or pose a danger to another person or the
13     community because he's been dong very well and has been fully
14     compliant with the conditions of his release for more than a
15     year.  That's the easy part.
16              As far as the exceptional circumstances part, that's
17     a little harder.  I'm not sure that any one of the things that
18     you mentioned in and of itself would be enough.  I mean the
19     pandemic, yes, that's a factor.  But you know, there are people
20     in jail, and while it's very uncomfortable and nobody in jail
21     is happy to be there, most people that are in jail are able to,
22     because of the restrictions that have been put on movement and
23     visitation, recreation, et cetera, have been able to remain
24     virus free.  Not all.  There's been plenty of people in jail
25     that have caught the virus, no question about it.  But it is a
```

1    factor.  I'm just saying standing alone it would not be enough.

2          The fact that I might impose a non-jail sentence is a

3    factor, but of course there's no guarantee that that's what I'm

4    going to do.  In fact, according to the government, the

5    sentencing range here is 51 to 63 months, which is roughly four

6    to five years in prison.  Not binding, but nonetheless, that is

7    the sentencing range, according to the government.  But there's

8    a possibility that, for all the obvious reasons, which boil

9    down to Mr. McCoy's unusual circumstances; his age, his mental

10   health circumstances.  It's a possibility.  Certainly it's a

11   possibility.

12         Probably the most important one is the mental health

13   treatment that he's receiving.  I really don't want to

14   interfere with that if I don't have to, and he's receiving

15   medication, he's receiving therapy, and I'm pretty much certain

16   that if I were to put him in jail today that that treatment

17   would be interfered with.  Would it destroy him forever?  I

18   don't think so.  People are pretty resilient.  He can receive

19   treatment while this custody.  But it would have an adverse

20   effect, of that I am certain, and it would take a while to

21   recover from.

22         So the combination of that those factors I believe

23   constitutes exceptional circumstances.  So I'm going to the

24   continue him on bail on the conditions that he's currently been

25   released on.

1           Now, Mr. McCoy, I have to give you a couple of

2   warnings, these are important.

3           First of all, do you understand that if you fail to

4   return to my courtroom for sentencing on the day and time set,

5   which again, is July 16 at 2:30 p.m., you would be guilty of a

6   separate crime if you failed to show up, and that separate

7   crime is called bail jumping?  And if you're convicted of bail

8   jumping, you could be sentenced to imprisonment and a fine

9   separate and apart from and in addition to whatever sentence

10  you might receive for the two crimes that you just pleaded

11  guilty to.  Do you understand that?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Also, do you understand that the

14  conditions on which you were released up until now continue to

15  apply?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  And the consequences can be very serious

18  if you violate any of those conditions.  Do you understand

19  that?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Nothing has changed.  Everything that

22  applied, all the conditions that applied to you up until now

23  continue to apply.  Do you understand that?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  All right, bail is continued.

```
 1              Hold on one second.  All right, July 16 is the
 2    deadline, excuse me, is the sentencing date.
 3              Mr. Koffsky, I'd like any sentencing submission from
 4    you by July 2nd, which is two weeks ahead of time.  I have a
 5    feeling that it might, might take me some time to review.  So,
 6    please, no later than July 2nd.  Obviously, if we need to
 7    adjourn it, we can do that.  July 2nd is your date, and July 9
 8    would be the government's submission.  You'll have plenty to do
 9    over the July 4th weekend, Mr. Bradley.  In fact, I would
10    suggest that you might assign that task to your colleague,
11    Ms. Keenan, if you have other plans.
12              MR. BRADLEY:  I will follow the Court's order.
13              THE COURT:  Bottom line is, July 2nd for the defense,
14    July 9 for the government.
15              MR. BRADLEY:  Yes, your Honor.
16              THE COURT:  All right, is there anything else we need
17    to do today?
18              Mr. Bradley.
19              MR. BRADLEY:  Not from the government, your Honor.
20              THE COURT:  And Mr. Koffsky.
21              MR. KOFFSKY:  Nothing, your Honor.  Thank you.
22              THE COURT:  Thank you all very much.
23              As I said, the trial date is canceled, and everybody
24    please stay safe and we'll see you on July 16.
25              THE DEPUTY CLERK:  All rise.  This Court will be in
```

1    recess.

2              (Proceedings concluded)

3    CERTIFICATE:   I hereby certify that the foregoing is a true and
     accurate transcript, to the best of my skill and ability, from
4    my stenographic notes of this proceeding.
     Angela A. O'Donnell, RPR,Official Court Reporter, USDC, SDNY
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

UNITED STATES OF AMERICA

        v.                19 CR 549 (VB)

LORENZO MCCOY,

              Defendant.

————————————————————————x
                  U.S. Courthouse
                  White Plains, N.Y.
                  August 19, 2021
                  9:30 a.m.


Before:  HON. VINCENT L. BRICCETTI,
         United States District Judge


APPEARANCES

UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK
300 Quarropas Street
White Plains, N.Y. 10601
BY: LINDSEY KEENAN
Assistant United States Attorney

BRUCE D. KOFFSKY, Esq.
Attorney for Defendant


Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

1              THE COURT:  Good morning everybody.

2              MR. KOFFSKY:  Good morning.

3              THE CLERK:  United States of America against Lorenzo

4     McCoy.  Will counsel please note their appearance for the

5     record?

6              MS. KEENAN:  Good morning, Your Honor.  Lindsey

7     Keenan for the Government.

8              MR. KOFFSKY:  Good morning, Your Honor.  Attorney

9     Bruce Koffsky.  I'm appointed counsel for Mr. Lorenzo McCoy.

10    Mr. McCoy joins me at counsel table.

11             THE COURT:  Okay.  Welcome.  Have a seat everybody.

12             All right.  This matter is on for sentencing today,

13    the Defendant having pleaded guilty to carjacking and

14    conspiracy to commit carjacking.  I have reviewed the

15    following materials in preparation for sentencing:

16             The Revised Presentence Report, which is dated June

17    23rd, 2021, prepared by Probation Officer Willett.

18             I also reviewed the Pimentel letter, dated March

19    23rd, 2021; defense counsel's sentencing memo, dated August

20    5th, 2021, as well as the materials attached thereto.

21             I also received a victim impact statement from the

22    victim of the crime in this case.  It was submitted along

23    with a letter from the U.S. Attorney's Office, dated August

24    17th, 2021.  Did you get that, by the way, Mr. Koffsky?

25             MR. KOFFSKY:  I did, Your Honor.  Thank you.

1              THE COURT:  And, finally, I reviewed the

2    Government's sentencing memorandum, dated August 12th, 2021.

3              Has anything else been submitted that I have failed

4    to mention?  Ms. Keenan.

5              MS. KEENAN:  No, Your Honor.

6              THE COURT:  And Mr. Koffsky.

7              MR. KOFFSKY:  No, Your Honor.

8              THE COURT:  Mr. Koffsky, have you read the Revised

9    Presentence Report and discussed it with your client?

10             MR. KOFFSKY:  I have, Your Honor, on a number of

11   occasions.

12             THE COURT:  And, Mr. McCoy, have you read the

13   Revised Presentence Report?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  And have you discussed it with your

16   attorney?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  Okay.  And, Ms. Keenan, have you read

19   the Revised Presentence Report?

20             MS. KEENAN:  I have, Your Honor.

21             THE COURT:  Let me just quickly summarize how the

22   report calculates the sentencing range here.  I don't think

23   there's any dispute, but let me just put it on the record.

24             The Base Offense Level is 20 under Guidelines

25   Section 2B3.1(a).  There is a three-level upward adjustment

1    because a dangerous weapon was brandished, in this case a

2    knife. That's 2B3.1(b)(2)(E). A two-level upward adjustment

3    because the victim sustained bodily injury. That's

4    2B3.1(b)(3)(A), although, I think the PSR incorrectly cites

5    Subsection (b)(3)(B). I'm pretty sure it's (b)(3)(A).

6                  There's a two-level upward adjustment because the

7    offense involved a carjacking under 2B3.1(b)(5).

8                  Those are all upward adjustments. And then there

9    is a three-level downward adjustment for acceptance of

10   responsibility under Section 3E1.1. So, the Final Offense

11   Level is 24. The Defendant has one criminal history point,

12   which places him in Criminal History Category I. According

13   to the PSR, the sentencing range is 51 to 63 months'

14   imprisonment. Also, the supervised release range is one to

15   three years, and the fine range is $20,000 to $200,000.

16                  Does the Government object to any of the factual

17   statements in the Presentence Report?

18                  MS. KEENAN: No, Your Honor.

19                  THE COURT: Does the Defendant object to any of the

20   factual statements in the Presentence Report?

21                  MR. KOFFSKY: No, Your Honor.

22                  THE COURT: There being no dispute as to the facts,

23   the Court adopts the factual statements in the Presentence

24   Report as the Court's own findings of fact for purposes of

25   this sentencing.

                  Sue Ghorayeb, Official Court Reporter

1          Does the Government object to the Guidelines

2    calculation or anything else in the report?

3          MS. KEENAN:  No, Your Honor.

4          THE COURT:  And the same question to you, Mr.

5    Koffsky.  Does the Defendant object to the Guidelines

6    calculation or anything else in the report?

7          MR. KOFFSKY:  No, Your Honor.

8          THE COURT:  Okay.  Based on my review of the

9    Presentence Report and my own evaluation of the Guidelines, I

10   adopt the Guidelines calculation in the report and conclude

11   that the Final Offense Level is 24, at Criminal History

12   Category I, which yields a sentencing range of 51 to 63

13   months' imprisonment.  There has been no motion for any

14   Guidelines-based departure from the applicable range.

15         I did receive, as I said, the victim impact

16   statement.  Just to confirm, Ms. Keenan, do you anticipate

17   the victim appearing in court today?

18         MS. KEENAN:  I do not, Your Honor.

19         THE COURT:  Okay.  Does the Government wish to be

20   heard on sentencing?

21         MS. KEENAN:  Just briefly, Your Honor.  Without

22   belaboring the points in our sentencing submission, in the

23   Government's view, it's really the nature and seriousness of

24   the offense which drives the Government's position that a

25   substantial sentence is warranted for the conduct in this

Sue Ghorayeb,  Official Court Reporter

**1**   case.  The facts of the offense conduct demonstrate advanced

**2**   planning.  A text message was sent to the victim directing him

**3**   to meet at a certain place.  The victim unwittingly and

**4**   willing to perform a favor for the Defendant and his

**5**   co-conspirator met up with them so that he could offer them a

**6**   ride.  At numerous points, when the message was sent en route

**7**   to the meeting place, while walking around the house, which

**8**   was the meeting place, to the back, to the basement steps, at

**9**   any of those points the Defendant could have withdrawn from

**10**  this conduct and he chose not to.

**11**          In the basement of this meeting point, the victim

**12**  was beaten, kicked and punched about the head and body so

**13**  badly that he required hospitalization and staples to his

**14**  head to close a laceration.  And not only did the Defendant

**15**  choose at each point along this venture to participate in

**16**  this conduct, but he also chose to brandish a knife, causing

**17**  the victim to fear for his life.

**18**          The victim impact statement, while not long or

**19**  terribly articulate, is poignant.  The victim says, "I have

**20**  terrible flashbacks whenever I even have to think about this

**21**  incident that happened.  I have trouble sleeping."  He has

**22**  lasting impact.  "I have nightmares when I remember.  Please

**23**  don't bring this up for me."  From these simple words, it's

**24**  apparent that this was a horribly scarring event for this

**25**  victim.  And, so, because of the nature and seriousness of

Sue Ghorayeb,  Official Court Reporter

1    the offense, the Government submits that a substantial

2    sentence is warranted.

3         And I'll just touch briefly on defense counsel's

4    suggestion that home detention is appropriate in this case,

5    and for two reasons, the Government does not believe that

6    such a substantial departure from the Guidelines is warranted

7    or that home detention would be appropriate for this

8    Defendant.

9         First, the Defendant has repeatedly shown his

10   inability to comply with court orders while he is at home.

11   He's had a number of violations of pretrial supervision.

12   And, second, in terms of unwarranted disparities between

13   like-situated defendants, the co-defendant in this case, Mr.

14   Taylor, was sentenced to time served, which was approximately

15   16 months.  And, so, a sentence of home detention for this

16   Defendant would create a substantially unwarranted disparity

17   among similarly situated defendants.

18        Unless Your Honor has any questions —

19        THE COURT:  I do have a couple of questions.  You

20   know I always have a couple of questions, Ms. Keenan.

21        First of all, I don't know that the Presentence

22   Report — again, hold on one second.  You know, the

23   Presentence Report describes the fact that the co-defendant

24   Taylor had sent a text message to the victim asking for a

25   ride.  And I remember from the sentencing in the Taylor case

1    that what precipitated this, apparently, was that the victim
2    had promised to give Taylor a ride on a previous day, maybe
3    the day before, and then didn't show up and Taylor was
4    stranded at the train station. And so — and, basically,
5    Taylor decided, "well, I'll show him. You know, I'll, I'll
6    try to get another ride and this time I'll take his car, and
7    that way I don't have to worry about asking him for a ride
8    anymore." So that was Taylor. But what the PSR doesn't
9    really do is explain — and maybe you don't know. I mean,
10    you only know what you know. But it doesn't really
11    explain — and, by the way, neither does Mr. Koffsky for that
12    matter — explain how McCoy got involved in this. I mean,
13    did McCoy know the victim?

14              Was McCoy — obviously, McCoy knew Taylor, but what
15    was their relationship? What can you tell me about how —
16    this — the report talks about how Taylor got involved, but
17    it doesn't really talk about how Mr. McCoy got involved,
18    other than the fact that he was there and he did what he is
19    alleged to have done.

20              MS. KEENAN: I can tell Your Honor a lot about that
21    from the evidence in this case, which includes text messages
22    and data from Taylor's cellphone. I do know that Taylor sent
23    that text message. I can't imagine that it was just an
24    unlucky accident that McCoy happened to be there as well with
25    a knife and prepared to tell the victim to get down in advance

Sue Ghorayeb,   Official Court Reporter

1    of a beating.

2            THE COURT:  I'm sure that that's not the case.  But

3    really the bigger question is:  Did — for example, I mean,

4    this is now a hypothetical, because I don't know.

5            Let's say Taylor said to McCoy — and we — I don't

6    think we really — I don't think anyone can dispute that this

7    is not Mr. McCoy's fault.  You know, he was born this way.

8    He is a person of limited intellectual functioning, let's

9    say.  Let's say that Taylor knowing that McCoy was someone

10   who was easily influenced and feeling that he needed an

11   accomplice to accomplish, you know, the carjacking, recruited

12   McCoy and offered him, you know, $20 to participate or gave

13   him some other kind of promise; maybe didn't even tell him

14   very much about what was going to happen other than, you

15   know, "we gotta do something to this other guy."

16           And, again, I'm — this is purely hypothetical,

17   because I don't know any of that.  But it would — you talked

18   about the nature and seriousness of the offense, and I agree

19   with you that that is the starting point.  Well, the statute

20   says that.  So we're not — we're not the first people to say

21   that, Congress said it.

22           But this is part of the nature and circumstances of

23   the offense, meaning Mr. McCoy's — we know pretty much what

24   Taylor did, but we don't really know what led up to what

25   McCoy did, and I'm just trying to draw additional facts, if

**1**  **you know of them, and I'll ask the same questions of Mr.**

**2**  **Koffsky, of course.**

**3**  **MS. KEENAN:  So, the answer, Your Honor, is that I**

**4**  **don't know of them and that I could speculate in the opposite**

**5**  **direction, in that, Taylor said, "I'm stuck at the train**

**6**  **station.  This person was supposed to give me a ride and he**

**7**  **didn't give me a ride."  Then McCoy said, "okay, I'll bring my**

**8**  **knife and we'll get him tomorrow."  We can speculate in either**

**9**  **direction.**

**10**  **THE COURT:  True.**

**11**  **MS. KEENAN:  And aside from asking Mr. McCoy and**

**12**  **getting an answer, there is no way to know, except to rely on**

**13**  **the fact that he pled guilty to a conspiracy to commit**

**14**  **carjacking, which involves an agreement with another person to**

**15**  **take a car, and we know that he actually completed the**

**16**  **objective of that conspiracy, and we know that he was there on**

**17**  **the date of the offense, April 10th, 2019, with a knife, and**

**18**  **that it's not the first time that he had threatened another**

**19**  **person with a knife.  In fact, it was the second time.**

**20**  **And I just would note again that it's very possible**

**21**  **that Mr. McCoy is someone who is easily influenced or easily**

**22**  **aroused to anger, but I would note that I think Mr. Taylor**

**23**  **had the same difficulties of intellectual functioning and the**

**24**  **same difficulties of background as Mr. McCoy.  And I would**

**25**  **also note that there are millions — billions of people in**

**1**     the world with difficult backgrounds and limited capacity who

**2**     do not resort to violence and who do not participate in

**3**     criminal conspiracies.

**4**          THE COURT:  Well, I know that is true, but you

**5**     understand why I'm just trying to get a little more detail,

**6**     but if you don't have it beyond what you've already told me,

**7**     then you don't have it.  You know, another distinction ——

**8**     there is a distinction between —— you mentioned unwarranted

**9**     disparity, so let me just follow up on that.

**10**          There is a distinction, it seems to me, between

**11**    Taylor's situation and McCoy's situation, because with

**12**    McCoy —— although Taylor definitely has issues in his past,

**13**    no question about that, I remember that clearly, and so does

**14**    McCoy.  But with McCoy, we have a series of basically a

**15**    lifetime of mental health issues, behavioral issues

**16**    documented.  You know, there are all these reports that Mr.

**17**    Koffsky produced.  And, by the way, there was also the report

**18**    and opinion of a forensic psychologist who examined Mr. McCoy

**19**    at the time of the competency hearing.  So we know a lot

**20**    about Mr. McCoy's mental health issues and limitations.  I

**21**    think more so —— I mean, it's fair, it's fair to say that

**22**    what distinguishes him from Taylor is that we have a

**23**    documented history of serious mental health issues.  So there

**24**    is a distinction.

**25**          No, no two people are alike.  It's never the case

Sue Ghorayeb,  Official Court Reporter

1   where they're always alike, in other words, and no two

2   people's involvement — if there's two people involved in a

3   crime, a conspiracy, or even if you're not charged with

4   conspiracy, just, you know, working together to commit a

5   substantive offense, no people — no two people are identical

6   in what they do and what their culpability level is.  There

7   is almost always some level of distinction between two people

8   or more.  Oftentimes, it's more than that in an offense that

9   involves, you know, multiple people.

10          But, I mean, don't you agree with me that we have a

11  much more complete and documented record of mental health

12  issues for Mr. Taylor — excuse me, for Mr. McCoy as compared

13  to Taylor?

14          MS. KEENAN:  I do agree with you on that point.

15          THE COURT:  I noticed that you said, at the

16  beginning of your remarks, that you thought that a substantial

17  sentence was warranted.  What you didn't say — although I

18  think you said it in your — in your sentencing submission.

19  What you didn't say is that you thought a sentence within the

20  Guidelines was warranted.  You said a substantial sentence was

21  warranted.  Now, I suspect that you chose your words carefully

22  there.  Am I right about that?

23          MS. KEENAN:  You're right about that, Your Honor.

24          THE COURT:  Okay.  All right.  Thank you, Ms.

25  Keenan.  Mr. Koffsky, do you wish to be heard?

1          MR. KOFFSKY:  Yes, Your Honor.  Thank you.

2          Let me try to first address some of the comments

3    that Assistant U.S. Attorney Keenan made.  I'll also try to

4    address some of the questions that the Court has.

5          This case, I have a trial file.  My file in this

6    case is very voluminous.  I didn't bring the discovery

7    material with me and I should have.  I should have wheeled in

8    my entire file.  But I can tell the Court —

9          THE COURT:  No, you shouldn't have.  This is

10   sentencing.  He has pleaded guilty.  We're here for

11   sentencing, not for trial.

12         MR. KOFFSKY:  I understand.

13         THE COURT:  Your trial — you trial file, trial is

14   no — there is no trial.

15         MR. KOFFSKY:  Because —

16         THE COURT:  Wait, wait, wait.  I mean, Mr. Koffsky,

17   hold on a second.  When a lawyer says, "gee, I should have

18   done something," I like to correct that on the record, because

19   sometimes, later on in the future, people say, "oh, my lawyer

20   was constitutionally ineffective.  He even said he was

21   ineffective because he didn't bring something to court."

22         You are not ineffective, okay.  I hope Mr. McCoy

23   realizes how hard you worked on this case, and it wasn't just

24   the case, it was dealing with a client and dealing with the

25   client's family, dealing, with Pretrial Services, dealing with

Sue Ghorayeb,  Official Court Reporter

1   me, dealing with the prosecutor.  I want the record to be
2   100 percent crystal clear, Mr. Koffsky has done an amazing
3   job; just not — not just an okay job, but an amazing job on
4   behalf of his client.

5           I don't mean to knock you off your, you know, your
6   game here, but I — when I hear that, I think what's that
7   going to look like in a record, in a transcript, you know, a
8   year from now.  Anyway, go ahead, Mr. Koffsky.

9           MR. KOFFSKY:  Thank you, Your Honor.  I say that not
10  to disparage myself, but because I — that was a preface to
11  letting the Court know I'm now going to speak off-the-top of
12  my head and not from a document that's in front of me.

13          As best I can recall, the Court knows — it has put
14  on the record what the Court believes to be this sort of
15  preamble to this crime, and that is that Mr. Taylor was
16  deprived of the ride by the victim, wanted to get even in
17  some way.  What the Court doesn't know, because the Court
18  wasn't handed this — given this at that point, was that
19  there was text messages between Mr. Taylor and my client that
20  evening.

21          That said, Mr. Taylor said to my client, "I wanna
22  do a rip," r-i-p, a rip.  Now, if you look up the word "rip"
23  in the slang dictionary, it means a robbery.  My client
24  doesn't respond to that.  Mr. Taylor says, "meet me."  My
25  client doesn't respond to that.  Mr. Taylor says, "meet me."

**1**   My client says, "where," and they ultimately meet. Again,

**2**   speaking off-the-top of my head, that is the nature of the

**3**   conversation which involves my client in this incident.

**4**         He stood before Your Honor and pled guilty to

**5**   conspiracy to commit carjacking and carjacking, and he

**6**   doesn't back away from that at all, but those, as I can best

**7**   remember them, are the salient facts that the Court was

**8**   inquiring about. There were text messages between Mr. Taylor

**9**   and my client.

**10**         THE COURT: Ms. Keenan, can you confirm the

**11**   substantial accuracy of that?

**12**         MS. KEENAN: Yes. I just don't know about Mr.

**13**   McCoy's own phone, what he sent out to others or — but —

**14**         THE COURT: Well, Mr. Koffsky didn't say that. He's

**15**   just saying, here is what Taylor's messages said, and

**16**   eventually — not initially, but eventually, Mr. McCoy said,

**17**   "where?" That was the key word.

**18**         MS. KEENAN: Right.

**19**         THE COURT: Because that means okay, especially if

**20**   you combine where with showing up at the where. But,

**21**   basically, you're not disputing any of the substantial

**22**   accuracy of these?

**23**         MS. KEENAN: No. I would not say that was verbatim,

**24**   but I would say that was close to the exchange.

**25**         THE COURT: All right. Thank you.

Sue Ghorayeb, Official Court Reporter

1          Go ahead, Mr. Koffsky.

2          MR. KOFFSKY:  And, so, that's, that's what brings us

3     here today for sentencing.

4          Let me just speak — Ms. Keenan talked about some

5     of the violations which indicate some nefarious behavior on

6     the part of my client and that that should be used against

7     him.  This has been, as the Court knows, a very trying period

8     for my client with his intellectual difficulties.  He has had

9     to be on a very, very, very short leash, and for somebody

10    with those difficulties, it has presented no shortage of

11    problems for him, for his family, for Mr. Barrios, the

12    Pretrial Services Officer, who at times had to step on my

13    client, literally and figuratively, to make sure that he

14    complied with the orders of the Court, and we were in front

15    of Your Honor and we were in front of Judge Davison a number

16    of times.  None of those incidents ever led to an arrest.

17    All of those incidents, after being called into court, were

18    resolved in some way or another without the Court having to

19    do anything except reprimand a defendant with limited

20    functioning.

21          And, so, something happened to Mr. Taylor which

22    resulted in a violation of his supervised release — I mean a

23    violation of his release conditions, and he was locked up as

24    a result of that.  I didn't follow that.  I didn't check the

25    transcript on that.  I don't know what he did.  I don't know

1    if it led to an arrest.  But I know that for the last two and

2    a half years, my client has not had to be locked up and has

3    not been arrested.

4            THE COURT:  Okay.  Let me, let me just sort of

5    shortcircuit that a little bit.

6            What Ms. Keenan said is correct, but we dealt with

7    that.  Those issues have been resolved, and really — meaning

8    his difficulty with pretrial release has been resolved and

9    I'm just not going to rechew that particular cabbage, just

10   not.  That is done.  So, don't worry about it.  It's not

11   going to — to put it in a legal — to use legal terminology,

12   it will not affect the sentence in this case.

13           MR. KOFFSKY:  Of course, Your Honor, that knife has

14   two edges, because Ms. Keenan also mentioned sentencing

15   disparity and if the — if Defendant Taylor did 16 months as a

16   result of violating his supervised release and was locked up

17   for that period of time, that shouldn't cause the Court to

18   say, "well, I've gotta be fair here," because he did 16

19   months.  If Mr. Taylor violated the Court's release conditions

20   and was jailed, that shouldn't in some way affect the scales

21   that the Court has to look at.

22           THE COURT:  Well, yes and no.  You're right, it

23   doesn't really affect it except that he did 16 months.  That's

24   a fact.  And it's always my goal, and it should be the goal of

25   every sentencing judge, to try to — I don't know — harmonize

Sue Ghorayeb, Official Court Reporter

**1**    sentences among, you know, among the participants in a

**2**    particular crime.  So they're all convicted of the same crime,

**3**    but the sentences don't have to be identical, and if they're

**4**    not, you gotta have a reason, you gotta come up with a reason.

**5**    So Defendant 1 might get 16 months and Defendant 2 might get

**6**    five years.  Well, you better damn well have a reason for

**7**    that, and, of course, the reverse is true as well.

**8**            So, it is a fact, however it came to pass, that Mr.

**9**    Taylor did 16 months in jail for this crime, that's a fact,

**10**    and that's a relevant fact here.  It is relevant.

**11**            MR. KOFFSKY:  It might be or the Court can look at

**12**    it that Mr. Taylor did 16 months both for doing the crime and

**13**    violating the terms of his release.

**14**            THE COURT:  I didn't punish him for violating the

**15**    terms of his release.  I revoked his bail.  Actually, I think

**16**    it was Judge Davison who did it.  So, the Court — you know,

**17**    broadly speaking, the Court revoked his, you know, his bail.

**18**    That's not a punishment.  That's designed to ensure, you know,

**19**    that the Defendant will appear in court and will not be a

**20**    danger to the community.

**21**            By the way, you know, Mr. McCoy — and this is

**22**    another interesting fact here — has been on home detention

**23**    not for the whole two and a half years.  Remember, he wasn't

**24**    originally.  But there came a point in time where, I think

**25**    the first violation, that was imposed.  It was not imposed

Sue Ghorayeb,   Official Court Reporter

**1** originally. It was imposed somewhat later on, maybe six

**2** months or so into the — into the case, that's my

**3** recollection, the home detention part of it, so it wasn't

**4** from day one. In any event, so there was a — it was a

**5** consequence to a violation.

**6** Anyway, the point is that he wasn't — Mr. — you

**7** almost say in your submission — and, again, this is one of

**8** those things that's both right and wrong at the same time.

**9** You make it sound like he has already been punished. Well,

**10** he really hasn't been punished by me in home detention. He's

**11** in home detention because of his own behavior, in order to

**12** ensure the safety of the community and that he will appear in

**13** court as required. That's why he was in home detention.

**14** Now, in fact — and this is — that is why he was in home

**15** detention your client.

**16** Now, is home detention a limitation on a person's

**17** liberty? Yes, it is, of course. So, in that sense, I guess

**18** you could say it's "punishment," but it's not really

**19** punishment. That's not why, why he was ordered to go into

**20** home detention. It was because of his own conduct, which

**21** made it — which made the Court believe that we needed more

**22** restrictive conditions to ensure those two things that I

**23** mentioned earlier, safety and return to court.

**24** MR. KOFFSKY: I agree. I agree. I also agree that

**25** the Court can look at that behavior over that period of time

Sue Ghorayeb, Official Court Reporter

1  and construe it in such a way that Mr. McCoy can comply with

2  the rules of society.  He has not been arrested in the last

3  two and a half years, and by and large he has complied with

4  the orders of the Court.  So — so, if the Court is looking

5  for a general deterrent factor, as it must, then the Court can

6  consider his behavior over the last two and a half years.

7          And if I may just speak to one other factor on the

8  disparity.  As the Court knows, disparity is just not within

9  the cases of any particular docket number but it's sort of

10  cases at-large.  Now, I don't have a series of carjacking

11  cases to present to the Court.

12          THE COURT:  This is one of the sort of amazingly

13  ridiculous things that the Sentencing Commission did

14  originally and never — has never corrected.  You know, they

15  say:  Well, you know, when you talk about unwarranted

16  disparity, you're not supposed to talk about among the

17  defendants.  That's, that's really in the context of everyone

18  who is convicted of this crime on a nationwide basis, as if we

19  have the ability to just sort of, you know, easily gather that

20  data and understand unique differences between — between and

21  among each and every one of those cases, which, of course, we

22  can't.

23          I mean, you could have data.  There is data

24  available.  The Sentencing Commission publishes data on, you

25  know, sentences and how often, you know, in a particular case

Sue Ghorayeb,  Official Court Reporter

**1**     there is a below guideline sentence, that kind of stuff is

**2**     there.  But I find that almost useless, because you don't

**3**     know why in that particular — in that case in the District

**4**     of Utah there was a downward variance.  I mean, who knows?

**5**     Maybe the guy was 17 when the thing happened.  Well, maybe

**6**     not that.  But there is a million different reasons why there

**7**     could be a downward or upward variance.

**8**             So, you're right, it is one of those areas of the

**9**     commission which is — excuse me, of the Guidelines — there

**10**    are quite a few of these areas, but that's one of them

**11**    where — for those of us who actually practiced criminal law

**12**    as prosecutors, defense lawyers and judges, for those of us

**13**    who are in that federal criminal justice system — we know

**14**    that's just nonsense.

**15**            Now, having said that, it is also — there's plenty

**16**    of case law that says that it is appropriate and it is —

**17**    it's an appropriate consideration in determining the sentence

**18**    for Defendant Number 2 — let's assume this is a two-

**19**    defendant case where there is jointly undertaken criminal

**20**    activity.  It is appropriate to consider what sentence was

**21**    imposed for Defendant Number 1 in deciding what sentence to

**22**    impose for Defendant Number 2, because fairness — forget

**23**    about the Guidelines, just put them aside for a moment —

**24**    fairness requires proportionality, it requires — it requires

**25**    unwarranted disparity.  It requires that there shouldn't be

1    an unwarranted disparity between two defendants who are
2    convicted of the same thing in the same case.  That's not
3    really a Guidelines concept, that is just a due process
4    concept, you might say.

5           So, you're right, but it is relevant to consider.
6    It's relevant to consider what sentence I imposed on Taylor.
7    It is relevant.  And then you decide, well, okay, that's
8    fine, that's one data point.  There are other data points,
9    which there are.  So — but it's one data point.  It's not
10   fair to say that it's not a data point, it is.

11          MR. KOFFSKY:  I completely agree and my argument
12   isn't a guideline argument.  My argument is — I've already,
13   I've already thrown the guideline arguments out of the window.
14   This is a 3553(a) argument and the Court can consider
15   everything including white bread, everything.

16          One of the things I'll just throw out to the
17   Court — and it might land with a thud, but that's okay.  One
18   of the things early on we attempted to do with the Government
19   is to identify this particular carjacking.  Now, this was not
20   a case where somebody with a loaded firearm grabbed the
21   pregnant woman, pulled her out of the car, and took
22   the — and this was, this was exactly what the Court knows it
23   is, and this could've very easily been prosecuted as a state
24   crime, and as a state crime, Mr. McCoy would have been
25   eligible for youthful offender status.

1              THE COURT:  Well, I don't know about that.

2              MR. KOFFSKY:  As a 19-year-old, he would have been

3    eligible —

4              THE COURT:  No, no.  You have to be less than 19.

5    He was 19 I think.  Let's see, let's just verify that.

6              First of all, this is not — we're not — I'm not a

7    State Court Judge, so it's — although, again, that's a data

8    point, right.  There's lots of different data points.

9              His birthday is June 4th, 1999.  This incident

10   occurred in April of 2019.  So he was, he was 19.  I don't

11   think he would have been eligible for Y.O. status.  I think

12   Y.O. is under 19; not 19 and under, but under 19 I think.

13             MR. KOFFSKY:  Okay.

14             THE COURT:  Having said that —

15             MR. KOFFSKY:  I was wrong.

16             THE COURT:  — he was 19, he's a kid, just like the

17   other guy is a kid.  You might even put the word stupid kid in

18   front of it, and I'm not trying to be mean when I say that,

19   because I think all 19-year-olds are stupid in terms of making

20   bad judgments, poor judgments.  They know what they're doing,

21   but they're making poor judgments.  I'm not piling on, believe

22   me, when I say — when I use that word.  I'm just saying it

23   applies.  I don't know, it might have even applied to you when

24   you were 19.  So —

25             MR. KOFFSKY:  It applied to me when I was 30.

Sue Ghorayeb,  Official Court Reporter

1           **THE COURT:** What's that?

2           MR. KOFFSKY: It applied to me when I was 30.

3           THE COURT: I don't know about that. But, anyway,

4    so the more important point is not the eligibility for the

5    Y.O. status. The more important data point is that he was 19

6    years of age, nineteen; old enough to vote, not old enough to

7    drink. Your client I'm talking about.

8           MR. KOFFSKY: Well, again, I offer the fact that had

9    this been a State Court case, which it could have been, it

10   would have been resolved differently.

11          THE COURT: It would have been resolved differently,

12   that's correct.

13          MR. KOFFSKY: Okay. Now, let me talk about

14   Mr. McCoy, but I don't really have to. I can imagine very

15   often defendants stand in front of Your Honor for sentencing

16   and really sentencing is the first time that the Court has an

17   opportunity to evaluate a particular defendant. Defendant is

18   new to the Court. The facts of the case have relatively

19   recently come to the Court's attention, because the Court

20   reviewed the Presentence Report. That is not the case in this

21   prosecution.

22          This Court has known Mr. McCoy for two years. The

23   Court has had the opportunity of evaluating my motions to

24   have him evaluated, has evaluated his release on conditions,

25   has seen a report from Dr. Casarella that I required so that

Sue Ghorayeb, Official Court Reporter

1    I would feel comfortable discussing the case and a possible

2    resolution with the Defendant, and I know the Court read

3    that, because the Court questioned me on it.

4            And then, of course, there was the question of

5    competency, and, again, the Court permitted me to ask for a

6    forensic psychiatrist — psychologist.  Working with the

7    Government, we agreed on a forensic psychologist, because I

8    have to imagine that the Government wanted to know whether he

9    was competent, as well as I did.

10           THE COURT:  Of course they did.

11           MR. KOFFSKY:  And the Court had an opportunity to

12   review Dr. Rosenfeld's report.

13           In addition to that, the Court has been given

14   references to hospitalizations that go back — well, psych

15   evaluations that go back to the client's earliest years.  It

16   talks about special education.  It talks about special

17   programs in school.  It talks about his first hospitalization

18   at eleven, and inpatient stays at 11 and 14 and 15.  It talks

19   about his hospitalizations at Westchester Medical Center and

20   the three hospitalizations at Four Winds.

21           Now, I'm not privy to anything having to do with

22   Mr. Taylor, so I can't, I can't evaluate it.  I can't say

23   that one is more impaired than the other.  I can only talk

24   about Mr. McCoy.  And Mr. McCoy presents himself to the Court

25   as somebody who the Court — you know, I can remember when

1    there was a question as to what we do with one or both of the

2    psychiatric or psychological evaluations where the Court

3    said, "look, I underlined this, limited intellectual

4    functioning," the Court found that, and that's who the Court

5    sentences today for this horrible thing, this horrible

6    incident that has traumatized a victim.  We don't step away

7    from that for a heartbeat.

8           This is from a Defendant, limited intellectual

9    functioning, who gets a text message from a friend, "hey,

10   let's do this," and as the Court said, a 19-year-old is

11   stupid.  No.  Normal 19 year olds are stupid.

12           THE COURT:  Yes.

13           MR. KOFFSKY:  This client not only falls into that

14   sort of cauldron, but has the added — not benefit, but having

15   a lifetime of mental health issues; an IQ that's been

16   documented in his school records as being a 72 — now, I'm

17   not — nobody has done a more recent intellectual quotient

18   test, but that's somebody who might gravitate towards doing

19   just about anything without thinking, and, so, I ask the Court

20   to consider those factors.

21           The Court doesn't have to decide whether he did

22   this intentionally.  We've already agreed he intentionally,

23   willfully and knowingly involved himself in a conspiracy to

24   commit carjacking and carjacking.  But is that an intent with

25   a little i?  Is that somebody who got a knock on the door and

Sue Ghorayeb,  Official Court Reporter

1  said, "come with me," and went?

2          And is keeping him in, locking him up for a

3  particular period of time — a guideline sentence, a less

4  than guideline sentence — one, could it do anything for him

5  when really he needs mental health treatment, educational

6  opportunities, guidance from Pretrial Services and Probation?

7          Is it really going to act as a deterrent for people

8  like him?  Because, you know, with an IQ of 72 and a lifetime

9  of mental health, when you — (knocking on table) — you get

10  that knock on your door, do you go, "mm-hmm, you know,

11  Lorenzo got locked up, but I'm not gonna do this," or are you

12  functioning limited intellectual functioning?

13          So, I know the word needs to go out that this

14  behavior can't be tolerated.  But if you're talking about

15  people such as Lorenzo McCoy and the tools that they have to

16  turn away from this, I'm not so sure a 42 months' sentence, a

17  36 months' sentence, an 18 months' sentence is going to be

18  the general deterrence that the Court wants.

19          The Court knows this Defendant more than probably

20  90 percent of the other defendants that the Court sentences,

21  and, so, the Court has everything it needs.  Very simple

22  crime, it's not a complex crime, it's not a conspiracy, it's

23  not racketeering, it's not a tax case.  It's an isolated

24  violent crime where somebody is hurt and property was taken,

25  and the question is:  What is the right and just punishment

1    for Mr. McCoy?  And I've requested it in my sentencing

2    memorandum.  I think that there is a basis for that

3    sentencing — for that sentence and I think there is a basis

4    for being — for there being a disparity between Mr. Taylor's

5    sentence and Mr. McCoy's.

6            If the Court has any questions of me, I will be

7    more on that happy to try to address them.

8            THE COURT:  No.  I just want to say, again, that

9    you're right.  You know, it's amazing.  In these cases,

10   oftentimes, the parties and the Court agree on, you know,

11   98 percent of what we're talking about.  This is one of those

12   cases, and you're right where — when you say that I do feel

13   like I "know" Mr. McCoy better than most.  I've never spoken

14   to him personally, but I've read a lot about him and I've had

15   a lot of interactions with him.  Like you said, you're right,

16   this is different than most cases in that regard.

17           I just want to make it clear that I appreciate the

18   hard work that you and all of the other members of the CJA

19   panel do, and that certainly is true here in this case.  So

20   thank you.  You can have a seat.

21           Mr. McCoy, do you have anything that you would like

22   to say or any information that you would like to present

23   before I impose sentence?

24           THE DEFENDANT:  I just wanted to read the letter I

25   had wrote for you.

Sue Ghorayeb,  Official Court Reporter

1           THE COURT:  Sure, and you can just stay seated.  You
2   don't have to stand up.  Speak clearly.
3           Hold on a second.  You know what, push it back just
4   a little bit, because otherwise it —
5           THE DEFENDANT:  Is this good?
6           THE COURT:  That's better.  Just speak slowly, and I
7   want to make sure I hear what you have to say.
8           THE DEFENDANT:  Okay.  Dear Honorable Judge
9   Briccetti, first and foremost, I would like to apologize to
10  you, Judge Briccetti, the victim, and to my parents and
11  family, and the community that I live in.  I understand what I
12  did was wrong and it was stupid, it was a stupid mistake on my
13  part to physically harm someone by fighting with them and
14  causing them to go to the hospital.  That wasn't my intentions
15  and I wish I could take it all back.  I will never involve
16  myself in stupid acts like that and behaviors again, even if a
17  friend asked me to, because I know that it is wrong.
18          By being on house arrest, I had a long time
19  thinking about what I want to do with my life.  I'm a father.
20  I discovered that I have this two-year-old daughter and I
21  want to put my energy into taking care of her as I want to be
22  a great father.  I plan to do this by continuing mental
23  health treatment and then getting a job and getting a place
24  for me and my daughter.
25          Again — again, I would like to apologize to Judge

1    Briccetti, the victim, the courts and my parents, my family,
2    and the community I live in, and I hope you all forgive me
3    for my actions and mistakes, because I really regret doing
4    these things and I am truly sorry.

5         THE COURT:  All right.  Thank you, Mr. McCoy.  That
6    was — I can tell that that was heartfelt on your part and
7    that you've spent a lot of time preparing that, so thank you
8    for that.

9         All right.  Well, let me say first that in deciding
10    an appropriate sentence in this case, I've considered all of
11    the statutory factors set forth in Section 3553(a).

12         It is my practice, as counsel know, to tell the
13    Defendant what sentence I intend to impose upfront and then
14    to explain why, because I don't want you to wait for me to
15    give my little speech to hear what the sentence is.  So, I'm
16    going to tell you upfront that I actually agree with what I
17    thought was a very thoughtful and sensible recommendation of
18    the Probation Department that a sentence of imprisonment of
19    six months, to be followed by three years of supervised
20    release, and that would be imposed on each of the two counts
21    to run concurrently, and also restitution in the amount of
22    $2,300, is sufficient, but not greater than necessary, to
23    comply with the purposes of sentencing set forth in the
24    statute.

25         And I have complimented the CJA panel attorneys.

**1**   You know, the Probation Officers are pretty amazing too.
**2**   They are very thoughtful, because they do so many of these
**3**   reports, and they develop — based on that experience and
**4**   based on talking to their colleagues, they develop a real
**5**   sense of, you know, what's right in each individual case.  I
**6**   don't have to agree with it and often I don't, but in this
**7**   case, I think it's just right, because that's a very
**8**   substantial downward variance, and my reasoning for this and
**9**   for agreeing with Probation is as follows:

**10**       First of all, this was, to say the least, a very
**11**   serious crime.  Simply put, Mr. McCoy and his co-defendant
**12**   carried out a pre-planned — that's an important factor —
**13**   knife-point — that's an important factor -- robbery of the
**14**   victim in which they kicked and punched the victim, that's
**15**   important, resulting in multiple lacerations to the victim's
**16**   head which required staples and hospitalization.  That's
**17**   important.  And, then, for good measure, they stole his
**18**   cellphone and his car.

**19**       So, yeah, you're right, it's a relatively simple
**20**   fact-pattern, but there's a lot, a lot going on there.  There
**21**   is pre-planning.  There is knife-point.  There is physical
**22**   assault.  There is multiple lacerations and theft.  And, by
**23**   the way, you also have — you know, we're not here to cross-
**24**   examine the victim, but, you know, when the victim says, "I
**25**   think about this incident that happened to me" — strike that

**1**   one.  "I have terrible flashbacks whenever I think — I have

**2**   to think about this incident that happened to me.  I have

**3**   trouble sleeping from nightmares," I believe that.  In fact,

**4**   that's what happens when you're victimized in this way.  It's

**5**   really not surprising to see that.  So, what does that mean?

**6**           That means it's a serious crime that requires a

**7**   serious punishment, really to ensure that a just sentence is

**8**   imposed, and that, of course, takes into consideration the

**9**   victim's view as well and trying to do justice by the victim.

**10**  The victim is entitled to justice, just like Mr. McCoy is,

**11**  just like the community is.  There are, however, clearly

**12**  mitigating factors here which warrant a significant downward

**13**  variance from the guideline range of 51 to 63 months, which

**14**  is roughly four-and-a-half to five-and-a-half years.

**15**           Now, I'll point out that you didn't ask for this.

**16**  You could have, but you didn't.  You could have asked for a

**17**  departure, you know, a traditional departure under the

**18**  Guidelines.  Section 5H1.3 says that "mental and emotional

**19**  conditions may be relevant in determining whether a departure

**20**  is warranted, if such conditions individually or in

**21**  combination with other offender characteristics are present

**22**  to an unusual degree and distinguish the case from the

**23**  typical cases covered by the Guidelines."  Another one of

**24**  those words, typical cases covered by the Guidelines.  I

**25**  mean, maybe some professor knows what the typical cases are.

Sue Ghorayeb, Official Court Reporter

**1**  I don't really know what they are and I've been doing this
**2**  for forty years.

**3**  But, in any event, the point is, I'm not departing
**4**  under 5H1.3, but arguably this is a basis.  5H1.3 would be a
**5**  basis for departure here.  I don't think it matters.  I think
**6**  I have plenty of authority under 3553(a) to impose a downward
**7**  variance.  But the point is that even the Sentencing
**8**  Commission recognizes that a person who has mental and
**9**  emotional — and those things are related but they are a
**10**  little bit different — conditions that are present to an
**11**  unusual degree and distinguish the case from typical cases
**12**  covered by the Guidelines; that's relevant, and I think here
**13**  that's the case, and I think that Mr. McCoy has a number of
**14**  mental and emotional conditions that are present to an
**15**  unusual degree.  We don't have to go over this in chapter and
**16**  verse, because we all know what we're talking about.  It's
**17**  all in the record.

**18**  By the way, your sentencing memorandum, Mr.
**19**  Koffsky, I will file under seal.  So, all of those reports
**20**  will be part of the record, but it will be under seal.

**21**  First of all, according to the various
**22**  psychological reports that I read, the Defendant has a
**23**  lifelong history of mental health issues and also,
**24**  unfortunately, has only borderline intellectual functioning.
**25**  He was 19 at the time of the offense.  Nineteen is old enough

1  to know what you're doing and know that you're doing
2  something that's wrong and illegal and just plain old bad;
3  it's old enough for that.  But 19 is still an age at which
4  even 19-year-olds without the other issues that Mr. McCoy
5  has, it's an age at which people make stupid choices and
6  don't really take into account the consequences of their
7  acts.  And in the various reports that I have read, one of
8  the things that jumped out was that — I forget.  I'm sorry,
9  I don't have it which one exactly, but somewhere in here it
10  said that he was largely functioning as a much, much younger
11  person.  He really was not — you know, he's physically now
12  22 years old, and, by the way, old enough to have a child,
13  but in terms of his mental capacity, he was functioning as a
14  much, much younger person, really almost as a child.  So, the
15  fact that he was 19 and that he might have been — even his
16  mental age might even be less than that is a relevant factor
17  here, absolutely positively.

18          He does have a conviction and it was a violant
19  offense, that's true, but, on the other hand, there was only
20  one prior conviction.  It's not like he's constantly getting
21  in trouble and getting arrested.  He did have this one prior
22  conviction.  What was it?  Was it some stranger attack on the
23  street or mugging?  No, it was a stupid fight between Lorenzo
24  and his brother, which escalated and ultimately he got
25  arrested for that.  I guess his mother called the police, I

Sue Ghorayeb,  Official Court Reporter

**1**  forget, but somehow the police get called and he was

**2**  convicted of a menacing, misdemeanor menacing, did not get

**3**  jailtime, and my recollection is that he successfully

**4**  completed probation in that case.

**5**  So, yeah, he has a prior conviction, but it's only

**6**  one conviction and it just was a — it was a family dispute

**7**  on steroids, you might say.  I don't mean that there were

**8**  actually steroids, but just got completely out of control, as

**9**  described in the report paragraph — excuse me, in Paragraph

**10**  46 of the report.  Anyway, it's just it happened.  On the one

**11**  hand, it's I suppose an aggravating factor, because it shows

**12**  that Lorenzo has an issue with controlling himself.  On the

**13**  other hand, it was a — happened entirely inside his home and

**14**  it involved his brother.  He didn't hurt an innocent, you

**15**  know, you know, a child who couldn't defend him or herself,

**16**  it wasn't like that.  It was, it was Lorenzo and his brother.

**17**  I mentioned this earlier.  I think this is a

**18**  mitigating factor.  I mentioned it earlier that he has been

**19**  restricted to his home for nearly two years now.  Again, to

**20**  be clear, that was not punishment for anything, that was

**21**  because he screwed up on supervised release — excuse me, not

**22**  supervised release, pretrial release, and the decision was

**23**  made, rather than put him in jail, which certainly could have

**24**  happened, a decision was made to restrict his freedom a

**25**  little bit more in order to ensure the safety of the

Sue Ghorayeb,  Official Court Reporter

1   community and mitigate any risk of flight.  That was why it
2   was done.  But, at the same time, I think it's fair for me to
3   consider that as a form of punishment.  He's been — he has
4   been restricted for a long time.  I mean, who would want to
5   be in their house every day for two years, which is
6   essentially what happened with Mr. McCoy.  Of course, a lot
7   of us were in our houses for a long time in the recent past,
8   but I think it was even more significant for Mr. McCoy.

9        So, all those factors to me warrant a significant
10  downward variance, a very significant downward variance.
11  It's just that the crime itself was just so serious, the
12  impact on the victim was so great that I just believe that
13  justice requires some level of punishment that is meaning-
14  fully greater than either continued home confinement or
15  community service.  I just think it warrants something more
16  serious than that, and, specifically, it warrants a
17  relatively short jail sentence, in this case six months,
18  which in my view is necessary to serve the sentencing
19  objectives of just punishment; it's probably the most — and
20  promoting respect for the law.  Those are probably the most
21  important factors here, just punishment and promoting respect
22  for the law.  I hope, although I'm not a 100 percent certain
23  of this, but I certainly hope that it will serve to deter Mr.
24  McCoy from engaging in future criminal conduct, because now
25  he knows for certain that if you do stuff like this, you go

1    to jail, that's what happens.

2              So, there is a need for deterrence here,
3    particularly since this is not his first but his second
4    go-round.  In other words, it's a second time that he was
5    involved in a violent offense.  The other one was — there
6    were mitigating issues there for the reasons I discussed
7    earlier.  But the fact is, this is the second go-round, and
8    the first time he got probation, which he successfully
9    completed, but evidently it did not deter him from committing
10   the instant offense.  So, I am hopeful that this sentence
11   will.

12             The bottom line is that given the nature and
13   circumstances of the offense and the history and
14   characteristics of the Defendant, the sentence I intend to
15   impose is sufficient, but not greater than necessary, to
16   reflect the seriousness of the offense, promote respect for
17   the law and provide just punishment for the offense, and also
18   to afford adequate deterrence to criminal conduct.

19             Does either counsel know of any legal reason why
20   this sentence should not be imposed as stated?  Ms. Keenan.

21             MS. KEENAN:  No, Your Honor.

22             THE COURT:  Mr. Koffsky.

23             MR. KOFFSKY:  No, Your Honor.

24             THE COURT:  Mr. McCoy, now I need you to stand.

25             It is the judgment of this Court — that's okay.

1    Thank you.

2              It is the judgment of this Court that you be

3    committed to the custody of the United States Bureau of

4    Prisons for a total term of six months, to be followed by

5    three years of supervised release, and this sentence is

6    imposed on each count to run concurrently.

7              I'm also going to impose restitution.  We'll get to

8    that in a minute.

9              The standard conditions of supervised release one

10   through 12 shall apply.

11             The following mandatory conditions shall apply:

12             They're on Page 24 of the PSR.

13             You must not commit another federal, state, or

14   local crime.

15             You must not unlawfully possess a controlled

16   substance.  You must refrain from any unlawful use of a

17   controlled substance.  You must submit to one drug test

18   within 15 days of release from imprisonment and at least two

19   periodic drug tests thereafter, as determined by the Court.

20             You must cooperate in the collection of —

21   cooperate in the collection of DNA, as directed by your

22   Probation Officer.

23             And then I'm also imposing a number of special

24   conditions of supervised release as follows:

25             1.  You must not have contact with the victim in

1    this case, and this includes any physical, visual, written or

2    telephonic contact with such person.  In addition, you must

3    not directly cause or encourage anyone else to have such

4    contact with the victim.

5                2.  You must participate in an outpatient mental

6    health treatment program approved by the U.S. Probation

7    Office.  You must continue to take any prescribed

8    medications, unless otherwise instructed by your healthcare

9    provider.  You must contribute to the costs of services

10   rendered based on your ability to pay and the availability of

11   third-party payments.

12               The Court authorizes the release of available

13   psychological or psychiatric evaluations and reports,

14   including the Presentence Investigation Report, to the

15   healthcare provider.

16               Because there is a restitution obligation here, you

17   must provide the Probation Officer with access to any, excuse

18   me, requested financial information.  That's number 3.

19               4.  You must not incur new credit charges or open

20   additional lines of credit without the approval of the

21   Probation Officer, unless you are in compliance with any

22   installment payment schedule.

23               5.  You shall submit your person and any property,

24   residence, vehicle, papers, effects, computer or other

25   electronic communications or data storage devices, cloud

Sue Ghorayeb,  Official Court Reporter

**1** storage or media to a search by any U.S. Probation Officer,

**2** with the assistance of any law enforcement, if needed.

**3** The search is to be conducted upon reasonable

**4** suspicion concerning violation of a condition of supervision

**5** or unlawful conduct by the Defendant. Failure to submit to a

**6** search may be grounds for revocation of release. The

**7** Defendant shall warn any other occupants that the premises

**8** may be subject to searches pursuant to this condition. Any

**9** search shall be conducted at a reasonable time and in a

**10** reasonable manner.

**11** And, 6, you shall be supervised by your district of

**12** residence.

**13** Okay. I'm also imposing the mandatory special

**14** assessment of $100 per count. I have no discretion in that

**15** regard. So that's a total of $200 and that amount is due

**16** immediately.

**17** I am not imposing a fine, that's a separate thing,

**18** because the Defendant is unable to pay a fine.

**19** I am imposing restitution in the amount of $2,300,

**20** and I've been provided with a proposed order of restitution.

**21** Let me just review it quickly. Hold on one second.

**22** By the way, have you seen this, Mr. Koffsky?

**23** MR. KOFFSKY: I have, Your Honor.

**24** THE COURT: It doesn't technically require your

**25** client's consent, but I just want to make sure you are aware

1   of it.

2          MR. KOFFSKY:  Yes, Your Honor.  The only thing I

3   would add and I didn't check is whether it's joint and several

4   with Mr. Taylor.

5          THE COURT:  Well, I'm going to make it joint and

6   several.  Yes, it is.  It says, "restitution is joint and

7   several with the following Defendant in the following case,"

8   and it mentions Mr. Taylor's case.

9          MR. KOFFSKY:  Thank you.

10          THE COURT:  Yes, it is, and that will be in the

11   judgment as well.

12          In addition, the Schedule A is the name of the

13   victim and his address, and that will be docketed under seal.

14   So, I'm going to go ahead and — unless you have any

15   objection or any further comment, I'm going to go ahead and

16   sign that.

17          MR. KOFFSKY:  No objections, Your Honor.

18          THE COURT:  Today is what, the 19th?

19          THE CLERK:  Nineteenth, Judge.

20          THE COURT:  So that will be docketed.  And,

21   specifically, here is what I'm going to do.  I'm going to

22   order — can I have it back for a second, Donna?  I apologize.

23          I'm going to — yeah, it is in here.  It says —

24   this says, "The Defendant shall commence monthly installment

25   payments of $50 payable on the last day of each month until

1    restitution is fully paid."  That's what I intended to do

2    myself.  So, I must — did I do that in Taylor as well?  Is

3    that where the $50 comes from?

4              MS. KEENAN:  Yes, Your Honor.

5              THE COURT:  Okay.  That's enough.  I mean, that's,

6    that's an amount of money that Mr. McCoy can pay once he

7    finishes his jail sentence.  It's not even so much that he pay

8    the restitution in full; although, obviously, I would like

9    that to happen, but I think it's actually therapeutic and it's

10   a way to remind the Defendant of what he has done to make him

11   send a small amount of money — it's not a lot of money, a lot

12   of money — fifty dollars a month over a period of three

13   years, the period of supervision, to commence 30 days after

14   the entry of judgment, and I think that that's important.

15             And I've had cases recently where someone has been

16   ordered to pay restitution, just a small amount of

17   restitution, just a little bit every month, and they still

18   don't do it, and to me, that demonstrates irresponsibility

19   and the failure to really accept responsibility for what

20   you've done.  So make those payments in a timely fashion,

21   please.  Anyway, it's an order, so you have to do it.

22             Okay.  The foregoing constitutes the sentence of

23   the Court.

24             You can have a seat, everyone.

25             Now, Mr. McCoy, you have the right to appeal your

                Sue Ghorayeb,  Official Court Reporter

1    sentence.  A Notice of Appeal must be filed within 14 days
2    after the entry of judgment.  Therefore, if you do wish to
3    appeal, you must advise your attorney to prepare and file a
4    Notice of Appeal immediately, or, if you request, the clerk
5    will immediately prepare and file a Notice of Appeal on your
6    behalf.  And if you are unable to pay the costs of an appeal,
7    you may ask for permission to appeal without payment of
8    costs.

9              I think there are open counts, because this was the
10   S2, the Information or Indictment, so there must be
11   underlying Indictments.

12             MS. KEENAN:  Yes, Your Honor.  The Government moves
13   at this time to dismiss Counts One and Two of the October 29,
14   2019 Indictment.

15             THE COURT:  Which is the S1 Indictment or —

16             MS. KEENAN:  It was inadvertently styled as a
17   Superseding Indictment.  I think, Your Honor, it's the first
18   Indictment on the docket, but I think it's the first
19   Indictment and then —

20             THE COURT:  All right.  Well, any open —

21             MS. KEENAN:  Any open counts.

22             THE COURT:  I think originally just one of these two
23   guys was indicted, and then the second one was added later.
24   Maybe I'm making that up.

25             MS. KEENAN:  That could be right, Your Honor.

1              THE COURT: All right. Anyway, any open counts —
2    any objection to dismissing them, Mr. Koffsky?
3              MR. KOFFSKY: No, Your Honor. Thank you.
4              THE COURT: Okay. They're dismissed.
5              Recommendations to the Bureau of Prisons. This is
6    a short sentence. It's my experience that typically BOP will
7    require him to serve his sentence locally; in other words,
8    MDC or MCC, but I'm willing to put something else in the
9    judgment if you'd like me to.
10             MR. KOFFSKY: My request —
11             THE COURT: If it's reasonable. Go ahead.
12             MR. KOFFSKY: Right. I can't request a State
13   facility, so — and it would make no sense.
14             The only thing I would request, Your Honor, is:
15   You know, I would request the camp at Otisville, because
16   neither MCC nor MDC have camps; they are mediums and they
17   house temporary prisoners. So, I would request Otisville
18   Camp.
19             THE COURT: I'm going to, I'm going to grant that
20   request, although — well, I'm going to grant the request in
21   the sense that I'm going to put it in the judgment, because
22   you know — and you need to tell your client this and his
23   family — I can't order the BOP to do that. Well, I can order
24   them to do it, but they won't do it.
25             MR. KOFFSKY: Right.

Sue Ghorayeb, Official Court Reporter

1           THE COURT:  They might do it, they might not do it.

2    It's up to them.  It's a function of space and facilities and

3    programs and everything else.  So, I'll put it in the

4    judgment, but it's not guaranteed that he's going to get it.

5           MR. KOFFSKY:  Correct.

6           THE COURT:  That's just my experience.

7           MR. KOFFSKY:  And the only other thing I would

8    request, Your Honor, is self-surrendering by my client.

9           THE COURT:  Well, I'm willing to do that.  You know,

10   Judge Brieant used to say — I know this because I heard him

11   say it over and over again — "the sooner you get started, the

12   sooner you get finished," which is a way of saying why?  Do

13   you really want to self-surrender?  Why don't you start now?

14          But unless the Government has an objection — well,

15   even if they do have an objection, I might overrule it.  But

16   let me ask you:  Does the Government have any objection to a

17   self-surrender date?

18          MR. KOFFSKY:  If I just may speak briefly just

19   before the Government answers?

20          THE COURT:  Just a second, Ms. Keenan.  Go ahead.

21          MR. KOFFSKY:  Certainly, the Court knows that

22   self-surrendering is a positive when —

23          THE COURT:  When BOP decides where to place him.

24          MR. KOFFSKY:  — when BOP decides.  So, you know,

25   this is not a drug case, this is a crime of violence —

Sue Ghorayeb,  Official Court Reporter

1              THE COURT:  Right.

2              MR. KOFFSKY:  — and that's going to be looked at

3    when they decide where Mr. McCoy should be housed.  It's a

4    short sentence, but it's for a violent crime.  And I would ask

5    the Court to allow him to self-surrender, because another

6    point or two might deprive him of his opportunity to go to a

7    place like the camp at Otisville.

8              THE COURT:  Okay.

9              MR. KOFFSKY:  But there is a particular reason for

10   it.

11             THE COURT:  I understand.  It's not crazy.

12             Ms. Keenan, do you have any view on this?

13             MS. KEENAN:  No objection, Your Honor.

14             THE COURT:  All right.  Okay.  So, we're going to

15   make it — well, I'm going to make it 45 days out, because,

16   again, if I make it any less than that, I often get a letter

17   or note at some point saying, "oh, we haven't gotten our

18   designation yet."  So, to avoid that happening, I want to make

19   it 45 days out or approximately 45 days out, which is October

20   4th, which is a Monday, October 4th, 2021, 2:00 p.m., to the

21   institution designated by the Bureau of Prisons.  That will be

22   included in the judgment.

23             The bail conditions that have applied up until now,

24   which, of course, includes home detention, I will continue

25   those pending surrender.  So, Mr. McCoy, that means that

Sue Ghorayeb,  Official Court Reporter

1    you're still required to, of course, not commit any new

2    crimes, but also you're still required to adhere to the home

3    detention requirements that have been in place for some time

4    now until the date of your self-surrender.  Do you understand

5    that?

6                THE DEFENDANT:  Yes, Your Honor.

7                THE COURT:  And I just want to add one last thing.

8                I don't — sometimes I hear lawyers — I don't

9    think you did this actually, Mr. Koffsky.  Sometimes lawyers

10   say something like, "jail is not going to do anything good

11   for the defendant," and in this case I kind of agree with

12   that.  It's not a good thing for the Defendant to go to jail,

13   but, of course, that's not the only consideration here,

14   right.  The only consideration is what's fair and what's

15   just, and what about the victim, and what about promoting

16   respect for the law.  So, yeah, it doesn't do a lot for the

17   Defendant, other than hopefully deter him from engaging in

18   this sort of thing in the future, but that's not the only

19   consideration, and it's not just what's good for the

20   Defendant; it's what's good for the community, what's good

21   for the victim, what's good for the due administration of

22   justice.

23                So, I am not at all pleased or happy that I'm

24   imposing this sentence.  Of course, I could have imposed a

25   much more severe sentence.  I'm not doing that.  But I'm not,

                Sue Ghorayeb,  Official Court Reporter

1    I'm not — I'm wearing a mask, so you can't see what I'm

2    doing, but I'm not smiling like this is, you know, this is

3    going to be just great.  It's not going to be great, it going

4    to stinks.  I can use other words as well.  But, Mr. McCoy,

5    you need to hear this loud and clear, okay?

6               This is actually the second time that you've

7    encountered the criminal justice system because of violent

8    conduct that you have engaged in.  This is much worse than

9    the first one, but it's the second time.  There shall not be

10   a third time.  I know who you are.  I know that there's a

11   limit to your ability to kind of process information, but

12   that's pretty black and white.  That should not be hard for

13   you to understand.  So, let me ask you.  Do you understand

14   that?  Do you understand what I'm saying?

15               THE DEFENDANT:  Yes, Your Honor.

16               THE COURT:  Okay.  Great.  Good luck to you.  I wish

17   you the best.  Thank you, everybody.

18               THE CLERK:  All rise.  This Court will be in recess.

19               (Case concluded)

20

21

22

23

24

25

Sue Ghorayeb,  Official Court Reporter

A321

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.                                                              **Order of Restitution**

LORENZO MCCOY,

                    Defendant.                                  S2 19 Cr. 549 (VB)

        Upon the application of the United States of America, by its attorney, Audrey Strauss,

United States Attorney for the Southern District of New York, Nicholas S. Bradley and Lindsey

Keenan, Assistant United States Attorneys, of counsel; the presentence report; the Defendant's

conviction on Counts One and Two of the above Superseding Information; and all other

proceedings in this case, it is hereby ORDERED that:

        1.      **Amount of Restitution**

        Lorenzo McCoy, the Defendant, shall pay restitution in the total amount of $2,300,

pursuant to 18 U.S.C. § 3663; 18 U.S.C. § 3663A (MVRA), to the victim of the offenses charged

in Counts One and Two.  The name, address, and specific amount owed to the victim is set forth

in the attached Schedule of Victims, attached hereto as Schedule A.  Upon advice by the United

States Attorney's Office of a change of address of a victim, the Clerk of the Court is authorized to

send payments to the new address without further order of this Court.

        **A.      Joint and Several Liability**

        Restitution is joint and several with the following defendant in the following case:

Jordan Taylor, 19 Cr. 549 (VB)

2.    **Schedule of Payments**

Pursuant to 18 U.S.C. § 3664(f)(2), in consideration of the financial resources and other assets of the Defendant, including whether any of these assets are jointly controlled; projected earnings and other income of the Defendant; and any financial obligations of the Defendant; including obligations to dependents, the Defendant shall pay restitution in the manner and according to the schedule that follows:

In the interest of justice, restitution shall be payable in installments pursuant to 18 U.S.C. § 3572(d)(1) and (2). The Defendant shall commence monthly installment payments of $50, payable on the last day of each month until restitution is fully paid.

3.    **Payment Instructions**

The Defendant shall make restitution payments by certified check, bank check, money order, wire transfer, credit card or cash.  Checks and money orders shall be made payable to the "SDNY Clerk of the Court" and mailed or hand-delivered to: United States Courthouse, 500 Pearl Street, New York, New York 10007 - Attention: Cashier, as required by 18 U.S.C. § 3611. The Defendant shall write his/her name and the docket number of this case on each check or money order.   Credit card payments must be made in person at the Clerk's Office.  Any cash payments shall be hand delivered to the Clerk's Office using exact change, and shall not be mailed.  For payments by wire, the Defendant shall contact the Clerk's Office for wiring instructions.

4.    **Additional Provisions**

The Defendant shall notify, within 30 days, the Clerk of Court, the United States Probation Office (during any period of probation or supervised release), and the United States Attorney's Office, 86 Chambers Street, 3rd Floor, New York, New York 10007 (Attn: Financial Litigation

Unit) of (1) any change of the Defendant's name, residence, or mailing address or (2) any material change in the Defendant's financial resources that affects the Defendant's ability to pay restitution in accordance with 18 U.S.C. § 3664(k). If the Defendant discloses, or the Government otherwise learns of, additional assets not known to the Government at the time of the execution of this order, the Government may seek a Court order modifying the payment schedule consistent with the discovery of new or additional assets.

    **5.**    **Restitution Liability**

The Defendant's liability to pay restitution shall terminate on the date that is the later of 20 years from the entry of judgment or 20 years after the Defendant's release from imprisonment, as provided in 18 U.S.C. § 3613(b). Subject to the time limitations in the preceding sentence, in the event of the death of the Defendant, the Defendant's estate will be held responsible for any unpaid balance of the restitution amount, and any lien filed pursuant to 18 U.S.C. § 3613(c) shall continue until the estate receives a written release of that liability.

    **6.**    **Sealing**

Consistent with 18 U.S.C. §§3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of victim, the Schedule of Victims, attached hereto as Schedule A, shall be filed under seal, except that copies may be retained and used or disclosed by the Government, the Clerk's Office, and the Probation Department, as need be to effect and enforce this Order, without further order of this Court.

SO ORDERED:

_____
THE HONORABLE VINCENT L. BRICCETTI
UNITED STATES DISTRICT JUDGE

8/19/2021
_____
DATE

3

AO 245B (Rev. 09/19)   Judgment in a Criminal Case   (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| LORENZO McCOY | ) Case Number:  S2 19 CR 549-2 (VB) |
| | ) USM Number:  86811-054 |
| | ) |
| | )  Bruce D. Koffsky, Esq. |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)   1, 2

☐ pleaded nolo contendere to count(s)
  which was accepted by the court.

☐ was found guilty on count(s)
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:2119 | Carjacking | 4/10/2019 | 1 |
| 18:371 | Conspiracy to Commit Carjacking | 4/10/2019 | 2 |

The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   The Underlying Indictment   ☑ is   ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/19/2021
_____
Date of Imposition of Judgment

_____
Signature of Judge

Vincent L. Briccetti, U.S.D.J.
_____
Name and Title of Judge

8/19/2021
_____
Date

AO 245B (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

| | Judgment — Page 2 of 7 |

DEFENDANT:  LORENZO McCOY
CASE NUMBER:  S2 19 CR 549-2 (VB)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

6 Months.
This sentence is imposed on each of Counts One and Two, to run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

That defendant be designated to FCI Otisville Satellite Camp.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☑ before 2 p.m. on   10/4/2021_____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

| | | Judgment—Page | 3 | of | 7 |

DEFENDANT:   LORENZO McCOY
CASE NUMBER:   S2 19 CR 549-2 (VB)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 Years.
This sentence is imposed on each of Counts One and Two, to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
        ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | | | |
|---|---|---|---|---|---|
| | | | Judgment—Page | 4 | of | 7 |

DEFENDANT: LORENZO McCOY
CASE NUMBER: S2 19 CR 549-2 (VB)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3D — Supervised Release

| | Judgment—Page | 5 | of | 7 |
|---|---|---|---|---|

DEFENDANT: LORENZO McCOY
CASE NUMBER: S2 19 CR 549-2 (VB)

## SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant must not have contact with the victim in this case.  This includes any physical, visual, written, or telephonic contact with such person.  Additionally, the defendant must not directly cause or encourage anyone else to have such contact with the victim.

2.  The defendant must participate in an outpatient mental health treatment program approved by the United States Probation Office.  The defendant must continue to take any prescribed medications unless otherwise instructed by the health care provider.  The defendant must contribute to the cost of services rendered based on his ability to pay and the availability of third party payments.  The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the health care provider.

3.  The defendant must provide the probation officer with access to any requested financial information.

4.  The defendant must not incur any new credit charges or open additional lines of credit without the approval of the probation officer unless he is in compliance with the installment payment schedule.

5. The defendant must submit his person, and any property, residence, vehicle, papers, effects, computer, other electronic communication or data storage devices, cloud storage or media, to a search by any United States Probation Officer, with the assistance of any law enforcement if needed.  The search is to be conducted upon reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the defendant.  Failure to submit to a search may be grounds for revocation of release.  The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.  Any search shall be conducted at a reasonable time and in a reasonable manner.

6.  The defendant shall be supervised by his district of residence.

Case 21-2098, Document 56, 08/30/2022, 3275066, Page178 of 185

**A329**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

| | | | Judgment — Page | 6 | of | 7 |
|---|---|---|---|---|---|---|

DEFENDANT: LORENZO McCOY
CASE NUMBER: S2 19 CR 549-2 (VB)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ 2,300.00 | $ 0.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Clerk, U.S. District Court, SDNY, 500 Pearl Street, New York, NY 10007, to be remitted to victim (see separate order regarding restitution to victim) | $2,300.00 | $2,300.00 | |
| **TOTALS** | $ 2,300.00 | $ 2,300.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☑ the interest requirement is waived for the   ☐ fine   ☑ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**A330**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT:  LORENZO McCOY
CASE NUMBER:  S2 19 CR 549-2 (VB)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __200.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☑  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

    Restitution shall be paid in monthly installments of at least $50 over the period of supervision, to commence 30 days after release from imprisonment.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| Jordan Taylor 19cr549-1 (VB) | 2,300.00 | 2,300.00 | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

**United States District Court**

Southern _____ District of New York

RECEIVED
AUG 2 6 2021
U.S.D.C.
W.P.

Caption:

USA _____ v.

LORENZO MCCOY
_____

Docket No.: 7:19-cr-549 (VB)

Briccetti, USDJ
_____
(District Court Judge)

Notice is hereby given that Lorenzo McCoy _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ✔, other | _____

entered in this action on August 20, 2021 . (specify)
                          (date)

This appeal concerns: Conviction only | ✔   Sentence only |___|   Conviction & Sentence |___   Other |___

Defendant found guilty by plea | ✔ | trial | | N/A |

Offense occurred after November 1, 1987? Yes | ✔ | No |      N/A |

Date of sentence: August 19, 2021 _____   N/A |___|

Bail/Jail Disposition: Committed |___|   Not committed | ✔ | N/A |

Appellant is represented by counsel? Yes ✔ | No |    | If yes, provide the following information:

Defendant's Counsel:   Bruce D. Koffsky

Counsel's Address:   Koffsky & Felsen, LLC

1150 Bedford Street, Stamford, CT 06905

Counsel's Phone:   203-327-1500

Assistant U.S. Attorney:   Lindsey Keenan, Esq.

AUSA's Address:   1 St. Andrew's Plaza New York, NY 10007

AUSA's Phone:   212-637-2634

Signature

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

### United States District Court

Southern _____ District of New York _____

Caption:

USA _____ v.

LORENZO MCCOY

Docket No.: 7:19-cr-549 (VB)

Briccetti, USDJ

(District Court Judge)

Notice is hereby given that Lorenzo McCoy _____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment ✔, other | _____

(specify)

entered in this action on August 20, 2021 _____.

(date)

This appeal concerns: Conviction only | ✔   Sentence only |___|   Conviction & Sentence |___   Other |___

Defendant found guilty by plea | ✔  | trial |    | N/A | .

Offense occurred after November 1, 1987?   Yes | ✔ |   No |     N/A |

Date of sentence: August 19, 2021 _____   N/A |___|

Bail/Jail Disposition: Committed |___|   Not committed | ✔ |   N/A |

Appellant is represented by counsel?   Yes | ✔ | No |    |   If yes, provide the following information:

Defendant's Counsel:   Bruce D. Koffsky

Counsel's Address:   Koffsky & Felsen, LLC

1150 Bedford Street, Stamford, CT  06905

Counsel's Phone:   203-327-1500

Assistant U.S. Attorney:   Lindsey Keenan, Esq.

AUSA's Address:   1 St. Andrew's Plaza New York, NY 10007

AUSA's Phone:   212-637-2634

Signature

LAW OFFICES OF

# KOFFSKY & FELSEN, LLC

1150 BEDFORD STREET
STAMFORD, CONNECTICUT 06905
(203) 327-1500
FACSIMILE (203) 327-7660
www.koffskyfelsen.com

BRUCE D. KOFFSKY
AUDREY A. FELSEN
—————
NATASHA STREITZ
CERTIFIED PARALEGAL

777 WESTCHESTER AVENUE
SUITE 101
WHITE PLAINS, NY 10604
(800) 637-3363

August 23, 2021



Clerk's Office
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

>        Re:    **United States v. Lorenzo McCoy**
>               **Case No.: 7:19CR549 (VB)**

Dear Sir/Madam:

Enclosed please find an original Notice of Appeal Form A and a copy of which I am filing on behalf of Mr. McCoy regarding the above-referenced matter. Please send the copy stamped by the Court to our office at above-listed address.

If you have any questions or require any additional documentation, please contact me at the above-listed number.

Very truly yours,

Bruce D. Koffsky

BDK/ns
Encl.

cc:    AUSA Lindsey Keenan
       1 St. Andrew's Plaza, New York, NY 10007

KOFSKY & FELSEN, LLC
1150 BEDFORD STREET
STAMFORD, CONNECTICUT 06905

USMP
SDNY
WP

7017 1000 0000 2075 8888

CERTIFIED MAIL®

FIRST-CLASS

Clerk's Office
Southern District Court for New York
300 Quarropas Street
White Plains, NY 10601-4150





RECEIVED
AUG 2 6 2021
U.S.D.C.
W.P.

02  7H
0001130554
AUG 23 2021
MAILED FROM ZIP CODE 06905

★★★ PITNEY BOWES ★★★
US POSTAGE
$ 006.96°

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,                 :
                                          :        **ORDER**
v.                                        :
                                          :        S2 19 CR 549-2 (VB)
LORENZO MCCOY,                            :
                           Defendant.    :
-------------------------------------------------------x

Defendant's motion for bail pending appeal is DENIED.

Without reviewing the entire procedural history of this case, suffice to say that, at the

time of sentencing on defendant's guilty plea to carjacking and conspiracy to commit carjacking,

which involved the knifepoint beating and robbery of the victim in this case, the Court was

acutely aware of the extent of defendant's mental health and cognitive issues.  Indeed, the

principal reason why the Court was so aware of these issues was the highly professional and

diligent manner in which prior defense counsel, Bruce D. Koffsky, Esq., investigated the relevant

facts of his client's mental health history and presented those facts to the Court.  Among other

things, Mr. Koffsky obtained a psychological evaluation of his client in 2020.  He later moved

for a hearing to determine his client's mental competency, pursuant to 18 U.S.C. § 4241, which

motion the Court granted.  Defendant thereafter underwent a thorough forensic psychological

examination.  A report of that examination was presented to the Court prior to defendant's guilty

plea, and re-presented to the Court at the time of sentencing.  Mr. Koffsky presented voluminous

other relevant mitigating information at sentencing, including several other psychological

evaluations, including the report of the evaluation he obtained in 2020.  Mr. Koffsky also made a

sentencing argument in favor of a noncustodial sentence.  The Court carefully considered all of

Mr. Koffsky's submissions and arguments, and ultimately imposed a sentence of 6 months'

imprisonment, which represented a substantial downward variance from the applicable

1

Sentencing Guidelines range of 51-63 months' imprisonment.  For these and other reasons, the

Court finds that Mr. Koffsky did an extraordinarily capable job on behalf of his client, and that

any claim of ineffective assistance of counsel is simply frivolous.

In short, the likelihood of a reversal or remand based on a claim of ineffective assistance

of counsel is zero.  Put another way, defendant's appeal does not raise a "substantial question of

law or fact likely to result in . . . a sentence that does not include a term of imprisonment."  18

U.S.C. § 3143(b)(1)(B)(3).

Defendant shall surrender for the service of his sentence on October 18, 2021, at the

institution designated by the Bureau of Prisons.

Dated:  October 5, 2021
        White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge